UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| COLLEEN GALLAGHER, et al.,<br><br>    Plaintiffs,<br><br>    v.<br><br>BAYER AG, et al.,<br><br>    Defendants. | Case No. 14-cv-04601-WHO<br><br>**ORDER DENYING MOTION TO DISMISS AND GRANTING MOTION TO APPOINT CLASS COUNSEL**<br><br>Re: Dkt. No. 59, 60, 77 |

The central question in the motion brought by defendants Bayer AG and related entities (collectively, "Bayer") to dismiss the Second Amended Class Action Complaint ("SACAC") is whether plaintiffs have plausibly alleged that Bayer's "supports heart health" and "supports immunity" claims are false or misleading. I previously held, and hold again, that those claims are structure/function claims and that preemption would apply without plausible allegations, supported by scientific evidence, that the claims are false or misleading. Plaintiffs have met their pleading burden in the SACAC by citing National Institute of Health fact sheets and other reports that cast sufficient doubt that Bayer's dietary supplement products have the benefits it claims. Accordingly, I DENY the motion to dismiss.

## BACKGROUND

I assume the truth of the allegations in the SACAC. *See Usher v. City of Los Angeles*, 828 F.2d 556, 561 (9th Cir. 1987). Plaintiffs contend that Bayer "sell[s] many varieties of Supplements targeted at different segments of the population based on age, gender, and even health concerns," but that "all of Bayer's One A Day Supplements are essentially the same product." SACAC ¶ 5 [Dkt. No. 58]. They challenge three claims made by Bayer in the marketing of its supplements: that the supplements support (i) "heart health;" (ii) "immunity;" and (iii) "physical energy" (collectively, "Claims"). *Id.* ¶ 6. The Claims used to market the

supplements are "based on one or more of the same 11 vitamins and minerals found in every One A Day variety," but these vitamins and minerals "do[] not affect the heart health, immunity, or energy levels of the majority of Americans to whom Bayer markets its Supplements." *Id.* ¶ 7. These Claims have been misrepresented, as they only apply to consumers who are suffering from vitamin or mineral deficiencies, and not to the majority of the general consumer population. *Id.* ¶ 8.

Bayer claims that its One A Day Supplements support heart health on its website, product packaging, and in print and television advertisements. *Id.* ¶¶ 34-35. For example, the product packaging of One A Day Women's Formula states that it supports "heart health," among other things, and a television advertisement for One A Day Men's 50+ claimed that it "[s]upports heart and eye health." *Id.* ¶¶ 35-36. Plaintiffs contend that studies have proven that supplements with the same vitamins do not support heart health. *Id.* ¶ 38. Accordingly, plaintiffs assert that Bayer's "heart health" claim is "false and misleading," and therefore constitutes "illegal marketing and advertising" as well as an "illegal structure/function claim." *Id.* ¶¶ 41-42, 44. Furthermore, plaintiffs assert that the "heart health" claim is an "illegal disease-prevention claim," because "Bayer represents throughout its marketing campaign that its One A Day Supplements can be used in the cure, mitigation, treatment, or prevention of heart disease." *Id.* ¶ 48.

Plaintiffs make similar allegations about Bayer's "immunity" claim, stating that such claims are made on Bayer's website, product packaging, and in print and television advertisements. *Id.* ¶ 50. Bayer's marketing and advertisements "link [the 'supports immunity' claim] to the concept of getting sick less often or otherwise having some support for consumers' immune systems." *Id.* ¶ 52. For example, a magazine advertisement for One A Day Vitacraves prominently stated "Immunity support in a gummy? Sweet," while the label for One A Day Essential Supplement lists "Immunity" as one of the things the supplement is "formulated to support." *Id.* ¶¶ 53-54. These immunity claims are false because "scientific studies confirm that supplementation with these vitamins and minerals has no effect on the immunity of the majority of adults in developed countries like the United States." *Id.* ¶ 56. Because of this scientific evidence, plaintiffs contend that "Bayer's immunity Claim is false and misleading," "constitutes illegal

marketing and advertising," and is an "illegal structure/function claim." *Id.* ¶¶ 61-63. It is also an "illegal disease-prevention claim" because Bayer's marketing campaign represents that its supplements "can be used in the cure, mitigation, treatment, or prevention of disease." *Id.* ¶ 67.

Each of the plaintiffs alleges that they relied on these representations when purchasing Bayer One A Day Women's Supplement. *Id.* ¶¶ 19-23. The Claims were made "to mislead consumers about the nature, composition, and nutritional and health benefits of [Bayer's] One A Day Supplements in order to make these Supplements more desirable to consumers, increase sales, and gain market share." *Id.* ¶ 29.

Based on these allegations, plaintiffs assert causes of actions under California, Florida, and New York consumer protection laws and allege that Bayer deceptively "misrepresent[ed] the health benefits of varieties of its One A Day multivitamin/multimineral supplements." SACAC ¶ 1. I previously dismissed the "heart health" and "immunity" claims with leave to amend because they are structure/function claims and plaintiffs failed to plead falsity plausibly. Order at 1 [Dkt. No. 54]. Bayer again seeks dismissal of the "heart health" and "immunity" claims, arguing that they are preempted as "structure/function" claims expressly approved by the FDA and do not adequately plead the that the claims are false. Mot. at 1 [Dkt. No. 59]. I heard argument on July 16, 2015.

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 12(b)(6), a district court must dismiss a complaint if it fails to state a claim upon which relief can be granted. To survive a Rule 12(b)(6) motion to dismiss, the plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible when the plaintiff pleads facts that "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). There must be "more than a sheer possibility that a defendant has acted unlawfully." *Id.* While courts do not require "heightened fact pleading of specifics," a plaintiff must allege facts sufficient to "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555, 570.

3

1    In deciding whether the plaintiff has stated a claim upon which relief can be granted, the
Court accepts the plaintiff's allegations as true and draws all reasonable inferences in its favor.
*See Usher*, 828 F.2d at 561. However, the court is not required to accept as true "allegations that
are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *In re Gilead
Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008).

## DISCUSSION

### I. MOTION TO DISMISS

In the prior Order, I found that the "supports heart health" and "supports immunity" claims are "structure/function" claims as defined by the Federal Food, Drug, and Cosmetic Act ("FDCA"). Order at 9-11. A structure/function claim is a statement that:

> claims a benefit related to a classical nutrient deficiency disease and discloses the prevalence of such disease in the United States, describes the role of a nutrient or dietary ingredient intended to affect the structure or function in humans, characterizes the documented mechanism by which a nutrient or dietary ingredient acts to maintain such structure or function, or describes general well-being from consumption of a nutrient or dietary ingredient.

21 U.S.C. § 343(r)(6)(A); *see also* 21 C.F.R. § 101.93(f). Alternatively, a disease claim is an express or implied statement that claims "to diagnose, mitigate, treat, cure, or prevent a specific disease or class of diseases." 21 U.S.C. § 343(r)(6)(C); *see also* 21 C.F.R. 101.93(g). Unlike a disease claim, a structure/function claim need only be "truthful and not misleading" and does not require approval by the FDA. 21 U.S.C. § 343(r)(3), (r)(6)(B); *see also* 21 C.F.R. § 101.93(f).

Preemption occurs where application of state laws would impose additional or inconsistent burdens on manufacturers as compared to the burdens imposed by the FDCA. *See Bronson v. Johnson & Johnson, Inc.*, 12-cv-04184-CRB, 2013 WL 1629191, at *6 (N.D. Cal. Apr. 16, 2013) (section 343(r)(6) "preempt[s] any state law that is not identical to the federal structure/function guidelines for dietary supplements"); *Wilson v. Frito-Lay N. Am., Inc.*, 12-cv-1586-SC, 2013 WL 1320468, at *7 (N.D. Cal. Apr. 1, 2013) ("[t]he FDCA, as amended by the NLEA [Nutritional Labeling and Education Act], contains an express preemption provision, making clear that state laws imposing labeling requirements not identical to FDA mandates are preempted"). "Courts in this district have generally found express preemption under the FDCA only when: (1) the FDA

4

requirements with respect to a particular food label or package are clear; and (2) the product label or package at issue is in compliance with that policy, such that plaintiff necessarily seeks to enforce requirements in excess of what the FDCA, NLEA, and the implementing regulations require." *Pratt v. Whole Foods Mkt. Cal., Inc.*, 12-cv-05652-EJD, 2014 WL 1324288, at *5 (N.D. Cal. Mar. 31, 2014).

Structure/function claims are not preempted if they are alleged to violate the FDA or analogous provisions by being false or misleading. *See* Regulations on Statements Made for Dietary Supplements Concerning the Effect of the Product on the Structure or Function of the Body, 65 FR 1000 at 1003 ("Section 403(a)(1) of the act already subjects all food claims, including structure/function claims on dietary supplements, to the 'truthful and non-misleading' standard.").

**A. Heart Health and Immunity Claims as Disease Claims**

In the prior Order, I directed plaintiffs to disprove my conclusion that the "supports heart health" claim is a structure/function claim preempted by the FDCA by pointing to "*specific* language on the packaging, websites, or advertisements of the Supplements that would take the 'supports heart health' language and move it towards a disease claim." Order at 10. I further directed that plaintiffs should "plead facts showing that this Statement has been linked – by virtue of specifically identified packaging or marketing – to treatment or prevention of cardiovascular disease." *Id.* at 11.

Plaintiffs point to two ways in which the SACAC has linked the "supports heart health" and "supports immunity" claims to disease. First, they included more legal information to explain that "[a]ny claim that implies that a product can be used to diagnose, cure, mitigate, treat, or prevent disease is an illegal disease claim, even if it uses the term 'supports.'" Oppo. at 2 [Dkt. No. 61]; SACAC ¶¶ 43-48, 62-67. But adding information about the legal context does not address the pleading problems that I identified in the prior Order, nor does it include any facts related to this case that would support a plausible disease claim.

Second, plaintiffs commissioned an unpublished consumer perception survey that showed participants One A Day Supplement packaging, and that concluded that "many of Bayer's

5

consumers . . . interpret 'supports heart health' as a disease-prevention claim." SACAC ¶ 46. According to plaintiffs, the survey also "shows that many of Bayer's consumers will interpret 'supports immunity' as a disease-prevention claim," as approximately 30% of participants examined the labeling of One A Day Women's products and believed that the products might help people get sick less often, help the body's ability to resist infection, or help prevent disease generally. SACAC ¶¶ 64-66.[1]

The results of this survey do not show that "supports heart health" or "supports immunity" are disease claims as opposed to structure/function claims. In the prior Order, I found that "[p]laintiffs' argument that Bayer's 'supports heart health' Statement is instead, as interpreted by a reasonable consumer, an impermissible disease claim, is preempted." Order at 10. Once again, plaintiffs "have pointed to no *specific* language on the packaging, websites, or advertisements" that illustrates how "supports heart health" or "supports immunity" have been linked to the treatment or prevention of cardiovascular disease.[2] *Id.*

Accordingly, the Claims may be treated only as structure/function claims.[3]

### B. Lack of substantiation or falsity

Defendants next argue that plaintiffs failed to plead that the "support heart health" and "support immunity" structure/function claims are false. Mot. at 4. I disagree.

---

[1] I GRANT defendants' motion to strike plaintiffs' statement of recent authority and do not consider it because it does not comply with Civil Local Rule 7-3. See Dkt. Nos. 76-77.

[2] Plaintiffs state that "Bayer . . . uses television advertisements to link its One A Day heart health Claims with cardiovascular disease," and provide a description of the commercial for One A Day Men's 50+ as an example. SACAC ¶ 36. However, the plaintiffs in this suit have only purchased the One A Day Women's Supplement, and have not provided any evidence that the Women's Supplement has similar television advertising. *See* Order at 10-11 n.10.

[3] This conclusion is consistent with *Hughes v. Ester C Co.*, No. 12-CV-0041 PKC GRB, 2015 WL 1469197 (E.D.N.Y. Mar. 27, 2015), a case that plaintiffs brought to my attention. *See* [Dkt. No. 70]. In that case, the court denied defendant's motion for partial summary judgment, holding that plaintiff's claims about defendant's "immune support" statements were not preempted because the plaintiffs identified other specific misleading statements in defendant's labeling and marketing that nudged the claim beyond a mere structure/function claim. *See Hughes*, 2015 WL 1469197, at \*\*5-6 ("Far from relying on an argument that Defendants' claim of 'Immune Support,' in itself, is misleading, Plaintiffs' Amended Complaint specifically identifies as misleading several other statements in Ester-C labels and marketing.").

### 1. Heart health

Plaintiffs contend that to the extent "supports heart health" is a structure/function claim, it is false and not preempted by the FDCA. Oppo. at 4-5. I gave them leave to amend to "explicitly plead – with support to scientific evidence – that Bayer's support heart health and support immunity claims are false as structure/function claims." Order at 13-14. They did, citing several scientific reports. They argue that "[b]ecause scientific evidence confirms that supplementation with [vitamins in One A Day supplements] does not support heart health, Bayer's heart health Claim is false and misleading." SACAC ¶¶ 41.

Bayer responds that the scientific studies cited by plaintiffs are only relevant to incidence of specific cardiovascular *diseases*, and are not relevant to the question of whether the vitamins at issue support heart health generally. Mot. at 4-5. At oral argument, it argued vigorously that plaintiffs conflate the requirements to plead a disease claim and structure/function claim, contending that they may not point to the vitamins' inability to prevent or treat disease to claim that the "supports heart health" structure/function claim is false.

While I agree with Bayer that structure/function claims cannot be proved false by pointing only to evidence of a product's ability to treat or prevent disease, in this case the studies are not as narrow as Bayer suggests. The SACAC cites to the National Institute of Health, Office of Dietary Supplements' ("NIH") "Fact Sheets" for vitamins B6, C, and E. Each of these fact sheets includes a section entitled "Vitamin [B6, C, or E] and Health." These sections discuss the health claims typically made about each vitamin and focus on diseases or disorders in which the vitamin might play a role. All include a section focused on cardiovascular or coronary heart disease. All also include a section that discusses health risks from excessive intake of such vitamins.

The vitamin B6 fact sheet discusses the interplay between vitamin B6, homocysteine levels, and cardiovascular disease. Vitamin B Dietary Supplement Fact Sheet, NATIONAL INSTITUTE OF HEALTH, OFFICE OF DIETARY SUPPLEMENTS, https://ods.od.nih.gov/factsheets/VitaminB6-HealthProfessional/ (last visited August 18, 2015). Most of the studies it highlights found that vitamin B6 lowered homocysteine levels but did not reduce the risk of cardiovascular disease. It states that "[t]he combined analysis of data from . . .

two [large randomized controlled] trials showed no benefit of vitamin B6 supplementation, with or without folic acid (0.8 mg/day) plus vitamin B12 (0.4 mg/day), on major cardiovascular events in 6,837 patients with ischemic heart disease." *Id.*

The vitamin C fact sheet discussed the antioxidant content of the vitamin and the effect that this had on potentially lowering the risk of cardiovascular disease. Vitamin C Fact Sheet for Health Professionals, NATIONAL INSTITUTE OF HEALTH, OFFICE OF DIETARY SUPPLEMENTS, https://ods.od.nih.gov/factsheets/VitaminC-HealthProfessional/ (last visited August 18, 2015) ("Vitamin C Fact Sheet"). It cited one study that showed that participants given vitamin C supplements "had increased cardiovascular disease mortality," and another that showed "supplements of 500 mg vitamin C plus 400 IU vitamin E twice per day not only provided no cardiovascular benefit, but significantly increased all-cause mortality compared with placebo." *Id.* Although the fact sheet focuses on the effect of vitamin C on cardiovascular disease, it includes information that has some relevance to overall heart health. *See id.* (stating that "[r]esults from most clinical intervention trials have failed to show a beneficial effect of vitamin C supplementation on the primary or secondary prevention of cardiovascular disease," and citing another study finding "no effect on major cardiovascular events in male physicians").

The vitamin E fact sheet states that vitamin E is an antioxidant, thus providing general health benefits. Vitamin E Fact Sheet for Health Professionals, NATIONAL INSTITUTE OF HEALTH, OFFICE OF DIETARY SUPPLEMENTS, https://ods.od.nih.gov/factsheets/VitaminE-HealthProfessional/#h6 (last visited August 18, 2015). It also states that vitamin E might help prevent the formation of blood clots. *Id.* However, the fact sheet additionally pointed to studies showing that "vitamin E provided no significant protection against heart attacks, strokes, unstable angina, or deaths from cardiovascular disease or other causes after 7 years of treatment." *Id.* "Participants taking vitamin E . . . were 13% more likely to experience, and 21% more likely to be hospitalized for, heart failure, a statistically significant but unexpected finding not reported in other large studies." *Id.* Again, although the factsheet ultimately discusses vitamin E's effect on heart disease, it also notes that in some studies "[n]ot only did the supplements provide no cardiovascular benefits, but all-cause mortality was significantly higher in the women taking the

8

1   supplements." *Id.* It also discusses trials that documented the effects of vitamin E on "the heart
2   and blood vessels of women" and found "no significant differences in rates of overall
3   cardiovascular events . . . or all-cause mortality." *Id.*

4   Although much of the evidence cited by the SACAC does not directly support plaintiffs'
5   claim, it provides circumstantial support and is relevant to the falsity of the "support heart health"
6   claim. There is undoubtedly a correlation between health and the absence of disease. Many of the
7   barometers of "heart health," such as homocysteine levels, are also associated with the presence or
8   absence of heart disease.

9   Moreover, the studies provide some direct evidence of the falsity of the "supports heart
10  health" claim. They state that the various supplements have no effect on "cardiovascular events,"
11  and provide evidence of vitamins' negative effect on certain indicia of "heart health."
12  Importantly, they include some indications that vitamin supplements actually harm heart health,
13  which is inconsistent with Bayer's claim that its products support heart health. Thus, even though
14  these studies discuss cardiovascular disease, they make it not only "possible," but "plausible" that
15  the vitamins do not improve heart health more generally.

16  These fact sheets distinguish plaintiffs' pleadings from the pleadings in the two cases on
17  which Bayer primarily relies. *Trujillo v. Walgreen Co.* found that "it is not inconsistent to say that
18  a nutrient 'contributes' to good cardiovascular health but cannot prevent major cardiovascular
19  diseases—which is precisely why Congress deliberately included *both* subcomponents (A) and (C)
20  under § 343(r)(6)." No. 13-cv-1852, 2013 WL 4047717, at *2 (N.D. Ill. Aug. 9, 2013), *appeal
21  dismissed* (Nov. 18, 2013). There, the court dismissed a structure/function claim because the
22  studies cited by the plaintiff also indicated that the vitamin *contributed* to cardiovascular health.
23  *Id.* at *3. The court noted that dismissal would be inappropriate "if there was no scientific
24  substantiation for the claim that antioxidants contribute to cardiovascular health." *Id.* Here, the
25  NIH fact sheets can be read to substantiate plaintiffs' claim that Bayer's dietary supplements do
26  not support heart health or immunity.

27  Bayer also cites to *Kardovich v. Pfizer, Inc.* for the proposition that a motion to dismiss
28  should be granted when the scientific studies cited by plaintiff do not support the claims made.

9

Mot. 5. However, this case relied on the extreme "mismatch" between the plaintiff's claims and the studies cited in support, and is inapposite. *See Kardovich v. Pfizer, Inc.*, No. 13-CR-7378 RRM VVP, 2015 WL 1506996, at *6-7 (E.D.N.Y. Mar. 31, 2015) (the scientific materials cited address "wholly different health issues than those underlying the representations made by defendant," or "address the health benefits of products other than multivitamins [the product at issue]"). While the fact sheets may be subject to differing interpretations, there is no extreme mismatch here.

Bayer's argument that plaintiffs' proffered studies are only relevant to the incidence of specific cardiovascular diseases, and are not determinative of whether the vitamins at issue support heart health generally, may prevail at trial. But to contend that the studies are not relevant at all imposes a higher pleading standard than the Supreme Court has established. The SACAC alleges a plausible claim that the "supports heart health" claim is false, and any further inquiry cannot be determined on a motion to dismiss. *See* Order at 14; *see also Quinn v. Walgreen Co.*, 958 F. Supp. 2d 533, 544 (S.D.N.Y. 2013) ("[t]he Court finds unavailing defendant's contention that plaintiffs' claims should be dismissed because the studies plaintiffs cite do not, in fact, support the precise propositions for which they are cited. Whether or not the studies support plaintiff's proposition . . . is an issue of fact the Court cannot resolve on a motion to dismiss"); *Vasic v. Patent Health, LLC.*, No. 13CV849 AJB MDD, 2014 WL 940323, at *4 (S.D. Cal. Mar. 10, 2014) (holding that plaintiff's claims were facially plausible because of the scientific studies cited in support, and finding that "the issue of whether the proffered studies do in fact show that Defendants' representations are provably false is a question not properly decided on a motion to dismiss"). Plaintiffs have adequately alleged falsity of the "supports heart health" claim.

### 2. Immunity

Plaintiffs also contend that the "supports immunity" claim is a false structure/function claim. Oppo. at 7-9. The SACAC alleges that "Bayer's immunity Claim is false because scientific studies confirm that supplementation with these vitamins and minerals has no effect on the immunity of the majority of adults in developed countries like the United States." SACAC ¶ 56. As with the "supports heart health" claim, it cites several sources in support, including NIH

fact sheets about the vitamins in One A Day, as well as published articles such as "Effects of Vitamin A Supplementation on Immune Responses and Correlation with Clinical Outcomes." *Id.* ¶ 56 n.25.

In addition, the SACAC states that "Bayer's immunity Claim is refuted by randomized controlled trials—the gold standard of clinical research—which show that, as measured by the number, severity, or length of illnesses, taking multivitamin/multimineral supplements does not affect immunity." *Id.* ¶ 57. It cites an article that discusses a "meta-analysis of 17 randomized controlled trials" that found no evidence for immune improvement in participants supplemented with multivitamins. *Id.* ¶ 57 n.27. Moreover, "NIH's comprehensive compilation of studies further indicates that, unless an individual suffers from rare vitamin or mineral deficiencies, Bayer's Supplements will provide no immunity support at all." *Id.* ¶ 59.

Again, Bayer asserts that the scientific studies cited in support of plaintiffs' "supports immunity" claim rely only on articles and studies dealing with disease. Mot. 5-6. It also contends that the studies prove that "the ingredients in One A Day are essential to basic immune function." *Id.* at 6. For the same reasons discussed above, studies that state that vitamins in One A Day have no effect on prevention of disease are relevant to the question of the "supports immunity" claim's falsity.

For the "supports immunity" claim, the absence of disease is even more relevant to the question of immune function, because immune function necessarily involves preventing disease. The Vitamin C factsheet that plaintiffs cite notes that vitamin C "plays an important role in immune function," but also concludes that "[o]verall, the evidence to date suggests that regular intakes of vitamin C at doses of at least 200 mg/day do not reduce the incidence of the common cold in the general population." Vitamin C Factsheet for Professionals.

In addition, the SACAC cites studies that specifically discuss the effects of vitamin supplements on immune function or reduction in illness. One study concludes that "[n]either daily multivitamin-mineral supplementation at physiological dose nor 200 mg of vitamin E showed a favorable effect on incidence and severity of acute respiratory tract infections in well-nourished noninstitutionalized elderly individuals. Instead we observed adverse effects of vitamin E on

1  illness severity." *See* J.M. Graat et al., *Effect of Daily Vitamin E and Multivitamin-mineral*
2  *Supplementation on Acute Respiratory Tract Infections in Elderly Persons: A Randomized*
3  *Controlled Trial*, 288 JAMA 715-21 (Aug. 2002), *available at*
4  http://jama.jamanetwork.com/article.aspx?articleid=195186.  Another finds that "[o]verall,
5  multivitamin and mineral supplementation does not have a significant effect on the incidence of
6  infections in institutionalized seniors."  B.A. Liu et al., *Effect of Multivitamin and Mineral*
7  *Supplementation on Episodes of Infection in Nursing Home Residents*, 55 J. AM. GERIATR. SOC.
8  35-42 (Jan. 2007), *available at* http://www.ncbi.nlm.nih.gov/pubmed/17233683; *see also* R.M.
9  Douglas et al., *Vitamin C for Preventing and Treating the Common Cold*, 3 COCHRANE DATABASE
10 SYST. REV. CD000980 (2007), *available at* http://www.ncbi.nlm.nih.gov/pubmed/17636648 ("The
11 failure of vitamin C supplementation to reduce the incidence of colds in the general population
12 indicates that routine prophylaxis is not justified.").

The studies cited in support of plaintiffs' "supports immunity" structure/function claim present both direct and circumstantial evidence of the claim's falsity.  Plaintiffs have pleaded a plausible claim that the "supports immunity" claim is a false structure/function claim.[4]

## II. MOTION TO APPOINT INTERIM CLASS COUNSEL

Rule 23(g)(3)[5] does not provide a standard for courts to use in appointing interim class counsel, although courts in this district typically consider the factors set forth in 23(g)(1).  *See Paraggua v. LinkedIn Corp.*, No. 5:12-CV-03088 EJD, 2012 WL 3763889 at *1 (N.D. Cal. Aug. 29, 2012).  These factors are: "(i) the work counsel has done in identifying or investigating potential claims in the action; (ii) counsel's experience in handling class actions, other complex

---

[4] Bayer also asks me to revisit my ruling on the "supports physical energy" claim, arguing that plaintiffs "once again misconstrue Bayer's claim and contend that Bayer claimed that consumers 'will experience increased energy.'"  Mot. at 1 n.1.  The same allegation was made in the First Amended Class Action Complaint.  Dkt. No. 36 ¶ 64.  There is no need to revisit this issue because plaintiffs did not make the allegation that Bayer contends that they did; instead, they stated that "[p]laintiffs and other reasonable consumers *interpret* Bayer's deceptive energy claims to mean that by taking Bayer's Supplements, they will experience increased energy."  SACAC ¶ 77 (emphasis added).

[5] This states that "[t]he court may designate interim counsel to act on behalf of a putative class before determining whether to certify the action as a class action."  FED. R. CIV. P. 23(g)(3).

litigation, and the types of claims asserted in the action; (iii) counsel's knowledge of the applicable law; and (iv) the resources that counsel will commit to representing the class." *Id.* (internal quotations omitted). Courts have found that "[i]nstances in which interim class counsel is appointed are those in which overlapping, duplicative, or competing class suits are pending before a court, so that appointment of interim counsel is necessary to protect the interests of class members." *Id.* (internal quotations omitted).

In opposing plaintiffs' motion to appoint class counsel, Bayer argues that appointment at this stage is premature. Dkt. No. 62 at 1. Bayer points out that there are no other suits involving these claims pending before another court, and thus no concerns of overlapping duplicative, or competing class suits. *Id.* at 1-2. It concludes that plaintiffs "can refile an appropriate motion after the pleadings are closed." *Id.* at 3.

While there do not appear to be competing or overlapping cases that may merit appointment of interim class counsel, Bayer's other arguments against appointment of class counsel are weak. Bayer's contention that there is no need to appoint counsel because this case is unsuitable for class certification is premature, and its argument that appointment would be futile due to the pending motion to dismiss fails in light of this Order. Moreover, Bayer does not argue that the Rule 23(g)(1) factors are not met.

Plaintiff has established that its proposed class counsel have knowledge of this case, experience handling class actions and knowledge of the applicable law, and the necessary resources to commit to the class. *See* Dkt. No. 60. In addition, plaintiffs have pointed to several cases in which courts have appointed interim class counsel in the absence of other class suits. *Id.* at 2-3; Dkt. No. 63 at 1. Because plaintiffs have satisfied the Rule 23(g)(1) factors, and because defendants have not argued that they will be prejudiced or any presented any other compelling reason to deny plaintiffs' motion, I GRANT the motion to appoint interim class counsel.

## CONCLUSION

For the foregoing reasons, defendants' motion to dismiss the causes of action regarding the "supports heart health" and "supports immunity" claims is DENIED. Plaintiff's motion to appoint interim class counsel is GRANTED.

**IT IS SO ORDERED**.

Dated: August 18, 2015



WILLIAM H. ORRICK
United States District Judge