Jonathan F. Cohn (*Pro Hac Vice*)
jcohn@sidley.com
Benjamin M. Mundel (*Pro Hac Vice*)
bmundel@sidley.com
SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington D.C. 20005
Telephone: (202) 736.8000
Facsimile: (202) 736.8711

Ryan M. Sandrock (SBN 251781)
SIDLEY AUSTIN LLP
555 California Street, Suite 2000
San Francisco, CA 94104
rsandrock@sidley.com

Attorneys for Defendants Bayer AG, Bayer Corporation,
Bayer Healthcare LLC

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| COLLEEN GALLAGHER, ILANA FARAR, ANDREA LOPEZ, JOANN CORDARO and ROSANNE COSGROVE, on behalf of themselves and all other similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> BAYER AG, BAYER CORPORATION and BAYER HEALTHCARE LLC, <br><br> Defendants. | Case No. 14-CV-04601-WHO <br><br> **DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION AND APPOINTMENT OF CLASS COUNSEL** <br><br> Date:  May 30, 2017 <br> Time: 2:00 pm <br> Courtroom:  17th Floor |

# REDACTED VERSION OF DOCUMENT
# SOUGHT TO BE SEALED

1

## **<u>TABLE OF CONTENTS</u>**

2   INTRODUCTION ..................................................................................................................1

3   BACKGROUND ...................................................................................................................2

4   I.      BACKGROUND ON MULTIVITAMINS ...................................................................2

5   II.     BAYER'S MARKETING OF ONE A DAY ................................................................4

6   III.    THE THREE NAMED PLAINTIFFS .........................................................................5

7   IV.     PLAINTIFFS' EXPERT TESTIMONY .....................................................................6

8   V.      PLAINTIFFS' ALLEGATIONS AND CLASS DEFINITION ..................................8

9   LEGAL STANDARD............................................................................................................8

10  ARGUMENT .........................................................................................................................9

11  I.      CERTIFICATION UNDER RULE 23(b)(3) SHOULD BE DENIED.............................9

12          A.      Common Questions Of Fact Do Not Predominate Over Individual Issues ............9

13                  1.      Plaintiffs Have No Classwide Damages Model........................................10

14                  2.      The Challenged Claims Are Not Material ................................................14

15                  3.      No Uniform Classwide Interpretation Of The Claims..............................16

16          B.      Class Litigation Is Not A Superior Method To Adjudicate This Controversy ......18

17                  1.      There Is No Manageable Way To Identify Class Members .....................18

18                  2.      A Class Action Is Not A Superior Method of Adjudication Because
19                          Congress And the FDA Determined That Multivitamins Should Be
                            Sold In The United States .......................................................................20

20  II.     CERTIFICATION OF AN INJUNCTION CLASS SHOULD BE DENIED
21          BECAUSE PLAINTIFFS ARE NOT LIKELY TO PURCHASE ONE A DAY IN
            THE FUTURE ...........................................................................................................21

22  III.    PLAINTIFFS DO NOT MEET THE PREREQUISITES FOR CLASS
23          CERTIFICATION UNDER RULE 23(a)........................................................................22

24          A.      Named Plaintiffs Will Not Adequately Represent The Interest Of The Class ......22

25          B.      Named Plaintiffs Are Not Typical Of The Classes They Seek To Represent .......23

26          C.      There Are Not Common Issues.................................................................................24

27  IV.     CERTIFICATION OF A NATIONWIDE CLASS SHOULD BE DENIED
            BECAUSE COMMON QUESTIONS WILL NOT PREDOMINATE...........................24

28  CONCLUSION....................................................................................................................24

# TABLE OF AUTHORITIES

**Cases**                                                                    **Page(s)**

*Astiana v. Ben & Jerry's Homemade, Inc.*,
  2014 WL 60097 (N.D. Cal. Jan. 7, 2014)....................................................................10, 11

*Bohn v. Pharmavite*,
  2013 WL 4517895 (C.D. Cal. Aug. 7. 2013)........................................................................22

*Bradach v. Pharmavite LLC*,
  No. 14-cv-3218 (C.D. Cal. July 6, 2016)........................................10, 14, 16, 17, 18

*Brazil v. Dole Packaged Foods LLC*,
  2014 WL 2466559 (N.D. Cal. May 30, 2014), *class decertified in part*,
  2014 WL 5794873 (N.D. Cal. Nov. 6, 2014) ..................................................................24

*Brazil v. Dole Packaged Foods LLC*,
  660 F. App'x 531 (9th Cir. 2016) ....................................................................................11

*Briseno v. ConAgra Foods, Inc.*,
  844 F.3d 1121 (9th Cir. 2017) ........................................................................................18

*Bruton v. Gerber Prods. co.*,
  2014 WL 2860995 (N.C. Cal. June 23, 2014) ................................................................19

*Bruton v. Gerber Prods. Co.*,
  2014 WL 7206633 (N.D. Cal. Dec. 18, 2014), *appeal filed*,
  No. 15-15174 (9th Cir. Jan. 30, 2015) ............................................................................16

*Caldera v. J.M. Smucker Co.*,
  2014 WL 1477400 (C.D. Cal. Apr. 15, 2014) ............................................................11, 12

*Califano v. Yamasaki*,
  442 U.S. 682 (1979)............................................................................................................8

*Comcast Corp. v. Behrend*,
  133 S. Ct. 1426 (2013)....................................................................1, 8, 9, 10, 11, 19

*In re ConAgra Foods, Inc.*,
  302 F.R.D. 537 (C.D. Cal. 2014) ............................................................14, 16, 17, 18

*English v. Apple Inc.*,
  2016 WL 1188200 (N.D. Cal. Jan. 5, 2016) ..................................................................22

*Eubank v. Pella Corp.*,
  753 F.3d 718 (7th Cir. 2014) ..........................................................................................22

*Gardner v. First Am. Title Ins. Co.*,
  2003 WL 221844 (D. Minn. Jan. 27, 2003)....................................................................20

*Gonzalez v. Proctor & Gamble Co.*,
   247 F.R.D. 616 (S.D. Cal. 2007) .........................................................................18

*Gyorke-Takatri v. Nestle USA, Inc.*,
   2016 WL 5514756 (N.D. Cal. Sept. 30, 2016) ......................................................10

*Hanon v. Dataproducts Corp.*,
   976 F.2d 497 (9th Cir. 1992) ...............................................................................23

*Hodes v. Van's Int'l Foods*,
   2009 WL 2424214 (C.D. Cal. July 23, 2009) ..................................................19, 20

*Imber-Gluck v. Google Inc*,
   2015 WL 1522076 (N.D. Cal. Apr. 3, 2015) ........................................................20

*Karhu v. Vital Pharm., Inc.*,
   2014 WL 3540811 (S.D. Fla. July 17, 2014), *aff'd*,
   621 F. App'x 945 (11th Cir. 2015) .................................................................18, 19

*Khasin v. R.C. Bigelow, Inc.*,
   2016 WL 1213767 (N.D. Cal. Mar. 29, 2016).............................8, 9, 10, 13, 14, 21

*In re Korean Ramen Antitrust Litig.*,
   2017 WL 235052 (N.D. Cal. Jan. 19, 2017) ...........................................................9

*Kosta v. Del Monte Foods, Inc.*,
   308 F.R.D. 217 (N.D. Cal. 2015).................................................................10, 14, 16, 19

*Lanovaz v. Twinings N. Am., Inc.*,
   2014 WL 1652338 (N.D. Cal. Apr. 24, 2014), *appeal filed*,
   No. 16-16628 (9th Cir. Sept. 14, 2016) ..........................................................11, 13

*London v. Wal-Mart Stores, Inc.*,
   340 F.3d 1246 (11th Cir. 2003) ...........................................................................22

*Mazza v. Am. Honda Motor Co.*,
   666 F.3d 581 (9th Cir. 2012) ...............................................................................24

*McDonough v. Toys "R" Us, Inc.*,
   638 F. Supp. 2d 461 (E.D. Pa. 2009) ...................................................................22

*Moheb v. Nutramax Labs. Inc.*,
   2012 WL 6951904 (C.D. Cal. Sept. 4, 2012) .......................................................15

*Moore v. Apple Inc.*,
   309 F.R.D. 532 (N.D. Cal. 2015).....................................................................19, 20

*In re NJOY, Inc. Consumer Class Action Litig.*,
   120 F. Supp. 3d 1050 (C.D. Cal. 2015) ................................................................17

page

*In re POM Wonderful LLC*,
   2014 WL 1225184 (C.D. Cal. Mar. 25, 2014) ..............................................................11, 12

*In re Rail Freight Fuel Surcharge Antitrust Litig.-MDL No. 1869*,
   725 F.3d 244 (D.C. Cir. 2013) ..............................................................................................10

*Red v. Kraft Foods, Inc.*,
   2012 WL 8019257 (N.D. Cal. Apr. 12, 2012) ........................................................................11

*Sandoval v. Pharmacare US, Inc.*,
   2016 WL 3554919 (S.D. June 10, 2016), *appeal filed*,
   No. 16-56301 (9th Cir. Sept. 9, 2016) ............................................................14, 15, 16, 24

*Stearns v. Ticketmaster Corp.*,
   655 F.3d 1013 (9th Cir. 2011), *abrogated on other grounds by*
   *Comcast Corp. v. Behrend*, 133 S. Ct. 1426 (2013) ......................................19, 22, 24

*Thurston v. Bear Naked, Inc.*,
   2013 WL 5664985 (S.D. Cal. July 30, 2013) ........................................................................16

*Wal-Mart Stores, Inc. v. Dukes*,
   564 U.S. 338 (2011)......................................................................................................8, 9, 22

*Werdebaugh v. Blue Diamond Growers*,
   2014 WL 2191901 (N.D. Cal. May 23, 2014), *class decertified*,
   2014 WL 7148923 (N.D. Cal. Dec. 15, 2014) ...........................................................10, 11, 14

*Xavier v. Phillp Morris USA Inc.*,
   787 F. Supp. 2d 1075 (N.D. Cal. 2011) ................................................................................19

**Statutes**

Dietary Supplement Health and Education Act of 1994, Pub. L. No. 103-417,
   108 Stat. 4,325 ........................................................................................................................20

21 U.S.C. § 321(ff) ........................................................................................................................11

21 U.S.C. § 343(r)(6) ....................................................................................................................11

Cal. Bus. & Prof. Code § 17200 .....................................................................................................8

Cal. Bus. & Prof. Code § 17500 .....................................................................................................8

Cal. Civ. Code § 1750 .....................................................................................................................8

Fla. Stat. § 501.204(1) .....................................................................................................................8

Fla. Stat. § 817.41(1) .......................................................................................................................8

N.Y. Gen. Bus. Law § 349(a) ..........................................................................................................8

N.Y. Gen. Bus. Law § 350...................................................................................................8

**Rule**

Fed. R. Civ. P. 23(b)(3)....................................................................................................9

### INTRODUCTION

Plaintiffs' motion for class certification is meritless.  To certify a class, Plaintiffs must provide a common classwide damages model showing that "damages are capable of measurement on a classwide basis." *Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1432-433 (2013).  But Plaintiffs' only damages model is based on the false premise that One A Day multivitamins (OAD) are "*worthless* to Plaintiffs and every member of the Class[]."  Dkt. 129 ("Motion") at 6.

This worthlessness theory has been repeatedly rejected by this Court, and Plaintiffs have no evidence supporting it.  Their own expert, Dr. Edward Blonz, emphatically rejected it: "I would never say that Bayer multivitamins are worthless."  Cohn Dec. Ex. 1 (Blonz Tr. 40:1-2).  In fact, Dr. Blonz believes so strongly that multivitamins provide benefits that he has been taking them for 40 years and touting them in books and articles for decades.  *Id*. (Blonz Tr. 261:24-262:1).

Explaining these benefits, Dr. Blonz stated that the "clear majority of people fail to get the [government] recommended amounts of the essential nutrients" from food.  *Id*. (Blonz Tr. 148:1-9).  This "clear majority" can obtain "benefits" from multivitamins "with respect to supporting normal hearth health," "normal immune health," and "normal energy health." *Id.* (Blonz Tr. 215:3-20).  His advice is simple:  "A daily multivitamin is an inexpensive nutrition insurance policy." "Try to take one every day." *Id*. (Blonz Tr. 210:19-25, *see also id*. 124:25-125:9,152:9-15, 200:16-22).

Dozens of leading scientific organizations agree with Dr. Blonz, including the American Dietetic Association, Harvard University, and the Mayo Clinic.  *See* Expert Dec. of Dr. Jeffrey Blumberg ¶ 37.[1]  They all recommend multivitamins to fill nutrient gaps.  *Id.*  Physicians around the country, including those treating Plaintiffs, agree.  They recommend multivitamins to their patients.

Plaintiffs' lead counsel also recognizes that multivitamins are not worthless.  He has publicly stated: "For many consumers, a daily multivitamin is an inexpensive insurance policy to make sure that one's getting the recommended daily amounts of important vitamins and minerals."  Ex. 1 (Blonz Tr. 241:11-242:7); Cohn Dec. Ex. 2.  Similarly, the organization that initially brought this suit, the Center for Science in the Public Interest, has said: "It makes sense to get roughly the Daily

---

[1] Dr. Blumberg's expert declaration is attached to Bayer's Opposition to Plaintiffs' Motion for Class Certification and Bayer's Motion for Summary Judgment.

Values for most vitamins and minerals just in case you don't get them from food." Cohn Dec. Ex. 3. Because everyone agrees that multivitamins are not worthless, Plaintiffs' damages model fails, and the Court should deny the class certification motion.

Plaintiffs' motion for class certification fails for other reasons as well. First, individualized issues predominate. Consumers purchase multivitamins for different purposes, are exposed to different advertising material, rely on different advertising claims, and obtain different benefits. Consumers have highly variable diets and unique genetic makeup that changes the way multivitamins impact them. Thus, individual inquiries related to standing, exposure to advertising, reliance, claim interpretation, materiality, and damages overwhelm common questions.

Second, a class action is not a superior method of adjudicating the case. There is no manageable way to identify absent class members, who may not know which product they purchased, which claims were made, or if they were in need of vitamins when they took the product.

Finally, named Plaintiffs—two of whom are married to Kaplan Fox employees—are too biased to represent the class and are subject to unique defenses. The Court should deny the motion.

Likewise, for the reasons stated in Bayer's summary judgment brief, Plaintiffs also fail on the merits. Plaintiffs have zero evidence that Bayer's claims are false, and their own expert agrees with Bayer that the claims are true. *See* Cohn Dec Ex. 1 (Blonz Tr. 215:3-20) (testifying that multivitamins provide "benefits with respect to supporting normal hearth health," "normal immune health," and "normal energy health"). The Court should grant summary judgment to Bayer.

**BACKGROUND**

**I.     BACKGROUND ON MULTIVITAMINS**

For hundreds of years, the scientific community has recognized that vitamins and minerals play a crucial role in supporting human health. *See* Blumberg Dec. ¶¶ 23-24, 46, 50. These compounds—including Vitamin A, B, C, D, and calcium—are the building blocks for nearly every biochemical process in the body. They are needed for "metabolism and energy release from food[,]" Ex. 1 (Blonz Tr. 85:24-86:2), "normal [heart] function[]," *id.* (Blonz Tr. 85:16-23), "the immune system," *id.* (Blonz Tr. 86:25-87:5), "fat and carbohydrate metabolism," *id.* (Blonz Tr. 86:16-20), "proper vision and skin health," *id.* (Blonz Tr. 87:16-20), "healthy bones and teeth," *id.* (Blonz Tr.

1    87:21-25), and "normal blood clotting." *Id.* (Blonz Tr. 88:9-12).

2          Recognizing the crucial role that vitamins play in supporting health, the Institute of Medicine

3    of the National Academy of Science developed the Dietary Reference Intakes ("DRIs").  Blumberg

4    Dec. ¶¶ 25-26.  The DRIs are a set of reference values that represent the most current knowledge on

5    the nutrient needs of healthy populations.  *Id.*  They have been a cornerstone of federal nutrition

6    policy since its introduction, and are used by health professionals throughout the country for diet

7    planning and nutritional assessment.  *Id.*

8          The DRIs include the Recommended Dietary Allowance (or Recommended Daily

9    Allowance) ("RDA"), which is defined as the average daily nutrient intake level sufficient to meet

10   the requirements of nearly all (97% to 98%) healthy individuals in a particular age range or life stage

11   and sex group.  Blumberg Dec. ¶ 26(b).  The RDAs are the "goals" that Americans should strive to

12   meet in their vitamin consumption.  Ex 1. (Blonz Tr. 251:9-252:23).

13         To help Americans reach their vitamin goals and improve their diets, the United States

14   Department of Health and Human Services and the United States Department of Agriculture

15   publishes the Dietary Guidelines for Americans ("DGA").  Cohn Dec. Ex. 4 (DGA at 2).  These

16   guidelines provide "recommendations about the components of a healthy and nutritionally adequate

17   diet to help promote health and prevent chronic disease."  *Id.*  By following these Guidelines,

18   Americans can ensure they generally reach the recommended intake levels of key vitamins.

19         Unfortunately, "the clear majority of people fail to get the recommended amounts of essential

20   nutrients," because they do not follow these dietary guidelines.  Ex. 1 (Blonz Tr. 153:18-21).  For

21   example, most Americans do not eat enough fruits, vegetables, and whole grains, and eat too many

22   sugars, sodium, and saturated fats.  *Id.* (Blonz Tr. 248:12-23).  The Dietary Guidelines note that

23   "some nutrients are consumed by many individuals in amounts below," not just the "goals" set forth

24   in the RDAs, but also "the Estimated Average Requirements (EARs)," which provide even lower

25   targets.  Ex. 4 (DGA at 60, 79, 91).  (The EAR is the average daily nutrient intake level estimated to

26   meet the requirement of only half of the healthy individuals in a particular life stage and sex group.)

27         The Dietary Guidelines specifically identify "potassium, dietary fiber, choline, magnesium,

28   calcium, and vitamins A, D, E, and C" as under consumed nutrients.  *Id.* (DGA at 60).  And even

though individuals with inadequate vitamin and nutrient intake may "never develop a deficiency disease, a chronically deficient diet will likely have long-term health implications." Ex. 1 (Blonz Tr. 191:22-194:8). Consumption of some nutrients—"fiber, vitamin D, calcium, and potassium" —is so woefully inadequate that it is a "public health concern." *Id.* (Blonz Tr. 246:18-247:6).

A number of factors cause Americans to fall short in essential nutrients, including fluctuations in diets, stress, and exercise. Ex. 4 (DGA at 67); Ex. 1 (Blonz Tr. 217:25-221:15). It is impossible to tell which vitamin and minerals are under-consumed, without an invasive blood test. *Id.* (Blonz Tr. 152:16-23). Even the blood tests are inconclusive. *Id.* (Blonz Tr. 297:16-98:6).

To address the serious shortfall in vitamin and mineral intake, many consumers purchase multivitamin supplements. In 2011, the National Center for Health Statistics reported that, between 2003 and 2006, approximately 40% of the U.S. adult population used multivitamins. Cohn Dec. Ex. 5 (*Examination of Vitamin Intakes Among U.S. Adults,* U.S. HHS). Studies have shown that multivitamins "constitute an important source of vitamins for large segments of the adult population in the United States." Cohn Dec. Ex. 6 (*Dietary Supplement Use Among U.S. Adults Has Increased*). Countless physicians and many scientific organizations recommend multivitamins.

Dr. Blonz himself recommends multivitamins. Although he says it is better to get vitamins from food, "it's better to get the nutrients from a supplement than not at all." Ex. 1 (Blonz Tr. 138:4-14). "The body cannot tell the difference between a natural vitamin and one that is synthetically made." *Id.* (Blonz Tr. 124:11-20). He personally consumes a multivitamin and has done so for 40 years. *Id.* (Blonz Tr. 261:24-262:1). His wife also regularly takes a multivitamin, even though he says she eats well and is not nutrient deficient. *Id.* (Blonz Tr. 264:1-5).

## II.   BAYER'S MARKETING OF ONE A DAY

Bayer markets twenty four unique products in its One A Day line of multivitamins. Cappello Dec. ¶ 2. The products are marketed based on gender, age group, and health-related interest. *Id.* ¶ 3. The products have different formulations to reflect the vitamin needs of the targeted population. *Id.* ¶ 5. Each of the twenty four products contains different combinations and amounts of essential vitamins and nutrients.[2] *Id.* ¶ 4.

---

[2] Plaintiffs incorrectly suggest that all of Bayer's products are the same. This is not true. Because

4

To educate consumers about the benefits of OAD products, Bayer advertises over a dozen different structure/function claims, including helping to support: Heart Health, Immune Health, Physical Energy, Cell Health, Bone Health, Digestive Health, Metabolism, Healthy Muscle Function, Physical Activity, Mental Alertness, Skin Health, Joint Health, and Menopause Symptoms. *Id.* ¶ 6. Each label includes different claims depending in part on the formulation of the product and the health area of interest to the target demographic. *Id.* ¶ 7. Plaintiffs challenge only three of these claims—heart health, immune health, and energy—which appear on some but not all products. *Id.* ¶ 8. The Court has already ruled that these are structure/function claims, not disease claims. Order, Dkt. 78, at 7-9.

Throughout the class period, many OAD labels also included statements other than structure/function claims. Cappello Dec. ¶ 9. For example, Bayer advertised that OAD is an easy to swallow pill, is formulated with more B vitamins than prior versions of the product, sponsors Major League Baseball, and contains more pills than prior versions of the product. *Id.*

Bayer also advertises OAD multivitamins through a number of diverse channels, including television commercials, web pages, web advertisements, self-talkers, radio ads, and free standing inserts. *Id.* ¶ 10. Bayer does not utilize all types of advertisements for all of its products. *Id.* In these advertisements, Bayer sometimes includes specific structure/function claims. *Id.* ¶ 7. Other times, Bayer includes no structure/function claim at all. *Id.* ¶¶ 7, 8.

### III.   THE THREE NAMED PLAINTIFFS

Three named Plaintiffs remain in the case.[3] Plaintiff Roseanne Cosgrove is married to Kevin Cosgrove, who is the chief investigator at class counsel, Kaplan Fox. Cohn Dec. Ex. 7 (Cosgrove Tr. 208:3-8, 215:13-23). His job is to find named plaintiffs for class actions, *id.* (Cosgrove Tr. 210:9-13), and he potentially receives a bonus depending on the outcome in this case. *Id.* (Cosgrove Tr. 209:5-15). Ms. Cosgrove purchased OAD Women's with her husband at a Costco in New York in April 2014. She purchased it to support "general" or "overall health." Motion, Ex. 12 (Cosgrove

---

the government recommends different vitamin intake goals based on age group and gender, Bayer tailors its products to particular consumer segments in accordance with these government guidelines. Cappello Dec. ¶ 5. Plaintiffs misrepresent deposition testimony and the content of the products.
[3] Two named plaintiffs withdrew prior to their depositions.

Dec. ¶ 7); Ex. 7 (Cosgrove Tr. 310:3-8, 324:18-20).  She gives her kids a multivitamin "[s]o that they could get nutrients and vitamins that they need that they are potentially not getting any of or enough of in their regular daily diet." *Id.* (Cosgrove Tr. 41:15-21).  She does not remember seeing any advertising before making her purchase. *Id.*  (Cosgrove Tr. 40:19-23, 313:16-314:25).  She just looked at the price and the label on the box, but she could not remember which claims had been present and she did not save the box. *Id.* (Cosgrove Tr. 314:23-315:18, 317:6-8).

Plaintiff Ilana Farar is married to Justin Farar, who is Of Counsel at Kaplan Fox.  Cohn Dec. Ex. 8 (Farar Tr. 21:15-16, 32:18-33:3).  Mr. Farar may be working on this very case; his wife did not know. *Id.* (Farar Tr. 24:6-22, 134:25-135:5).   Ms. Farar purchased OAD Women's at CVS sometime in 2014.  She did not save the receipt, *id.* (Farar Tr. 99:24-100:2), and she cannot remember exactly when the purchase took place, but she believes it was in "summertime" of 2014. *Id.* (Farar Tr. 57:24-25).   Ms. Farar took OAD because she wanted a multivitamin that was reputable and she believes multivitamins support hair, skin, nails, immunity, energy, and her heart. *Id.* (Farar Tr. 55:9-12, 69:11-12).

Plaintiff Andrea Lopez was approached to be a class representative by her former employer, Mr. Montejo, with whom she still has "a relationship" and who has a financial interest in the case. Cohn Dec. Ex. 9 (Lopez Tr. 38:11-20, 21:19-22:1, 36:25-37:2). ██████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
██████  She thought about this recommendation when she bought OAD Women's. *Id.* (Lopez Tr. 198:15-21).  None of the named Plaintiffs used any of the twenty three other OAD products.

## IV.   PLAINTIFFS' EXPERT TESTIMONY

Plaintiffs' expert, Dr. Edward Blonz, testified that the vitamins in OAD are essential to overall good health, including supporting normal heart health, immune health, and energy.  Ex. 1 (Blonz Tr. 75:1-9, 86:3-15, 90:9-25, 91:1-92:25, 93:16-94:6, & 22-24).  He also testified that Americans should strive to consume the RDA of each vitamin, a goal set by the government, *id.* (Blonz Tr. 106:7-11, 148:1-23), and that over 90% of Americans fail to meet this target. *Id.* (Blonz Tr. 235:16-19; 259:9-25).  Failing to meet the RDA has health consequences, including for normal

6

heart health, immune health, and physical energy.  *Id.* (Blonz Tr. 235:16-236:1, 111:14-20).
Multivitamins, including OAD, help people meet the recommended dietary allowance, and thus
provide "benefits with respect to supporting normal heart health," "normal immune health," and
"normal energy health."  *Id*. (Blonz Tr. 215:3-20).[4]

Dr. Blonz's only complaint about Bayer's advertising is that there are no "randomized
controlled trials," *id.* (Blonz Tr. 198:13-15), showing a reduction in "*disease endpoints*" from taking
a multivitamin.  *Id*. (Blonz Tr. 34:25-35:11, 38:21-39:2, 167:13 & 20-24; 306:4-12).  His
requirement for disease-level randomized controlled trials is "premised on [the] position that Bayer
is making claims to try to *assuage consumers' concerns about disease risks*."  *Id*. (Blonz Tr. 308:9-
13 (emphasis added)).

Dr. Blonz admitted, however, that he is "not an expert in consumer interpretation or
impli[ed] claim[s]," and he is "not rendering an expert opinion that Bayer actually is making these
implied claims" regarding diseases.  *Id*. (Blonz Tr. 348:16-349:14).  Dr. Blonz also admitted that he
does not know of anyone, except for himself, who interprets Bayer's claims as pertaining to disease
risk.  *Id*. (Blonz. Tr. 300:2-5).

Dr. Blonz further explained that if Bayer were making only "proper structure function
claims," Bayer's substantiation would be sufficient.  *Id*. (Blonz Tr. 277:11-279:16). The Dietary
Supplement Health and Education Act would "protect[]" Bayer's claims, and his opinion requiring
randomized controlled trials would not apply.  *Id*. (Blonz Tr. 328:6-24).

Finally, Dr. Blonz testified that Bayer's claims would be "proper"—indeed, they would be
"ideal"—if Bayer had only inserted the word "normal" between "supports" and "heart health,"
"immune health," and "energy."   *Id*. (Blonz Tr. 164:14-166:1, 279:1-280:4).  Dr. Blonz asserted that
the law requires the word "normal," but he cited nothing in his deposition or in his expert report to
support this assertion.  Indeed, in his report, he did not even contend that the word "normal" made a
difference; nor have Plaintiffs ever previously raised the issue.

---

[4] Dr. Blonz also conceded that there is no safety issue with OAD multivitamins.  Ex. 1 (Blonz Tr.
135:8-17).  This concession contradicts an assertion that Plaintiffs' counsel raised at the second
hearing on Bayer's motion to dismiss.

1

## V.    PLAINTIFFS' ALLEGATIONS AND CLASS DEFINITION

2

3

Plaintiffs have brought eight counts under California, New York, and Florida law challenging Bayer's structure/function claims regarding heart health, immune health, and energy.[5]  Dkt. 58.

4

Plaintiffs previously alleged that Bayer was making *disease* claims, but the Court dismissed that

5

challenge.  Dkt. 78, at 7-9.  The Court held that Plaintiffs could proceed only with their contention

6

that Bayer's structure/function claims are false or misleading.  *Id*.

7

Plaintiffs seek to represent four broad classes—all people who purchased any OAD product

8

that contained one of the three challenged claims in (1) California, (2) Florida, (3) New York and (4)

9

the United States from October 15, 2010 to present.  Motion, at 7-8.

10

### LEGAL STANDARD

11

The "usual rule" is that "litigation is conducted by and on behalf of the individual named

12

parties only."  *Califano v. Yamasaki*, 442 U.S. 682, 700-01 (1979).  Due process and the Federal

13

Rules allow for a limited exception, permitting class litigation when the requirements of Rule 23 are

14

satisfied.  *Id.*; *Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1432 (2013).  Before certifying a class,

15

trial courts must conduct "a rigorous analysis" to determine that all of the requirements of Rule 23

16

are met.  *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350-51 (2011).

17

Rule 23(a) sets forth four prerequisites for class certification.   Plaintiffs must prove:

18

19

20

> (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.

21

*Khasin v. R.C. Bigelow, Inc.*, No. 12-cv-02204-WHO, 2016 WL 1213767, at *2 (N.D. Cal. Mar. 29,

22

2016).

23

To pursue an injunction under Rule 23(b)(2), the named Plaintiffs must establish a "real and

24

immediate threat of repeated injury."  *Id.* at *4 (quoting *Bates v. United Parcel Serv., Inc.*, 511 F.3d

25

974, 985 (9th Cir. 2007)).  Plaintiffs who say they "were previously misled by deceptive food labels"

26

27

28

---

[5] Count 1: California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200; Count 2: Consumer Legal Remedies Act ("CLRA"), Cal. Civ. Code § 1750; Count 3: California's False Advertising Law ("FAL"), Cal. Bus. & Prof. Code § 17500; Count 4: Fla. Stat. § 501.204(1); Count 5: Fla. Stat. § 817.41(1); Count 6: N.Y. Gen. Bus. Law § 349(a); Count 7: N.Y. Gen. Bus. Law § 350; Count 8: unjust enrichment.

but are now "better informed, lack standing for injunctive relief because there is no danger they will be misled in the future." *Id.* at *5.

For monetary damages, Rule 23(b)(3) imposes two additional requirements: predominance and superiority.  Predominance requires "evidentiary proof" that "questions of law or fact common to class members predominate over any questions affecting only individual members." *Comcast Corp*, 133 S. Ct. at 1432.  Superiority requires that class litigation is superior to "other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).

Rule 23 "does not set forth a mere pleading standard;" *Comcast*, 133 S. Ct. at 1432, rather the "party seeking certification must affirmatively demonstrate [] compliance with the Rule." *Wal-Mart,* 564 U.S. at 351; *In re Korean Ramen Antitrust Lit.*, 13-cv-04115-WHO, 2017 WL 235052, at *9 (N.D. Cal. Jan. 19, 2017) ("The plaintiff 'must actually prove—not simply plead—that their proposed class satisfies each requirement of Rule 23 . . . .'") (quoting *Halliburton Co. v. Erica P. John Fund, Inc*., 134 S. Ct. 2398, 2412 (2014))).  The burden rests with Plaintiffs to demonstrate satisfaction of all of Rule 23's requirements.  *Id.*; *Khasin*, 2016 WL 1213767, at *2.

## ARGUMENT

The Court should not certify a class.  *First*, Plaintiffs cannot meet the predominance or superiority requirements for a monetary damages class under Rule 23(b)(3) because (among other reasons) the premise of their motion—that OAD  is "worthless"— is flatly contradicted by their own expert.  *Second*, Plaintiffs cannot maintain an injunctive relief class under Rule 23(b)(2) because the named Plaintiffs are unlikely to purchase OAD in the future.  *Third*, neither class can be certified because the prerequisites of typicality, adequacy, and commonality under Rule 23(a) are not met. Finally, differences in the laws of the 50 states defeat predominance for the nationwide class.

## I.   CERTIFICATION UNDER RULE 23(B)(3) SHOULD BE DENIED

The Court should deny Plaintiffs' motion to certify damages classes because (A) common questions of fact or law do not predominate over individualized questions and (B) class treatment is not a superior method for adjudicating the dispute.

### A.   Common Questions Of Fact Do Not Predominate Over Individual Issues

Common questions do not predominate for three reasons.  *First*, Plaintiffs do not present a

permissible classwide damages model.  *See Comcast*, 133 S. Ct. at 1432-33.  *Second*, the challenged claims are not material to a reasonable consumer.  *See Kosta v. Del Monte Foods Inc.*, 308 F.R.D. 217, 229 (N.D. Cal. 2015) (denying certification when no classwide proof of materiality).  Third, "[c]onsumers [do not] uniformly interpret the statement[s] in a particular manner."  *Bradach v. Pharmavite*, No. 14-cv-3218-GHK, slip op. at 6-8 (C.D. Cal. July 6, 2016) (Dkt. 202).

### 1.      Plaintiffs Have No Classwide Damages Model

Predominance requires Plaintiffs to demonstrate that "damages are capable of measurement on a classwide basis."  *Comcast Corp.*, 133 S. Ct. at 1433.  "Without presenting [a classwide] methodology . . . [q]uestions of individual damage calculations will inevitably overwhelm questions common to the class."  *Id*.; *see also In re Rail Freight Fuel Surcharge Antitrust Lit.-MDL No. 1869*, 725 F.3d 244, 253 (D.C. Cir. 2013) ("No damages model, no predominance, no class certification.").  Under *Comcast*, Plaintiffs' damages methodology must also be tied to "[their] theory of liability."  *Astiana v. Ben & Jerry's Homemade, Inc.,* No. 10-cv-4387-PJH, 2014 WL 60097, at *12-13 (N.D. Cal. Jan. 7, 2014).  This means the model "must measure *only* those damages attributable to [defendant's misleading conduct]."  *Khasin,* 2016 WL 1213767, at *3

Plaintiffs cannot satisfy *Comcast*.  They present only a single theory of damages—full restitution or "the price paid for Bayer's products," Motion, at 16—and it is untenable. According to Plaintiffs, they are entitled to full restitution because Bayer's multivitamin are "*worthless* to Plaintiffs and every member of the Class[]."  *Id*. at 6; *id.* at 18 ("Products have no value").

As this Court has concluded, however, "[t]he 'full refund' method of calculating restitution has been repeatedly rejected in this district."  *Khasin*, 2016 WL 1213767, at *3  (citing *Jones v. ConAgra Foods, Inc.*, No. 12-cv-1633, 2014 WL 2702726, at *23 (N.D. Cal. June 13, 2014) (rejecting full restitution in case challenging labeling of Hunt's tomato, PAM cooking spray, and Swiss Miss hot coco); *see also Gyorke-Takatri v. Nestle USA, Inc*., No. 16-cv-03893-WHO, 2016 WL 5514756, at *3 (N.D. Cal. Sept. 30, 2016).  Courts reject the "full refund" approach because "[proper] restitution in a mislabeling case is the amount necessary to compensate the purchaser for the difference between a product as labeled and the product as received."  *Werdebaugh v. Blue Diamond Growers*, No. 12-cv-2724-LHK, 2014 WL 2191901, at *22 (N.D. Cal. May 23, 2014),

*class decertified* 2014 WL 7148923 (N.D. Cal. Dec. 15, 2014).  Plaintiff "must present a damages methodology that can determine the *price premium* attributable to [the challenged] label statements." *Id.* (emphasis added); *Brazil v. Dole Packaged Foods LLC*, 660 F.App'x. 531, 534 (9th Cir. 2016).

The "full refund" claim is particularly inappropriate where, as here, the product at issue provides "benefits in the form of calories, nutrition, vitamins, and minerals." *Werdebaugh*, 2014 WL 2191901, at *22.  Courts therefore have repeatedly rejected the full restitution damages model and denied class certification for many different types of foods.  *Id.* (rejecting full restitution in case challenging labeling of almond milk); *Lanovaz v. Twinings N. Am., Inc.* No. 12-cv-02646-RMW, 2014 WL 1652338, at *6 (N.D. Cal. Apr. 24, 2014) (green, black and white tea)); *Ben & Jerry's Homemade, Inc.*, 2014 WL 60097, at *12 (ice cream, frozen yogurt and popsicles); *Caldera v. J.M. Smucker Co.*, No. 12-cv-4936-GHK, 2014 WL 1477400, at *4 (C.D. Cal. Apr. 15, 2014) (Uncrustables, Crisco Original and Butter Flavor Shortening); *In re POM Wonderful LLC*, No. 10-ML-02199-DDP, 2014 WL 1225184, at *3 & n.2 (C.D. Cal. Mar. 25, 2014) (pomegranate juice); *Red v. Kraft Foods, Inc.*, No. 10-cv-1028-GW, 2012 WL 8019257, at *11 (N.D. Cal. Apr. 12, 2012) (Teddy Grahams, Ritz Crackers, Saltine Crackers, and other products).

These cases control.  There is no dispute that OAD multivitamins provide substantial nutritional value.[6]  Blonz Dec. at 7 & Attachment C.  Each OAD multivitamin contains 100% of the RDA of numerous essential vitamins and nutrients.  Blumberg Dec. ¶ 34.  Indeed, Plaintiffs' own expert has repeatedly recognized the health benefits of multivitamins—both in his deposition testimony and in numerous books.  Ex. 1 (Blonz. Tr. 40:1-21).  Dr. Blonz and his wife have purchased multivitamins *for decades*.  *Id.* (Blonz Tr. 261:20-262:6, 264:1-13).

Dr. Blonz also testified that the vitamins in OAD are essential for normal health including heart health, immune health, and energy.  *Id.* (Blonz Tr. 75:1-9, 86:3-15, 90:9-91:16, 92:4-94:6 & 22-24).  He agrees that Americans should consume enough of these vitamins to meet the goals—the RDAs—established by the government, and that the vast majority of Americans fail to do so.  *Id.* (Blonz. Tr. 153:18-154:2, 259:22-25, 295:17-22); s*ee also* Ex. 4 (DGA at 60 (listing "magnesium,

---

[6] Also, multivitamins are considered a food product, 21 U.S.C. § 321(ff); *id.* § 343(r)(6), but regardless of how they are classified, they indisputably provide nutrition, vitamins, and minerals.

calcium, and vitamins A, D, E, and C" as underconsumed nutrients)).  By taking a multivitamin, consumers can get closer to the RDA. Ex. 1 (Blonz. Tr. 85:5-92:11).  For this reason, as Dr. Blonz explained, OAD provides "benefits with respect to supporting normal heart health," "normal immune health," and "normal energy health."  *Id.* (Blonz Tr. 215:3-20).

Further, Dr. Blonz testified that a "daily multivitamin is a great nutrition insurance policy." He recommends: "Try to take one every day."  *Id.* (Blonz Tr.  210:19-25, *see also id.* Blonz Tr. 125:16-126:1, 152:2-15, 200:16-201:1).  Individual consumers cannot know (without blood tests) which nutrients they fall short on.  Therefore, taking a multivitamin like OAD, which provides 100% of the RDA for many essential vitamins, helps consumers get the right amount when their diets falls short.  *Id.* (Blonz Tr. 147:15-148:20) ("think of supplements as an insurance policy. . . whether it's auto, home, health or life, in modern society, we rely on insurance to cover us").

Plaintiffs cannot dispute this insurance benefit.  Ms. Cosgrove takes a multivitamin to fill gaps in her diet, and both Ms. Cosgrove and Ms. Farar give a multivitamin to their children for the same reason. Ex. 8 (Farar Depo. 52:1-17, 52:25-53:24, 54:10-20), Ex. 7 (Cosgrove Tr. 41:15-21, 299:6-10, 305:14-25).  Plaintiffs' lead counsel, Mr. Steven Gardner, is on the record agreeing that, "[f]or many consumers, a daily multivitamin is an inexpensive insurance *policy*." Ex. 2.  The Center for Science in the Public Interest, formerly Plaintiffs' counsel in this case, agrees and similarly recommends multivitamins as insurance:  "It makes sense to get roughly the Daily Values for most vitamins and minerals just in case you don't get them from food."[7]  Ex. 3.

Moreover, in addition to the insurance value—and the benefits of reaching the RDA— Plaintiffs repeatedly concede that some members of the class are vitamin deficient or at risk of becoming deficient, and thus receive benefits from multivitamins.  *See* Motion, at 5 ("unless consumers are biochemically deficient, they will experience no benefit."); Ex. 1 (Blonz Tr. 221:13-25).  These benefits further undermine Plaintiffs' full restitution damages model.  *Caldera*, 2014 WL 1477400, at *4 (rejecting full restitution model when "a single class member received a[] benefit from the products"); *In re POM Wonderful*, 2014 WL 1225184, at *3 n.2 & 5.

---

[7]  *See also* Cohn Dec. Exs. 19-21. In 2016, CSPI recommended Bayer OAD Men's 50+ Health Advantage, Men's Health, Women's 50+ Health Advantage, and OAD Women's as one of the "Best Multivitamins" for pre and post menopausal women, and for men generally.  Cohn Dec. Ex. 22.

1

2

3

4

5 The

6 other named Plaintiffs also take multivitamins pursuant to their physicians' recommendations.  Ex. 7

7 (Cosgrove Tr. 66:2-4, 67:11-25, 303:9-11); Ex. 8 (Farar Tr. 228:1-3).  Similarly, Dr. Blonz testified

8 that much of the American public is at risk of becoming deficient.  Ex. 1 (Blonz Tr. 40:1-41:22,

9 218:6-220:25 (testifying that the following groups fall short of consuming requisite amount of

10 nutrients: "infants, children, adolescents," "[o]lder adults," and "the vast majority of Americans"

11 "whose diets [do] not adhere[] to the USDA food plate, formerly food pyramid."); *see also id.* (also

12 listing those that are "[p]regnant," on a diet, "[o]bese," "taking medication[]," "[l]ow socioeconomic

13 status," "vegetarian," "vegan," and "anemic").

14          Regardless, Plaintiffs' new assertion of worthlessness is not even tied to their theory of

15 liability.  Plaintiffs have challenged only *three* out of *more than a dozen* claims made across OAD

16 labels.  Plaintiffs do not allege that OAD fails to provide the other advertised benefits, including: (1)

17 Bone Health, (2) Skin Health, (3) Cell Health, (4) Joint Health, (5) Mental Alertness, (6) Healthy

18 Muscle Function, and more.  Because there are no allegations—let alone evidence—that these

19 claims are false, Plaintiffs cannot support their damages claim that the entire product is worthless.[9]

20 *Lanovaz,* 2014 WL 1652338, at *1 (denying certification where plaintiffs failed isolate damages due

21 to challenged claims as opposed to non-challenged claims).

22          Finally*,* it "is too implausible to accept" that multivitamins are worthless to all people.

23 *Khasin,* 2016 WL 1213767, at *3.  Approximately 40% of Americans take a multivitamin.  Ex. 5.

24

25 [8] None of the other named Plaintiffs knew if they were vitamin deficient because none of them had
    been tested.  Ex. 7 (Cosgrove Tr. 299:1-10 ("[Y]ou don't know if you have the recommended intake

26 level for any vitamin, nutrient, or mineral correct? A: That's right.")); Ex. 8 (Farar Tr. 227:5-14 ("Q:
    Are you aware now of any vitamin or mineral deficiency that you have? A: No.")).

27 [9] Several of the named plaintiffs took OAD in part for these unchallenged claims.  Ex. 9 (Lopez Tr.
    59:16-17) ("It's going to help your skin look better."); Ex. 8 (Farar Tr. 55:9-12) ("I think it's good

28 for my hair and my skin and my nails.")); Ex. 7 (Cosgrove Tr. 328:6-18) ("Q" [Bone Strength] made
    you more likely to purchase the product? A: Yes.")).

Countless medical authorities recommend multivitamins: The National Institute for Health advises that "[t]aking an MVM [multivitamin] increases nutrient intakes and helps people obtain recommended intakes of vitamins and minerals when they cannot meet these needs from food alone." Cohn Dec. Ex. 10.  The Harvard School of Public Health states that "[a] daily multivitamin is an inexpensive insurance policy" and recommends:  "[t]ry to take one every day." Cohn Dec. Ex. 11.  The Linus Pauling Institute's Micronutrient Information Center advises that "[multivitamins] are a simple, inexpensive, and safe way to help fill nutritional gaps and improve micronutrient status." Cohn Dec. Ex. 12; *see also* Cohn Dec. Ex. 13.  And leading academic researchers have concluded that "the[] studies suggest that [multivitamin] supplements are beneficial among healthy individuals, and that dietary supplements in general are associated with higher nutrient intakes among Americans." Cohn Dec. Ex. 14 (*Multivitamin/Mineral Supplement Contributions to Micronutrient Intakes in the United States*).

Because Plaintiffs' only damages theory fails, the Court should deny Plaintiffs' motion to certify the 23(b)(3) classes.

### 2.   The Challenged Claims Are Not Material

Plaintiffs' motion fails for other reasons as well.  Predominance requires Plaintiffs to show that the alleged misrepresentations were material to a reasonable consumer. *Werdebaugh*, 2014 WL 2191901, at *12; *Kosta,* 308 F.R.D. at 224; *Bradach*, No. 14-cv-3218, slip op. at *8; *Sandoval v. Pharmacare U.S., Inc.*, No. 15-cv-0738-H, 2016 WL 3554919, at *4-5 (S.D. Cal. June 10, 2016), *appeal filed*, No. 16-5631 (9th Cir. Sept. 9 2016).  Materiality is an element of each of the causes of action[10] and plaintiffs must show materiality on a classwide basis.  *Kosta,* 308 F.R.D. at 230-31; *see also Khasin*, 2016 WL 1213767, at *5.

They cannot do so.  Plaintiffs have made no effort to demonstrate materiality on a classwide basis.  They have not retained a survey expert or presented any surveys showing materiality.  This alone is fatal to their claim. *In re ConAgra Foods, Inc.*, 302 F.R.D. 537, 577 (C.D. Cal. 2014) (finding "[t]he evidence plaintiffs proffer to show materiality . . . is weak at best" where plaintiffs failed to "adduce . . . survey evidence concerning the actual reaction of consumers").

---

[10] *See* cases cited in Bayer's Summary Judgment Motion.

Bayer, by contrast, retained Dr. Ran Kivetz, a marketing professor at Columbia University, to conduct two materiality surveys of 823 multivitamin consumers (one nationwide sample and the second, a sample of California, Florida, and New York purchasers).  Kivetz Dec. ¶¶ 20-21. Following methodology that has been used in countless consumer-research studies, including hundreds by Dr. Kivetz, half of the study respondents were shown the actual OAD package (the test group) and the other half were shown a control package, which was identical, except that the three challenged claims were removed (the control group).[11]  *Id.* ¶ 31.  The results of these surveys "were conclusive that there was *no* statistical difference in the likelihood of purchasing" between the test and the control groups.  *Id.* ¶ 23.  This means the challenged claims "had no material effect on the respondents' purchase decision.  *Id.*  The challenged claims are not material to the class.

Dr. Kivetz's study is confirmed by Bayer's internal market research, which shows that consumers purchase OAD for a wide range of reasons having nothing to do with any of the three challenged claims.  Kivetz Report ¶ 79.  The top three drivers of purchase are (1) providing good value for the money, (2) trusted brand, and (3) the product makes them feel like they are taking good care of themselves.  Cohn Decl. Ex. 15 (DEF-0010728).  Specific claims or benefits are *not* one of the top or key drivers of purchase.  *Id.*  Moreover, consumers largely obtain key information from their physicians, their own research, and friends/family—not advertising claims.  *Id.* (DEF-0010725; 0010739); *Moheb v. Nutramax Labs. Inc.*, No. 12-cv-3633-JFW, 2012 WL 6951904, at *7 (C.D. Cal Sept. 4, 2012) (common questions do not predominate because some "members of the Class . . . relied on the recommendations of doctors, . . . reviews, [or] articles, . . . in deciding to purchase" the product).

With no evidence of classwide materiality, Plaintiffs offer only *ipse dixit* from their counsel, Motion, at 17, and their own self-serving testimony.  But testimony from the named Plaintiffs that they found the claims to be material is not *classwide* proof that the millions of other class members did so too.  *Sandoval*, 2016 WL 3554919, at *5 ("Plaintiffs did not submit sufficient evidence that the representations were material to consumers, that any *significant* portion of consumers shared

---

[11] Consistent with removing the challenged claims, Dr. Kivetz made a number of confirming formatting changes to the control package (like matching the requisite vitamins to the proper claims) to ensure that there was no bias in the control.

their understanding of the effects [the product] would have, or that others similarly found the produc

lacking.")(emphasis added).  Materiality cannot be based on "the subjective understandings of

individual plaintiffs."  *Kosta*, 308 F.R.D. at 224; *Bruton v. Gerber Prods. Co.*, No. 12-cv-02412-

LHK, 2014 WL 7206633, at *6 (N.D. Cal.  Dec. 18, 2014) (plaintiff's testimony insufficient to

establish materiality for absent class members), *appeal filed*, No. 15-15174 (9th Cir. Jan. 30, 2015).

Further, Plaintiffs' own testimony *undermines* materiality here.  Ms. Cosgrove could not

identify which, if any, of the three claims were material to her purchase decision.  She purchased the

multivitamin at the recommendation of her physician, Ex. 7 (Cosgrove Tr. 66:2-4, 67:11-25). █████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████   Ms. Farar testified that when she was in the aisle purchasing OAD, she was thinking

"I wanted something reputable, and One A Day is very reputable." Ex. 8 (Farar Tr. 69:11-12). None

of this testimony demonstrates that the challenged claims were material to the named Plaintiffs.

### 3.     No Uniform Classwide Interpretation Of The Claims

Predominance also requires Plaintiffs to show that there is a common, classwide

interpretation of each claim, so that individualized inquiries into how each consumer interpreted the

claims are not necessary.  *Bradach*, No. 14-cv-3218, slip op. at 6-8 (no predominance when

"individualized inquiri[es] into each consumer's interpretation of 'Helps Maintain a Healthy Heart'

would be required"); *In re ConAgra Foods, Inc*, 302 F.R.D. at 576-77; *Thurston v. Bear Naked, Inc.*,

No. 3:11-cv-02890-H, 2013 WL 5664985, at *8 (S.D. Cal. July 30, 2013).  To satisfy this burden,

Plaintiffs must demonstrate that "consumers uniformly interpret the statement in a particular

manner"; otherwise, they will have "failed to show that this interpretation question would be

common to the class."  *Bradach*, No. 14-cv-3218, slip op. at 6.

Plaintiffs have no evidence of any uniform classwide interpretation of the claims.  They have

offered no expert testimony or survey evidence describing *how* consumers interpret the three claims

at all, let alone offered evidence that consumers have a *uniform* interpretation.  This too is fatal to

their motion.  *Sandoval*, 2016 WL 3554919, at *5 (plaintiffs failed to "submit sufficient evidence"

"that any significant portion of consumers shared their understanding"); *Bradach*, No. 14-cv-3218,

slip op. at 6, 8 (denying class certification when plaintiff offered "no evidence on how consumers interpret [the challenged claim]" or that it was "uniform"); *In re ConAgra Foods, Inc*., 302 F.R.D. at 576-77 (no predominance when plaintiffs offered no evidence that consumers interpret "100% Natural" claim to mean it contains no GMO ingredients).

Plaintiffs instead rely almost exclusively on their own testimony, but it disproves that there can be any uniform interpretation of the claims because all three Plaintiffs had different interpretations. Ms. Lopez interpreted Bayer as making disease claims. She testified that, to her, Immune Health means: "They will help you not to get [sick]." Ex. 9 (Lopez Tr. 201:5-8). She testified that Heart Health is "something that helps . . . heart disease not happen." *Id*. (Lopez Tr. 48:17-19, 58:8-16). Because Bayer is not making disease claims, her challenge is preempted.

Ms. Farar had a different interpretation. She stated that: "*I felt like it was a super pill*." Ex. 8 (Farar Tr. 78:20-23 (emphasis added)). She thought she "would feel really strong and I'd be able to, you know, fight off colds [and] I'd have more energy to deal with, you know, the energy it takes." *Id*. (Farar Tr. 153:19-24). She thought Heart Health meant "you can run without huffing and puffing, you can take a hike without passing out," *id*. (Farar Tr. 93:19-21), and "be able to run up and down without worry." *Id*. (Farar Tr. 102:3-7). There is no evidence that any other consumer similarly thought that OAD was a "super pill." And, insofar as Ms. Farar thought that Bayer was making disease claims, her challenge is likewise preempted.

Ms. Cosgrove never stated how she interpreted OAD advertising or any of the three claims at issue. Instead, she has simply testified that she took OAD to support her "general health." Ex. 7 (Cosgrove Tr. 310:3-8, 324:18-20); Motion, Ex. 12, ¶¶ 7, 8.

Plaintiffs' expert, by contrast, testified that he views the claims as "try[ing] to assuage consumers' concerns about disease risks." Ex. 1 (Blonz Tr. 308:9-13). As far as he knows, not a single other "person in the world shares [his] view of Bayer's claims." *Id*. (Blonz Tr. 310:2-5). The fact that the named Plaintiffs and their expert have different interpretations of the three claims— some of which are preempted—demonstrates that individual questions predominate over common ones. *Bradach*, No. 14-cv-3218, slip op. at 4; *In re ConAgra Foods, Inc.*, 302 F.R.D. at 576-77.

These varying interpretations are further complicated by the fact that Plaintiffs are

challenging dozens of different labels and hundreds of different television, web, and print ads over the entire six year class period, some of which did not have the challenged claims.  Cappello Dec. ¶ 11.  Because there is no evidence that all consumers were exposed to the challenged claims, individualized inquiries as to exposure defeat class certification.  *Gonzalez v. Proctor & Gamble Co.*, 247 F.R.D. 616, 623 (S.D. Cal. 2007) (denying class certification when "[c]lass members may have relied on different representations, while some may not have relied on, or even have been exposed to, any of the allegedly false representations"); *In re NJOY, Inc. Consumer Class Action Lit.*, 120 F. Supp. 3d 1050, 1110-11 (C.D. Cal. 2015) (declining to certify class when Plaintiffs could not show that all consumers were exposed to challenged ads).

### B.     Class Litigation Is Not A Superior Method To Adjudicate This Controversy

Rule 23(b)(3) requires Plaintiffs to show "that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Class treatment is not superior because (1) there is no manageable way to identify class members and (2) Congress and the Federal Drug Administrative have primary responsibility for determining whether multivitamins should be sold in the United States, and have rejected the notion that multivitamins are worthless.

### 1.     There Is No Manageable Way To Identify Class Members

A class action is not a superior method of adjudication when class members cannot be identified in an objective or manageable way.  *See Karhu v. Vital Pharm. Inc.*, No. 13-cv-60768, 2014 WL 3540811, at *3 n.1 (S.D. Fla. July 17, 2014) (denying class certification because of difficulty in identifying absent class members that purchased dietary supplement); *Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121, 1126, 1127-28 (9th Cir. 2017) (issues related to identifying class members should be considered under manageability criteria in Rule 23(b)(3)); *Bradach,* No. 2:14-cv-03218, slip op. at 8-9 (denying class certification when it would be a massive administrative burden on the court to conduct the inquiry as to who was harmed and who was not).

To identify injured class members here, the Court would need to identify consumers (1) who purchased OAD products, (2) containing one of the challenged claims, (3) for a challenged purpose, (4) who relied on an advertisement or label that made one of the challenged claims, and (5) who were not vitamin deficient.  Each of these steps renders the class unmanageable.

First, Bayer is a wholesaler and has no access to retail receipts, and consumers are unlikely to retain them either. *Hodes v. Van's Int'l. Foods*, No. 9-cv-1530-RGK, 2009 WL 2424214, at *4 (C.D. Cal. July 23, 2009). Any attempt for customers to self-identify whether they purchased OAD would be rife with errors. *Xavier v. Phillp Morris U.S.A. Inc.*, 787 F. Supp. 2d 1075, 1090 (N.D. Cal. 2011) (purchaser affidavits are unreliable). Kivetz Dec. § B.

Second, even assuming consumers could self identify as OAD purchasers, the Court would still not know whether the product contained one of the challenged claims. *Id.* The OAD line of products has had dozens of different labels over the years, some of which do not have any of the claims at issue. *Bruton v. Gerber Products Co.*, No. 12-cv-2412-LHK, 2014 WL 2860995, at *7-8 (N.D. Cal. June 23, 2014) (class not ascertainable when not all products at issue made the challenged claims). This would require an impractical memory test that has been rejected by numerous courts.[12] *Kosta*, 308 F.R.D. at 229; *Gerber*, 2014 WL 2860995 at *7-8; *Karhu,* 2014 WL 815253, at *3; Kivetz Dec. § B.

Third, there is no classwide basis to determine whether a customer purchased for one of the three challenged claims or for one of the dozen of other claims that have not been challenged, or for a reason that has nothing to do with the stated claims—such as a physician's recommendation. If a customer did not purchase for one of the challenged claims, they would not have been injured and should not be part of the class. *See Moore v. Apple Inc*., 309 F.R.D. 532, 543, 545 (N.D. Cal. 2015); *Stearns v. Ticketmaster Corp.*, 655 F.3d 1013, 1019-20 (9th Cir. 2011), *abrogated on other grounds by Comcast Corp v. Behrend*, 133 S. Ct. 1426 (2013).

Fourth, the Court would have to individually determine what advertisement or labeling each customer saw and relied on. *Hodes*, 2009 WL 2424214, at *4. None of the named plaintiffs could remember, so absent class members would likely not remember either. Ex. 7 (Cosgrove Tr. 317:6-8) (discarded box and could not remember claims on it); Ex. 9 (Lopez. Tr. 277:14-16) (discarded bottle

---

[12] Requiring a bottle or package would not solve this difficulty. Even with bottles, Ms. Cosgrove could not remember which of the claims was on the package she purchased. Motion Ex. 12 (Cosgrove Decl. ¶ 7). Beyond that, many people do not save their receipts, boxes, or bottles. All of the Plaintiffs threw out either a bottle, box, or receipt. *Gerber*, 2014 WL 2860995, at *7; *Hodes*, 2009 WL 2424214, at *4 (class action not manageable where "[t]he likelihood that tens of thousands of class members saved their receipts as proof of their purchase of Van's waffles is very low").

and could not remember claims); Ex. 8 (Farar Tr. 161:20-162:1; 166:1-4); Kivetz Dec. § B.

Fifth, the Court would have to determine if any class members were vitamin deficient—if so, even under Plaintiffs' theory, they received a benefit.  The only way to determine whether a customer is vitamin deficient is through a blood test, but even a post hoc blood test could not determine if the class members were deficient before they started taking OAD. This would be a highly unmanageable and invasive method of adjudication, and likewise qualifies as an individualized inquiry.  *See Hodes*, 2009 WL 2424214, at *4; *Moore,* 309 F.R.D. at 543 ("individualized inquiries necessary to determine whether an individual has, in fact, suffered an injury defeats predominance").

> **2.      A Class Action Is Not A Superior Method of Adjudication Because Congress And the FDA Determined That Multivitamins Should Be Sold In The United States**

This is not a typical deceptive advertising case in which the Court is being asked to rule on particular advertising claims.  Rather, Plaintiffs are attempting to take down the entire multivitamin industry by asserting that the products are completely "worthless."

But Congress and the FDA have already determined that multivitamins are not worthless. Congress passed the Dietary Supplement Health and Education Act of 1994 ("DSHEA") and expressly found that "the importance of nutrition and the benefits of dietary supplements to health promotion and disease prevention have been documented increasingly in scientific studies." Pub. L. No. 103-417, § 2(2), 108 Stat. at 4,325, 4,325.  Congress further found that "there is a growing need for emphasis on the dissemination of information linking nutrition and long-term good health."  *Id.* § 2(7), 108 Stat. at 4326.  The "appropriate use of safe nutritional supplements will . . . reduce long-term health care expenditures."  *Id.* § 2(5).

Likewise, the FDA stated: "There are many good reasons to consider taking vitamin supplements, such as over-the-counter multivitamins."  *See* Cohn Dec. Ex. 23 (FDA *Fortify Your Knowledge About Vitamins*).  When Congress has charged an administrative agency with oversight, "Plaintiffs must climb a steep hill to prove that a class action is superior to another method of adjudication."  *Gardner v. First Am. Title Ins. Co.*, No. 00-cv-2176-RHK, 2003 WL 221844, at *8 (D. Minn. Jan. 27, 2003); *Imber-Gluck v. Google Inc*, No. 5:14-cv-0107, 2015 WL 1522076 (N.D.

Cal. Apr. 3, 2015) (denying class certification because FTC conducted investigation and reached settlement for same underlying conduct as proposed class action). Plaintiffs have failed to climb that hill, particularly in light of the fact that Plaintiffs' own expert has rejected their extreme theory of worthlessness.

## II. CERTIFICATION OF AN INJUNCTION CLASS SHOULD BE DENIED BECAUSE PLAINTIFFS ARE NOT LIKELY TO PURCHASE ONE A DAY IN THE FUTURE

To certify an injunction class under Rule 23(b)(2), the named Plaintiffs must establish that they face a "real and immediate threat of repeated injury." *Khasin*, 2016 WL 1213767 at *3 (quoting *Bates*, 511 F.3d at 985). Plaintiffs who say they "were previously misled by deceptive food labels" but are now "better informed, lack standing for injunctive relief because there is no danger they will be misled in the future." *Id.* at *5.

Plaintiffs have no standing for an injunction class because, just like in *Khasin*, there is no "danger" that the named Plaintiffs "will be misled in the future." *Id.* at *5. All three testified they had no intent to purchase OAD again. Ms. Lopez stated point blank: "I just don't believe in multivitamins anymore." Ex. 9 (Lopez Tr. 73:13-20). Ms. Cosgrove testified that she stopped taking OAD when she read the information provided to her by her lawyers and the complaint. Ex. (Cosgrove Tr. 234:9-24).[13] Ms. Farar only believes in multivitamins that are "raw" and "whole food." Ex. 8 (Farar Tr. 60:12-15). She said that "[b]uying the One A Day vitamin for me was a departure from my normal shopping criteria . . . . [b]ecause this is not raw, organic." *Id*. (Farar Tr. 178:20-25). Because none of Bayer's multivitamins make a raw or organic claim, she is unlikely to purchase OAD again.

Concurrent with their class certification motion, the named Plaintiffs proffered "conditional declarations" that this Court has previously rejected as insufficient to establish standing. *Khasin*, 2016 WL 1213767, at *4-5. Using textbook conditional language, Plaintiffs stated that they "will *likely consider* buying their products in the future . . . *but only if* . . . current practices are stopped." Motion, Ex. 10 ¶ 14, Ex. 11¶ 16, Ex. 12 ¶ 15. The Court should reject these declarations like it has

---

[13] While she testified that she would take multivitamins in the future, she did not say she would ever consider taking OAD again. Ex. 7 (Cosgrove Tr. 255:6-20).

in other cases.  Indeed, Plaintiffs' "conditional declarations" are not even credible considering their assertion that OAD multivitamins are "worthless."  Plaintiffs never explain why they would ever buy a product that they consider to be "worthless."

## III.   PLAINTIFFS DO NOT MEET THE PREREQUISITES FOR CLASS CERTIFICATION UNDER RULE 23(A)

Rule 23(a) requires adequacy, typicality and commonality for all classes.  *Wal-Mart*, 564 U.S. at 345; *Stearns,* 655 F.3d at 1019.  Plaintiffs cannot meet these elements either.

### A.   Named Plaintiffs Will Not Adequately Represent The Interest Of The Class

To adequately protect the interest of the class, a named plaintiff cannot have a conflict of interest with absent class members.  *Bohn v. Pharmavite*, No. 11-cv-10430-GHK, 2013 WL 4517895, at *3 (C.D. Cal. Aug. 7. 2013).  Close personal or familial ties between class counsel and named plaintiffs pose a conflict rendering class representatives inadequate.[14]  *See id.*  "Such relationship[s] warrant[] scrutiny because they pose the danger of champterty, especially when the attorney's fees will vastly exceed what any of the class members will received."  *Id.*; *see also English v. Apple Inc*., No. 14-cv-01619-WHO, 2016 WL 1188200, at *13 (N.D. Cal. Jan. 5, 2016) (class counsel inadequate because named plaintiffs were former employees of counsel's firm).

All three named Plaintiffs have conflicts of interest that risk them placing their personal interests ahead of those of the absent class members.  Ms. Cosgrove's husband works for Kaplan Fox as its Chief Investigator; he "is responsible for overseeing . . . the firm's effort to identify, develop, document and prosecute sophisticated cases."  Cohn Dec. Ex. 16 (Kaplan Fox website); Ex. 7 (Cosgrove Tr. 208:3-8, 215:13-23).  His job responsibilities include finding named Plaintiffs for class actions, and he approached his wife about becoming involved in case.  Ex. 7 (Cosgrove Tr. 127:18-23, 137:23-138:13,145:7-17, 210:9-13).  Ms. Cosgrove stopped taking OAD only after she signed the retainer agreement.  *Id*. (Cosgrove Tr. 136:3-18).  More importantly, her husband

---

[14] *See also Eubank v. Pella Corp*., 753 F.3d 718, 723 (7th Cir. 2014) ("improper for the lead class counsel to be the son-in-law of the lead class representative"); *London v. Wal- Mart, Inc*., 340 F.3d 1246, 1255 (11th Cir. 2003) ("[B]ecause the personal *and* financial ties between London and [class counsel] are very close, and because [class counsel's] recovery will vastly exceed what any of the class members will receive, we conclude that London cannot fairly and adequately represent the class."); *McDonough v. Toys "R" Us, Inc*., 638 F. Supp. 2d 461, 478 (E.D. Pa. 2009) (inadequate class rep where class rep was sister of class counsel).

potentially gets paid based on the success of the firm and the case.  *Id.* (Cosgrove Tr. 209:2-15).

Ms. Farar is even more conflicted.  Ms. Farar's husband, Justin Farar, is Of Counsel at Kaplan Fox.  Ex. 16 (Kaplan Fox website).  She estimated that "close[] to 50 percent" of his income comes from Kaplan Fox, and he might be working on this very case.  Ex. 8 (Farar Tr. 24:6-22, 134:25-135:5).  Part of the contingent fee Kaplan Fox will seek if it wins will go directly into Ms. Farar's family bank account.  *Id.* (Farar Tr. 21:15-21).

Ms. Lopez also has conflicts of interest because her former employer, Mr. Montejo, with whom she has "a relationship," works to find plaintiffs to bring cases like this one.  Ex. 9 (Lopez Tr. 38:11-20).  Ms. Lopez was approached about becoming a class representative by Mr. Montejo, who has a financial interest in the case.  *Id.* (Lopez Tr. 19:22-23:21:19-22:1, 36:25-37:2).

**B.    Named Plaintiffs Are Not Typical Of The Classes They Seek To Represent**

"[C]lass certification is inappropriate where a putative class representative is subject to unique defenses which threaten to become the focus of the litigation."  *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992).  All three of the named Plaintiffs face defenses unique to them that threaten to overwhelm the litigation.

**Roseanne Cosgrove:**  The challenged claims were not relevant to Ms. Cosgrove's purchase. She bought OAD for "general health."  Ex. 7 (Cosgrove Tr. 310:3-8, 324:18-20).  She does not remember seeing any advertising before making her purchase; she just looked at the label.  *Id.* (Cosgrove Tr. 314:23-315:24, 317:6-8).  She is therefore not typical of other class members who may have relied on other advertising sources.

**Andrea Lopez:**  Ms. Lopez is not typical because her interpretation of the heart health claim is preempted.  At her deposition, she testified that she interprets Heart Health to mean preventing heart disease. Ex. 9 (Lopez Tr. 48:15-19, 199:6-15).  ███████████████████████████████ ███████████████████████████████████████████████████  Finally, she follows an extremely uncommon and restricted diet, which means her vitamin intake is very different from the average class member.  *Id.* (Lopez Tr. 148:2-12, 150:11-20).

**Ilana Farar:**  Ms. Farar still takes a daily multivitamin that contains the same vitamins as the OAD product she purchased.  Ex. 8 (Farar Tr. 57:9-11); Cohn Dec. Ex. 17.  She therefore faces an

23

1    individual defense that the product is not worthless to her because she continues to consume a

2    product with essentially the same ingredients.

3        Moreover, none of the Plaintiffs saw or relied on the statement on which Plaintiffs focus in

4    their class certification motion—"up to 90% of Americans fall short of getting key nutrients from

5    food alone."[15]  The named-plaintiffs therefore all face an individual defense that they lack standing

6    and cannot show damages.  Dkt. 54 at 11 n.10; *Stearns*, 655 F.3d at 1019-20 (named plaintiffs who

7    did not view challenged claims are not typical).

8        **C.    There Are Not Common Issues**

9        The commonality requirement is closely related to the predominance requirement and for the

10   same reasons that there is no predominance, *see supra*, there is no commonality either.

11   **IV.   CERTIFICATION OF A NATIONWIDE CLASS SHOULD BE DENIED BECAUSE**
        **COMMON QUESTIONS WILL NOT PREDOMINATE**
12

13       For the proposed nationwide class, the laws of all 50 states would apply because California's

14   choice of law rules point to "the consumer protection laws of the jurisdiction in which the

15   transaction took place."  *Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 594 (9th Cir. 2012).  These

16   state consumer protection laws diverge on key questions including scienter and reliance.  *Id.* at 591

17   (California "requires named class plaintiffs to demonstrate reliance, while some other states'

18   consumer protection statutes do not.").  Here, just like in *Mazza,* "common questions of law would

19   not predominate for the proposed nationwide class" because it "require[s] application of the laws of

20   50 states," *Brazil v. Dole Packaged Foods, LLC,* 12-cv-01831-LHK, 2014 WL 2466559, at *14

21   (N.D. Cal. May 30, 2014), class decertified in part, 2014 WL 5794873 (N.D. Cal. Nov. 6, 2014);

22   *Sandoval*, 2016 WL 3554919, at *6-7.

23                              **CONCLUSION**

24       For the foregoing reasons, Bayer respectfully requests that the Court deny with prejudice

25

26   [15] The OAD Women's 90% ad did not first air until over half way through the class period and until
     *after* all three named Plaintiffs had purchased OAD and filed this action in October 2014. Cappello
27   Dec. ¶ 12.  Complaint, Dkt. 1 (Oct. 15, 2014); Cohn Dec. Ex. 18 (Lopez Interrogatory No. 6); Ex. 7
     (Cosgrove Tr. 258:9-11); Ex. 8 (Farar Tr. 57:24-58:5).  As a result none of the named Plaintiffs even
28   *could* have relied on the OAD Women's 90% ad.

1   Plaintiffs' Motion for Class Certification and Appointment of Class Counsel.

2

3   DATED:  March 24, 2017

4

5                                      By: */s/ Jonathan F. Cohn*

6                                      SIDLEY AUSTIN LLP

7                                      Jonathan F. Cohn (pro hac vice)
                                       Benjamin M. Mundel (pro hac vice)
8                                      1501 K Street, N.W.
                                       Washington D.C. 20005
9
                                       Ryan M. Sandrock
10                                     555 California Street, Suite 2000
                                       San Francisco, California 94104
11
                                       *Counsel for Defendants Bayer AG, Bayer Corporation*
12                                     *and  Bayer Healthcare LLC*

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Colleen Gallagher v. Bayer AG, Bayer Corporation, and Bayer Healthcare LLC**
United States District Court Case 3:14-cv-04601-WHO

### CERTIFICATE OF SERVICE VIA CM/ECF SYSTEM

The undersigned certifies that on March 24, 2017 a true and correct copy of the following document was electronically filed and served on all counsel of record who are deemed to have consented to electronic service via the Court's CM-ECF system:

**DEFENDANT BAYER'S OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**

Pursuant to the CM/ECF system, registration as a CM/ECF user constitutes consent to electronic service through the Court's transmission facilities.  Any other counsel of record will be served by electronic mail and U.S. mail.


*/s/ Benjamin Mundel*
Benjamin Mundel
SIDLEY AUSTIN LLP
Attorney for Defendant Bayer AG, Bayer Corporation, and Bayer Healthcare LLC
email:  bmundel@sidley.com