UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

COLLEEN GALLAGHER, ILANA FARAR,
ANDREA LOPEZ, JOANN CORDADO AND
ROSANNE COSGROVE, on behalf of
themselves and all others similarly situated,

               Plaintiff,

vs.

BAYER AG, BAYER CORPORATION, and
BAYER HEALTHCARE LLC,

               Defendants.

Case No. 314-cv-04601-WHO

Judge: Hon. William H. Orrick

**EXPERT DECLARATION OF DR. RAN KIVETZ**

**HIGHLY CONFIDENTIAL**

# REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

ASSIGNMENT AND QUALIFICATIONS

1.      My name is Dr. Ran Kivetz.  I have been asked by counsel for Bayer AG,

Bayer Corporation, and Bayer HealthCare LLC (hereafter "Bayer" or Defendants) to

evaluate: (*a*) whether the heart health, immunity, and energy claims challenged by the

Plaintiffs (hereafter the "challenged claims") are material (causal) factors in influencing

purchase decisions commonly across the putative class or subclass members;[1] and

(*b*) whether the putative class and subclasses members can self-identify in a reliable and

valid manner (*i.e.*, in order to ascertain and manage the putative class and subclasses).  As

part of my evaluation, I conducted two surveys in order to determine whether the

challenged claims,[2] which appeared on the packaging of some of the disputed Bayer "One

A Day" products, have a material effect on consumers' purchase decisions.[3]  The surveys

were also intended to shed light on the considerations that drive consumer to purchase the

disputed "One A Day" Bayer products.  I have personal knowledge of the matters set forth

in this declaration and, if called to testify at a hearing or trail in this matter, would so state.

2.      I am the Philip H. Geier, Jr., Professor of Marketing at Columbia

University Business School.  A copy of my curriculum vitae, which includes a complete

list of my publications, is attached as Exhibit A.1.

3.      I earned a Ph.D. in Business from Stanford University, Graduate School of

Business; a Master's degree in Psychology from the Stanford University Psychology

Department; and a Bachelor's degree from Tel Aviv University with majors in

Economics and Psychology.

4.      My field of expertise is consumer behavior; survey methods; marketing

---

[1] *See, e.g.*, *Plaintiffs' Notice of Motion, Motion, and Memorandum of Points and Authorities in Support of Class Certification*, pp. 1 – 2, 17;  *see also Second Amended Class Action Complaint*.
[2] *See, e.g.*, *Plaintiffs' Notice of Motion, Motion, and Memorandum of Points and Authorities in Support of Class Certification*, pp. 1 – 2.
[3] Both surveys tested the Bayer One A Day *women's* Multivitamin/Multimineral Supplement product. One of the surveys used a nationwide sample representing the proposed national class, and the other survey used a California, Florida, and New York sample representing the proposed California, Florida, and New York subclasses.

management; behavioral economics; human judgment, perception, and decision making; consumer and sales incentives; and branding.  Most of my research has focused on buyers' purchase behavior; survey design; and the effect of product characteristics (*e.g.*, brand, features, quality, price), the competitive context, and marketing activities (*e.g.*, promotions, incentives, loyalty programs, advertising, branding) on buying decisions and perceptions.

5.    I have received multiple research awards and nominations, including: (a) the "*Ferber Award*" from the Association for Consumer Research, which is the largest association of consumer researchers in the world; (b) the "*Best Competitive Paper Award*" from the Society of Consumer Psychology, which is the premier association of consumer psychologists in the world; (c) the "*Early Contribution Award*" from the Society of Consumer Psychology; (d) five finalist nominations, for the 2016, 2011, 2009, 2007, and 2005 "*O'Dell Award*," given to the *Journal of Marketing Research* (the major journal on marketing research issues) article that has had the greatest impact on the marketing field in the previous five years; (e) two finalist nominations for the 2007 and the 2005 "*Green Award*," given to the *Journal of Marketing Research* article published in the prior year that "demonstrates the most potential to contribute significantly to the practice of marketing research and research in marketing"; (f) three finalist nominations for the awards for the "*Best Article*" published in the *Journal of Consumer Research* between 2002 and 2005, between 2006 and 2009, and between 2011 and 2014; (g) having my research selected by *The New York Times* in its *Annual Year in Ideas* as one of the "Best Ideas in 2006"; (h) being rated as the third most prolific scholar in the leading marketing journals during 1982–2006;[4] and (i) being ranked by the American Marketing Association as one of the Top 50 most productive scholars in the premier marketing journals during 2009–2013 and during 2010–2014.

---

[4] Seggie, Steven H. and David A. Griffith (2009), "What Does It Take to Get Promoted in Marketing Academia? Understanding Exceptional Publication Productivity in the Leading Marketing Journals," *Journal of Marketing,* 73, 122–132.

6.      At Columbia University, I have taught MBA and Executive MBA courses on Marketing Strategy and Management, Customer Centricity and Innovation, High-Technology Marketing and Entrepreneurship, and Marketing of a Nation, covering such topics as developing marketing strategies, buyer behavior, customer segmentation, customer acquisition and retention, competitive strategies, branding, pricing, advertising, sales promotions, and behavioral economics.  In addition to teaching MBA and Executive MBA courses, I have guided and supervised numerous MBA student teams in their work on company and industry projects dealing with a variety of markets.  I also taught in various executive education programs, including programs for senior executives, programs for marketing managers in high-technology companies, programs for marketing managers in pharmaceuticals, programs in entrepreneurship, programs on marketing and innovation, and programs on customer centricity.

7.      I have taught several doctoral courses.  One doctoral course, titled "Bridging Behavioral Economics and Marketing Science," examines human judgment and decision making and its application to marketing science.  It focuses on understanding, predicting, and quantitatively modeling different phenomena and biases in judgment and decision making, including by employing conjoint analysis models.  A second doctoral course deals with consumer behavior, covering such topics as the processes underlying choices and judgments, influences on purchase decisions, attitudes, and persuasion.  Both of these courses focus on modeling the various stages involved in a research project, including defining the problem to be investigated, selecting and developing the research approach, data collection and analysis, and deriving conclusions.  I have guided and supervised numerous Ph.D. students in their research.  I have also served as the advisor for multiple Ph.D. students who are now professors at such institutions as Chicago Booth School of Business, Harvard Business School, and The Wharton School at the University of Pennsylvania.

8.      I have conducted, supervised, or evaluated well over 1,000 marketing

research surveys, including many related to consumer behavior and decision-making, sales promotions, marketing strategies, branding, trademark, and advertising-related issues.  I serve on three editorial boards and as a frequent reviewer, including for leading journals in our field, such as the *Journal of Marketing Research*.  I have served as a Guest Editor for the *Journal of Marketing Research* and as a Guest Associate Editor for *Marketing Science* and *Management Science*.  I have served on the editorial board of, and received the "*Outstanding Reviewer Award*" from, the *Journal of Consumer Research*.  I have also served on the editorial boards of the *Journal of Consumer Psychology* and the *International Journal of Research in Marketing*.  I am a frequent reviewer of articles submitted to journals in other fields, such as psychology, decision making, and economics.  As a reviewer, I am asked to evaluate the research of scholars wishing to publish their articles in leading scholarly journals.  I have also worked as a consultant for companies and organizations on a variety of strategy, marketing, consumer behavior and perception, promotions, branding, advertising, and incentives topics.  Additionally, I have served as an expert in litigations involving various marketing and buyer behavior issues, false advertising, market surveys, patent infringement, trademark and trade dress related matters, branding, retailing, promotions, and other areas.  I have also served as an expert witness for the Federal Trade Commission.

9.      A list of cases in which I provided sworn testimony at trial and/or by deposition during the past four years is included in Exhibit A.2.  I am being compensated at a rate of $850 an hour.  I also received compensation from Cornerstone Research based on its collected staff billings for its support of me in this matter.[5]  Neither my compensation in this matter, nor my compensation from Cornerstone Research, is in any way contingent, or based, on the content of my opinions or the outcome of this or any

---

[5] Cornerstone Research staff assisted me in this matter based on my request and under my direction. Cornerstone Research is a research and consulting company that has extensive experience in conducting such work as it did under my direction in this matter.

other matter.

10.     My analyses are based, among other things, on the brands, products, and packaging found in the supplements and vitamins market; existing scientific research regarding consumer behavior, decision-making, and survey design; general principles of marketing; the surveys that I conducted in this case; Bayer's research materials and other internal documents; and the depositions of the named Plaintiffs and of Bayer's employees.  In conducting my analysis, I, or support staff at my direction, reviewed certain documents, including, but not limited to, documents that were made available to me in connection with the preparation of this report.  Those documents are referenced herein and/or listed in Exhibit B.  I also visited multiple stores in which supplements and vitamin products, including the Bayer One A Day Bayer products at issue, are sold.

11.     Any, and all, of the opinions expressed herein are held to a reasonable degree of professional certainty.  The information on which I relied consists of the type of information that is reasonably relied upon in my field of expertise.

*******************

## SUMMARY OF CONCLUSIONS

12.     In order to evaluate whether the three challenged claims are material and common purchase factors and whether consumers can self-identify in a reliable and valid manner into the putative class and subclasses, I relied on multiple scientific analyses, empirical findings, and sources of information, including, but not limited to:

(*i*) two consumer surveys that I conducted, following well-established survey standards, to determine whether the challenged packaging claims have a material effect on consumers' purchase decisions and to shed light on the considerations driving consumers' purchases of the disputed Bayer One A Day products;

(*ii*) market research conducted for Bayer in the normal course of its business;

(*iii*) reviewing, analyzing, and integrating relevant scientific theories and academic research from marketing, consumer behavior and perception, and social psychology;

(*iv*) reviewing the relevant facts and testimony (*e.g.*, by the named Plaintiffs and by Bayer executives) available so far in this litigation;

(*v*) analysis of the information sources that consumers rely on when making purchase decisions regarding multivitamins and Bayer One A Day products;

(*vi*) analysis of the differences across the putative class members in terms of their purchase decisions; and

(*vii*) careful review and analysis of the challenged One A Day products, packages, and claims, as well as of similar multivitamin products and packages sold by competitors during the proposed Class Period.

13.     Based on the aforementioned consumer surveys, market studies, academic research, analyses, facts, testimony, and information, I have reached the following conclusions:

a.   The three challenged claims are *not* material or common factors in consumers' decisions to purchase the disputed Bayer One A Day products.

b.   Consumers will <u>*not*</u> be able to self-identify in a valid and reliable manner into the

putative class and subclasses, and consequently, there is *no* manageable way to ascertain the putative class or subclasses.

A.      **THE CHALLENGED CLAIMS ARE** *NOT* **MATERIAL FACTORS IN CONSUMERS' DECISIONS TO PURCHASE THE DISPUTED BAYER ONE A DAY PRODUCTS**

14.     A key question in this case is whether or not the challenged claims are material factors in consumers' purchase decisions.  For example, would removing the challenged claims from the Bayer One A Day product packages change the purchase behavior of the putative class and subclass members?  In this section, I analyze whether the challenged claims are likely to commonly affect consumers' purchase decisions.  I also evaluate whether the putative class and subclass members are similar to, or different from, each other in terms of their purchase considerations.

15.     To evaluate whether the challenged claims are material and common considerations in consumers' purchase decisions, it is useful to examine several related questions: (a) what is the impact of the challenged claims on consumers' purchase intention or likelihood? (b) why did consumers purchase the disputed Bayer products? (c) what sources of information do consumers consider when they decide which multivitamin products to purchase? and (d) are the putative class (and subclass) members likely to be similar or different from each other in terms of their purchase decisions?

16.     To address the important aforementioned questions, in the following subsections, I report the results of two empirical consumer surveys that I conducted in this case; analyze well-established principles and findings from the marketing, consumer behavior, and decision-making literatures; analyze Bayer's marketing research; and review relevant excerpts from Plaintiffs' depositions.  The subsections are organized according to the following topics: (*i*) two empirical consumer surveys that I conducted in this case demonstrate that the challenged claims do *not* materially impact the likelihood of purchasing the disputed One A Day Bayer products; (*ii*) market research conducted for Bayer in the normal course of its business, as well as academic research, demonstrate that multiple factors -- unrelated to the three challenged claims -- drive consumers' purchases

of the disputed One A Day products; (*iii*) the named Plaintiffs' deposition testimony supports the notion that consumers purchase Bayer One A Day products for a variety of reasons; (*iv*) some consumers are likely to purchase the disputed multivitamin products to obtain insurance value or as a perceived nutritional safety net; (*v*) consumers purchase multivitamins and Bayer One A Day products based on information from a variety of non-Bayer sources that are independent of the challenged packaging and advertising claims; and (*vi*) the putative class/subclass members differ from each other in terms of their purchase decisions.

A.1   <u>Two Empirical Consumer Surveys Demonstrate that the Challenged Claims Do</u>
<u>*Not* Materially Impact the Likelihood of Purchasing the Disputed Bayer Products</u>

A.1.1. *Surveys' objective and conclusions*

17.     Plaintiffs argue that consumers are misled into buying the disputed Bayer One A Day multivitamin products due to the challenged heart, immunity, and energy claims, which appear on the One A Day product packages.[6]  Accordingly, the two consumer surveys described in this subsection were intended to evaluate whether listing the challenged heart health, immunity, and energy claims on the packaging of the disputed Bayer products has a material effect on consumers' likelihood of purchasing the products.  That is, the surveys were designed to test whether the challenged claims appearing on the Bayer One A Day product packages impact consumer purchasing decisions.  The surveys were also designed to investigate the considerations driving consumers' purchases of the disputed Bayer products.

18.     Following well-established survey standards, I designed two surveys to investigate consumers' purchase decisions.  One of the surveys used a nationwide sample

---

[6] *E.g.*, *Plaintiffs' Notice of Motion, Motion, and Memorandum of Points and Authorities in Support of Class Certification*, pp. 1 – 2, 17;  *see also Second Amended Class Action Complaint*.

to represent the putative National Class, which Plaintiffs defined as: "All persons in the United States who purchased Bayer One A Day Supplements in the United States that contained one or more Claims from October 15, 2010 until the date of certification ("Class Period")."[7]   The other survey used a sample of consumers from California, Florida, and New York to represent the proposed California, Florida, and New York Subclasses, which Plaintiffs have defined as: "All persons in California [Florida/New York] who purchased Bayer One A Day Supplements in California [Florida/New York] that contained one or more Claims during the Class Period."[8]   Both surveys tested the Bayer One A Day *Women's* product.

19.     I employed a standard (cause-effect) experimental methodology that has been utilized in countless consumer research studies, including in many of the hundreds of academic and consulting studies that I have conducted.  Such an experiment allows measuring the purchase likelihood of a Bayer One A Day product among "test group" respondents, who are provided with a Bayer package that depicts the challenged claims, compared to "control group" respondents, who are provided with a corresponding Bayer package for which the challenged claims have been removed.  Importantly, the surveys that I conducted reflect marketplace conditions by presenting respondents with an actual Bayer One A Day product and package similar to what the putative class and subclass members encounter in the marketplace.

20.     Thus, each of the two surveys included a "test group" and a "control group." In each survey, respondents randomly assigned to the "test group" viewed a package of a Bayer One A Day *Women's* product; this test package contains the challenged heart health, immune health, and physical energy claims.[9]   In contrast, respondents randomly assigned to the "control group" viewed a revised package of the aforementioned Bayer One A Day

---

[7] *Plaintiffs' Notice of Motion, Motion, and Memorandum of Points and Authorities in Support of Class Certification*, p. 7.
[8] *Ibid*, p. 8.
[9] *See* Exhibit G.1 for photographs of all sides of the "test" package.

product, which did not depict the challenged heart health, immune health, and physical energy claims.[10]  This control package was identical to the test package, with six exceptions: (*i*) the words "Heart Health[††]" were removed from both the hanger tab and the top panel; (*ii*) the accompanying disclosure "†† Not a replacement for heart medications" was removed from the top panel; (*iii*) the words "Immune Health" were removed from both the hanger tab and the top panel; (*iv*) the words "Physical Energy" were removed from both the hanger tab and the top panel; (*v*) the listing of vitamins and minerals on the top panel was shortened; and (*vi*) the phrase "*which help convert food to energy*" was removed from the statement "*One A Day® Women's is a complete multivitamin specially formulated for women.  It contains 100% daily value of all 8 B-Vitamins†, which help convert food to energy\*, and 5 other essential nutrients‡.*"[11]

21.    The nationwide survey of the Bayer One A Day product was conducted in twelve consumer research centers around the country.  This survey included a total of 412 female respondents (*i.e.*, 206 "test" respondents and 206 "control" respondents) representing the relevant consumer population.[12]

---

[10] *See* Exhibit G.2 for photographs of all sides of the "control" package.

[11] This statement, which appeared on the bottom of the back panel -- was shortened in the control package to read as follows: "*One A Day® Women's is a complete multivitamin specially formulated for women.\* It contains 100% daily value of all 8 B-Vitamins† and 5 other essential nutrients‡.*" *See* Exhibit G1. vs. Exhibit G.2.

[12] A sample of over 400 respondents (approximately 200 respondents in the test group and 200 respondents in the control group) is sufficiently large to adequately represent the relevant consumer universe. Furthermore, such a sample size is sufficiently large to detect differences, if any, between the test and control groups' responses.  Typically, for a survey conducted for purposes of litigation, an expert should make sure that in each condition (test and control) there are at least 150 respondents.  The criterion for judging the adequacy of a sample size is the *confidence interval* of the sample's estimate (*e.g.*, the CI of the percentage of customers who provide a particular response).  The 95% confidence interval of a percentage of consumers (*e.g.*, who have a particular purchase likelihood) based on a sample of respondents means that there is a 95% likelihood that the actual percentage of consumers in the entire population who have the same purchase likelihood lies within that confidence interval.  For example, consider the 79.1% (163/206) of test group respondents who either answered that they "definitely would buy this product" or answered that they "probably would buy this product" in the nationwide survey.  The corresponding 95% confidence interval of that 79.1% lies between 73.6% and 84.7%.  Such a narrow confidence interval indicates that the survey's estimate is quite precise.  As Professors Kaye and Freedman write: "For a given confidence level, a narrower interval indicates a more precise estimate"; D. H. Kaye and D. A. Freedman, *Reference Guide on Statistics*, in *Reference Manual on Scientific Evidence*, Federal Judicial Center ed., 2000, p. 119).  The

22.     The California, Florida, and New York survey of the Bayer One A Day product was conducted in nine consumer research centers in metropolitan areas in the states of California, Florida, and New York.  This survey included a total of 411 female respondents (*i.e.*, 206 "test" respondents and 205 "control" respondents) representing the relevant consumer population.

23.     As explained below, the two surveys' results were conclusive that there was *no* statistical difference in the likelihood of purchasing the disputed Bayer product between the test group respondents and the control group respondents.  That is, in each of the two surveys, modifying the One A Day product package by removing the allegedly deceptive heart health, immune health, and physical energy claims had *no* material effect on respondents' purchase decisions.[13]

24.     Respondents' explanations of their purchase decisions also strongly support the finding that the challenged claims are neither material nor common factors in consumers' purchase decisions.  In both surveys, only a small minority of the "test group" respondents, who considered an original Bayer One A Day package bearing the challenged claims, mentioned a heart benefit, immunity benefit, or energy benefit as a reason for purchasing the disputed product.[14]  Respondents' explanations also show that purchases of the disputed Bayer One A Day products are driven by myriad reasons, which vary across consumers.

---

confidence interval is narrower when the estimate's standard error is smaller (Kaye and Freedman, 2000), and the standard error is smaller when the sample size is larger.  My professional opinion, having conducted and evaluated many surveys in the context of litigation, is that a sample size of 400 respondents is highly sufficient and that the resulting 95% confidence intervals (CIs) are narrow enough to reach reliable conclusions from the results of the survey's questions.

[13] The results, which are summarized in this sub-section, are subsequently detailed in sub-section A.1.3. (titled "Survey Findings").  Exhibits I and J to this declaration provide the computer tables with the screening data, the purchase likelihood results, and the coding of respondents' purchase explanations for the nationwide survey and for the California, Florida, and New York survey, respectively.

[14] *See* Exhibit I, Table 6, pp. 7 – 8; Exhibit J, Table 6, pp. 6 – 7.

A.1.2. *Survey methodology*

A.1.2.1.    Overview

25.    Two mall-intercept surveys were conducted to determine whether removing the allegedly deceptive heart health, immunity, and energy claims from the packaging of the disputed Bayer One A Day product has a material effect on consumers' purchase decisions.  The disputed Bayer product tested in the surveys was the Bayer One A Day *Women's* product.

26.    The use of mall-intercepts is a well-accepted and standard survey procedure. Further, as subsequently explained, in the present case, a mall-intercept survey allows for approximating marketplace conditions.

27.    Qualified respondents were females who: (a) were 18 years of age or older; (b) personally purchased a multivitamin product in the past twelve months; and (c) expected to personally purchase a multivitamin product in the next twelve months.  The national survey was conducted in January and February of 2017 with a total of 412 respondents in 12 locations around the country.  The California, Florida, and New York survey (hereafter the "state-specific survey") was conducted in January and February of 2017 with a total of 411 respondents in nine locations in the states of California, Florida, and New York.

28.    The surveys were designed and conducted based on scientific methodologies that are relied upon in this field of expertise and according to well-established survey standards, including, but not limited to, the following seven factors listed in the Manual for Complex Litigation:[15]

(i)    the population was properly chosen and defined;

(ii)    the sample chosen was representative of that population;

---

[15] *Manual for Complex Litigation*, Federal Judicial Center, Fourth, 2004, Section 11.493, p. 103. Although I am not an attorney or an expert on legal matters, I find it useful to refer to legal authorities and prior court decisions to illustrate the types of issues and principles that have come up in connection with the evaluation of consumer surveys.

(iii)   the data gathered were accurately reported;

(iv)   the data were analyzed in accordance with accepted statistical principles;

(v)   the questions asked were clear and non-leading;

(vi)   the survey was conducted by qualified persons following proper interview procedures; and

(vii)   the process was conducted so as to ensure objectivity.

29.      In each of the two surveys, respondents were randomly assigned to one of four versions of the survey.  As detailed below, for each survey, the four versions differed only with respect to: (*i*) the product package shown to respondents (*i.e.*, a "test" package for "test group" respondents vs. a "control" package for "control group" respondents); and (*ii*) the order of the answer choices in Question 1 (*i.e.*, the order of answer choices was rotated across respondents to prevent any order effects).  Since a consumer purchase decision-making survey should reflect marketplace conditions as closely as possible, respondents in all conditions were provided with a package of a Bayer product (*i.e.* a One A Day *Women's* product), similar to what the putative class and subclass members encounter in the marketplace.  After examining the package as they do when shopping for a multivitamin product at the store, respondents were asked questions intended to assess their purchase likelihood and their explanations for their purchase decision.

30.      The Survey Screeners used to qualify respondents into the national survey and into the California, Florida, and New York survey are included in Exhibits D.1 and D.2, respectively.  The Supervisor and Interviewer Instructions for the national survey and the California, Florida, and New York survey are included in Exhibits E.1 and E.2, respectively.

31.      The four versions of the Main Questionnaire for the national survey and for the California, Florida, and New York survey are included in Exhibits F.1 and F.2, respectively.  Photographs of the test package -- a Bayer One A Day *Women's* product package with the phrases "Heart Health[††]," "Immune Health," "Physical Energy," and

"*which help convert food to energy*" stated on the packaging -- are shown in Exhibit G.1. Photographs of the control package -- a revised Bayer One A Day *Women's* product package with the aforementioned challenged claims removed from the packaging -- are shown in Exhibit G.2.  The main Questionnaires, as well as the test and control packages were the same for the national survey and the California, Florida, and New York survey.

32.     The two surveys were conducted in a double-blind manner: the interviewers, supervisors, and respondents were all unaware of the purpose of the survey and the identity of its sponsor.  The surveys' universes and participant screening procedures, the surveys' interviewing locations, and the surveys' validation are described in detail in Exhibit C.  The interviewing procedure (which was identical for the two surveys), and the surveys' materials are described next**.**

A.1.2.4.     <u>Main Questionnaire</u>

33.     In both the national survey and the California, Florida, and New York survey, respondents were randomly assigned to one of four versions of the Main Questionnaire (*see* Exhibit F.1 for the national survey's Main Questionnaires and Exhibit F.2 for the California, Florida, and New York survey's Main Questionnaires).  In each survey, the procedure, task, and questions in all Main Questionnaire versions were identical, and the only difference between the four Main Questionnaire versions involved the One A Day product that was shown to respondents (*i.e.*, test or control; *see* Exhibits G.1 vs. G.2, respectively) and the order of the answer choices in Question 1 (*see* Exhibits F.1 & F.2).

34.     In the national survey, respondents who were randomly assigned to complete the Blue Main Questionnaire were shown the "test" package of the Bayer One A Day multivitamin product; in the California, Florida, and New York survey, respondents who were randomly assigned to complete the Green Main Questionnaire

were shown the "test" package.  The "test" package displays the challenged heart health, immunity, and energy claims.

35.    In contrast, in the national survey, respondents who were randomly assigned to complete the Yellow Main Questionnaire were shown the "control" package of the Bayer One A Day multivitamin product; in the California, Florida, and New York survey, respondents who were randomly assigned to complete the Lilac Main Questionnaire were shown the "control" package.  The control package does *not* mention any of the challenged claims.  More specifically, to construct a proper control, the following revisions were made to the Bayer One A Day *Women's* product package:

(a)    the words "Heart Health††" -- which appeared on the hanger tab, and on the top panel, of the original package -- were removed from the control package;

(b)    the accompanying disclosure "†† Not a replacement for heart medications." -- which appeared on the top panel of the original package – was removed from the control package;

(c)    the words "Immune Health" -- which appeared on the hanger tab, and on the top panel, of the original package -- were removed from the control package;

(d)    the words "Physical Energy" -- which appeared on the hanger tab, and on the top panel, of the original package -- were removed from the control package;

(e)    the listing of vitamins and minerals on the top panel was shortened; and

(f)    the phrase "*which help convert food to energy*" -- which appeared on the bottom of the back panel of the original package -- was removed from the control package.[16]

---

[16] *I.e.*, the statement "*One A Day*® *Women's is a complete multivitamin specially formulated for women. It contains 100% daily value of all 8 B-Vitamins†, which help convert food to energy\*, and 5 other essential nutrients‡*" -- which appeared on the bottom of the back panel of the original package -- was shortened in the control package to read as follows: "*One A Day*® *Women's is a complete multivitamin specially formulated for women.\*  It contains 100% daily value of all 8 B-Vitamins† and 5 other essential nutrients.‡*"

36.     The test and control Bayer One A Day packages were identical in all other aspects.  Exhibit G.1 shows the original (test) package, whereas Exhibit G.2 depicts the revised (control) package.  The test and control conditions were identical in terms of all other aspects, including the survey's procedure and questions (*see* Exhibits F.1 & F.2).

37.     The control multivitamin package was designed to eliminate the misrepresentations alleged by the Plaintiffs.  To the extent that displaying the challenged heart health, immunity, and energy claims on the packaging is a material factor that drives the putative class and subclass members' purchase decisions, we should obtain a significantly higher percentage of respondents who indicate that they would definitely or probably purchase the Bayer One A Day product in the test condition (in which an original Bayer One A Day package was shown with the challenged claims) than in the control condition (in which a revised Bayer One A Day package was shown *without* the challenged claims).

38.     The procedure, task, and questions were identical across the national survey and the state-specific survey.  The only difference between the two surveys was the use of a national sample versus a California, Florida, and New York sample.

39.     A standard survey procedure is to explicitly instruct respondents not to guess.  Accordingly, at the beginning of the interview, the interviewer told the respondent:

> Thank you for participating in our study.  I am going to show you a multivitamin product and ask you a few questions.  For each of my questions, if you don't know or don't have an answer, please don't guess.  Just tell me you "don't know" or "don't have an answer," and we'll go on to the next question.  There are no right or wrong answers.

40.     Respondents were next given the following instructions:

> Please examine the multivitamin product without opening the package, just as you would if you were at the store thinking of buying such a product.  Take as much time as you would normally do when considering buying such a product.  Feel free to handle the package if that's what you normally would do.  Just tell me when you are done.

41.     To approximate marketplace conditions, respondents were then shown an actual Bayer One A Day package similar to what the putative class and subclass members

encounter in the marketplace (except that in the control condition, the package did not depict the challenged claims).

42.     After the respondent finished examining the Bayer One A Day product package, the interviewer left the package on a table and allowed the respondent to handle the package until after the respondent answered the first survey question, Q.1.  More specifically, prior to asking the first question, the interview told the respondent:

> I would like to ask you a few questions.  Feel free to examine the package at any time.

43.     The first question measured respondents' likelihood of purchasing the displayed product.  The interviewer first read the following instructions: "Now, I am going to read to you my first question.  This question has six answer choices, which are shown on this card."[17]  The interviewer handed the aforementioned card to the respondent and read the remainder of the question:

> 1.     Please allow me to read the entire question before answering.  After I am done, if you would like me to repeat the question, just ask me.
>
> Assume that the price of the multivitamin product that you just examined is comparable to the price of other multivitamin products available in stores.  If you were at the store thinking of buying a multivitamin and you saw the product that you just examined, how likely would you be to buy this product?
>
> Would you say that you...
>> Definitely would buy this product,
>> Probably would buy this product,
>> May or may not buy this product,
>> Probably would not buy this product,
>> Definitely would not buy this product, or
>> Don't know?

44.     The interviewer read Question 1 and the six answer choices exactly as they appear above; the six answer choices were printed on the card.  In two out of four versions of each survey's main questionnaire (*i.e.*, in the Blue Main Questionnaire version 2 and in the Yellow Main Questionnaire version 2 of the national survey, and in the Green Main Questionnaire version 2 and in the Lilac Main Questionnaire version 2 of

---

[17] *See* Exhibits F.1 & F.2 for the cards used in Q.1 in the national survey and in the state-specific survey, respectively.

the state-specific survey), which were administered to approximately half of the respondents in each of the two surveys, the first five answer choices were counterbalanced (rotated) and a corresponding card was used.[18]

45.   After respondents selected their answer, the interviewer took back the card and removed the Bayer One A Day product from sight.  Respondents were then asked the next open-ended question:

> 2.   What makes you say that you (INSERT ANSWER FROM Q.1)?  "Any other reason why you (INSERT ANSWER FROM Q.1)"?

The interviewer recorded respondents' answers verbatim.  Respondents were then told that those were all of the questions, were thanked for their participation, and were asked to complete the certificate page.

A.1.3. *Survey findings*

A.1.3.1.   <u>Survey Findings from the Nationwide Sample</u>

46.   Exhibit I provides the computer tables with the screening data, the purchase likelihood results from Question 1, and the coding of the verbatim responses to Question 2 for the nationwide survey.

47.   As shown in Table 1 below (see also Table 5 on p. 6 of Exhibit I), the national survey results indicate that there was *no* difference in the likelihood of purchasing the Bayer One A Day product between the test group respondents and the control group respondents ($\chi^2 = 1.05$, $df = 4$, $p > .90$, *n.s.*).[19]  That is, removing from the Bayer One A Day package the challenged heart health, immunity, and energy claims did *not* influence respondents' stated likelihood of purchasing the Bayer multivitamin product.

---

[18] *See Ibid.*

[19] A $\chi^2$ statistic that equals 1.05 and has four degrees of freedom (*df*) yields a *p*-value greater than 0.90.  This means that there is *no* statistically significant difference between the test group and control group in the dependent variable (*e.g.*, purchase likelihood).  The standard in consumer research is that a statistic is considered statistically significant when its corresponding *p*-value is smaller than 0.05.

**Table 1: Percent of Respondents Selecting Various Answer Choices in Question 1**

|  | Blue Questionnaires: Challenged Claims Listed (Test Group) (N = 206) | Yellow Questionnaires: Challenged Claims Removed (Control Group) (N = 206) |
|---|---|---|
| Definitely would buy this product | 46.1% | 43.7% |
| Probably would buy this product | 33.0% | 33.0% |
| May or may not buy this product | 10.2% | 9.7% |
| Probably would <u>not</u> buy this product | 6.3% | 8.3% |
| Definitely would <u>not</u> buy this product | 2.9% | 1.9% |
| Don't know | 1.5% | 3.4% |

48.     More specifically, 46.1% of test group respondents, who considered a Bayer One a Day package with the challenged claims, answered that they "Definitely would buy this product." A similar proportion, 43.7% of control group respondents, who considered a similar package but with the challenged claims removed, provided the same answer, that is, that they "Definitely would buy this product." The 2.4% difference between the proportions of test group and control group respondents who indicated that they "Definitely would buy this product" does *not* approach statistical significance ($\chi^2 = 0.245$, $df = 1$, $p > .62$, *n.s.*), which means that this 2.4% difference is statistically indistinguishable from zero.

49.     A similar lack of effect of the challenged claims is observed among respondents who answered that they "Probably would buy this product" (*i.e.*, the second row in Table 1 above). Specifically, the results indicate that there was *no* difference between the percent of respondents who answered that they "Probably would buy this product" in the test condition versus in the control condition (33.0% vs. 33.0%; *see* Table 5 on p. 6 of Exhibit I).

50.     In terms of "top two boxes" (*i.e.*, the first two rows in Table 1 above), the results indicate that there was *no* significant difference between the percent of respondents who answered that they "Definitely would buy this product" or "Probably

would buy this product" in the test condition versus in the control condition (79.1% vs. 76.7%, respectively; *see* Table 5 on p. 6 of Exhibit I). That is, the 2.4% difference between the test and control groups in the rate of respondents indicating that they "Definitely would buy this product" or "Probably would buy this product" was *not* statistically significant ($\chi^2 = 0.35$, $df = 1$, $p > .55$, *n.s.*). Similarly, there were *no* significant differences between the test and control groups in the likelihood of answering "May or may not buy this product" (10.2% vs. 9.7%, respectively; $\chi^2 = 0.027$, $df = 1$, $p > .86$, *n.s.*) or in terms of the "bottom two boxes" (9.2% vs. 10.2%, respectively; $\chi^2 = 0.11$, $df = 1$, $p > .74$, *n.s.*; see Table 5 on p. 6 of Exhibit I).

51.     In the present case, it is informative to examine the explanations that respondents provided for their purchase decisions. Tables 6 and 7 of Exhibit I (pp. 7 - 26) contain the coding of the verbatim responses to Question 2 ("What makes you say that you [INSERT ANSWER FROM Q.1]? "Any other reason why you [INSERT ANSWER FROM Q.1]"?).

52.     As the results shown in Table 6 of Exhibit I indicate, respondents in the national sample provided a variety of reasons -- unrelated to the challenged heart, immunity, or energy claims -- in favor of purchasing the disputed Bayer One A Day product. For example, "test" group respondents' verbatim responses mentioned such purchase considerations as brand equity/recognition of Bayer or One A Day (26.7%; 55 out of 206 respondents); appeal of packaging in terms of amount of pills, appearance, color, or size (24.3%); for women (18.4%); specific vitamins or general vitamin mentions (17.5%); healthy/health (11.2%); "it has everything you need/don't need to buy other products" (9.2%); bone benefits (6.8%); minerals (4.4%); "good for you/your body" (4.4%); and skin benefits (3.4%); as well as multiple other reasons unrelated to the challenged heart, immunity, or energy claims.[20]

---

[20] *See* Exhibit I, Table 6, pp. 7 - 18.

53.     Respondents' explanations of their purchase decisions strongly support the finding that the challenged claims are neither material nor common factors in consumers' purchase decisions.  *First*, only a small minority of "test group" respondents, who considered an original Bayer One A Day package bearing the challenged claims, mentioned a heart, immunity, or energy benefit as a reason for purchasing the disputed product.  In particular, among "test group" respondents, only 5.8% (*i.e.*, 12 out of 206), 6.3% (*i.e.*, 13 out of 206), and 7.8% (*i.e.*, 16 out of 206) of respondents mentioned a heart, immunity, or energy benefit, respectively, as a reason for purchasing the disputed Bayer One A Day product.[21]  It is noteworthy that the heart, immunity, and energy benefits mentioned as purchase reasons by many respondents in this survey do *not* necessarily indicate that these respondents' purchase decisions were driven by a challenged packaging or advertising claim made by Bayer regarding heart health, immune health, or physical energy.  That is, some consumers may have preexisting beliefs that multivitamins provide heart, immunity, and/or energy benefits, and such preexisting beliefs could have been the source of respondents' mentions of such benefits as purchase reasons.  For example, more than half of the mentions of an energy benefit consisted of the following purchase explanation: "good for/provides/helps with energy."[22] Such a purchase explanation can reflect a consumer's preexisting belief (*e.g.*, that multivitamins, in general, provide energy benefits) as opposed to an (alleged) misperception caused by Bayer's packaging or advertising.

54.     *Second*, as mentioned earlier, respondents from the national sample mentioned numerous considerations for, and against, purchasing the Bayer One A Day product.[23]  These respondents' explanations demonstrate that decisions to purchase the disputed Bayer multivitamin product are driven by myriad reasons.  Further, the different

---

[21] *See* Exhibit I, Table 6, pp. 7-8.
[22] Specifically, 4.4% (*i.e.*, 9 out of 206) of "test" group respondents provided this explanation; *see ibid*, p. 8.
[23] *See ibid*, Tables 6 and 7, pp. 7 – 26.

purchase motivations varied across respondents.[24]  These findings are diametrically opposed to the notion that the challenged heart health, immunity, and energy claims are important and common purchase considerations across the putative nationwide class.

55.     In conclusion, the national survey's results from both the purchase likelihood measure and the respondents' explanations are highly consistent: listing the challenged heart, immunity, and energy claims on the packaging of the Bayer One A Day product does *not* influence (*i.e.*, does *not* have a material or causal effect on) consumers' decisions to purchase the product.  Relatedly, respondents' explanations indicate that, not only are the challenged claims immaterial in consumers' purchasing decisions, but also a variety of other purchase motivations influence consumers, with significant heterogeneity (differences) arising between consumers.

A.1.3.2.     Survey Findings from the California, Florida, and New York Sample

56.     Exhibit J provides the computer tables with the screening data, the purchase likelihood results from Question 1, and the coding of the verbatim responses to Question 2 for the California, Florida, and New York survey.

57.     As shown in Table 2 below (*see also* Table 5 on p. 5 of Exhibit J), the state-specific survey results indicate that there was *no* difference in the likelihood of purchasing the Bayer One A Day product between the test group respondents and the control group respondents ($\chi^2 = 3.259$, $df = 4$, $p > .51$, *n.s.*).  That is, removing from the Bayer One A Day package the challenged heart, immunity, and energy claims did *not* influence respondents' stated likelihood of purchasing the Bayer multivitamin product.

*****************

---

[24] *See ibid*, Table 6, pp. 7 – 18.

**Table 2: Percent of Respondents Selecting Various Answer Choices in Question 1**

| | Green Questionnaires: Challenged Claims Listed (Test Group) (N = 206) | Lilac Questionnaires: Challenged Claims Removed (Control Group) (N = 205) |
|---|---|---|
| Definitely would buy this product | 37.9% | 39.0% |
| Probably would buy this product | 36.4% | 38.0% |
| May or may not buy this product | 14.6% | 13.7% |
| Probably would <u>not</u> buy this product | 3.4% | 4.9% |
| Definitely would <u>not</u> buy this product | 6.3% | 2.9% |
| Don't know | 1.5% | 1.5% |

58.     More specifically, 37.9% of test group respondents, who considered a Bayer One a Day package with the challenged claims, answered that they "Definitely would buy this product."  A similar proportion, 39.0% of control group respondents, who considered a similar package but with the challenged claims removed, provided the same answer, that is, that they "Definitely would buy this product."  The -1.2% difference between the proportions of test group and control group respondents who indicated that they "Definitely would buy this product" does *not* approach statistical significance ($\chi^2 = 0.058$, $df = 1$, $p > .80$, *n.s.*), which means that this -1.2% difference is statistically indistinguishable from zero.

59.     A similar lack of effect of the challenged claims is observed among respondents who answered that they "Probably would buy this product" (*i.e.*, the second row in Table 2 above).  Specifically, the results indicate that there was *no* difference between the percent of respondents who answered that they "Probably would buy this product" in the test condition versus in the control condition (36.4% vs. 38.0%; *see* Table 5 on p. 5 of Exhibit J).

60.     In terms of "top two boxes" (*i.e.*, the first two rows in Table 2 above), the results indicate that there was *no* significant difference between the percent of respondents who answered that they "Definitely would buy this product" or "Probably

would buy this product" in the test condition versus in the control condition (74.3% vs. 77.1%, respectively; *see* Table 5 on p. 5 of Exhibit J). That is, the -2.8% difference between the test and control groups in the rate of respondents indicating that they "Definitely would buy this product" or "Probably would buy this product" was *not* statistically significant ($\chi^2 = 0.44$, $df = 1$, $p > .50$, *n.s.*). Similarly, there were *no* significant differences between the test and control groups in the likelihood of answering "May or may not buy this product" (14.6% vs. 13.7%, respectively; $\chi^2 = 0.069$, $df = 1$, $p > .79$, *n.s.*) or in terms of the "bottom two boxes" (9.7% vs. 7.8%, respectively; $\chi^2 = 0.47$, $df = 1$, $p > .49$, *n.s.*; *see* Table 5 on p. 5 of Exhibit J).

61.     Tables 6 and 7 of Exhibit J (pp. 6 - 29) contain the coding of the verbatim responses to Question 2 ("What makes you say that you [INSERT ANSWER FROM Q.1]? "Any other reason why you [INSERT ANSWER FROM Q.1]"?). As the results shown in Table 6 of Exhibit J indicate, respondents in the state-specific sample provided a variety of reasons -- unrelated to the challenged heart, immunity, or energy claims -- in favor of purchasing the disputed Bayer One A Day product. For example, "test" group respondents' verbatim responses mentioned such purchase considerations as specific vitamins or general vitamin mentions (27.2%; 56 out of 206 respondents); appeal of packaging in terms of amount of pills, appearance, color, or size (26.2%); brand equity/recognition of Bayer or One A Day (19.9%); for women (17.5%); bone benefits (10.7%); healthy/health (7.8%); skin benefits (7.8%); "it has everything you need/don't need to buy/take other products" (6.3%); minerals (6.3%); and "good for you/your body" (4.4%); as well as multiple other reasons unrelated to the challenged heart, immunity, or energy claims.[25]

62.     Respondents' explanations of their purchase decisions strongly support the finding that the challenged claims are neither material, nor common, factors in

---

[25] *See* Exhibit J, Table 6, pp. 6 - 18.

consumers' purchase decisions. *First*, only a small minority of "test group" respondents, who considered an original Bayer One A Day package bearing the challenged claims, mentioned a heart, immunity, or energy benefit as a reason for purchasing the disputed product. In particular, among "test group" respondents, only 9.7% (*i.e.*, 20 out of 206), 6.3% (*i.e.*, 13 out of 206), and 6.3% (*i.e.*, 13 out of 206) of respondents mentioned a heart, immunity, or energy benefit, respectively, as a reason for purchasing the disputed Bayer One A Day product.[26] It is noteworthy that the heart, immunity, and energy benefits mentioned as purchase reasons by many respondents in this survey do *not* necessarily indicate that these respondents' purchase decisions were driven by a challenged packaging or advertising claim made by Bayer regarding heart health, immune health, or physical energy. That is, some consumers may have preexisting beliefs that multivitamins provide heart, immunity, and/or energy benefits, and such preexisting beliefs could have been the source of respondents' mentions of such benefits as purchase reasons. For example, the majority of the mentions of an energy benefit consisted of the following purchase explanations: "good for/provides/helps with energy," "more energy than from previous brands," and "gives me energy for the entire day."[27] Such purchase explanations can reflect consumers' preexisting beliefs (*e.g.*, that multivitamins, in general, provide energy benefits) as opposed to an (alleged) misperception caused by Bayer's packaging or advertising.

63.    *Second*, as mentioned earlier, respondents from the state-specific sample mentioned numerous considerations for, and against, purchasing the Bayer One A Day product.[28] These respondents' explanations demonstrate that decisions to purchase the disputed Bayer multivitamin product are driven by myriad reasons. Further, the different

---

[26] *See ibid*, Table 6, pp. 6 - 7.
[27] Specifically, 2.4%, 0.5%, and 0.5% of "test" group respondents provided these explanations; *see ibid*, p. 7.
[28] *See ibid*, Tables 6 and 7, pp. 6 – 29.

purchase motivations varied across respondents.[29]  These findings are diametrically opposed to the notion that the challenged heart, immunity, and energy claims are important and common purchase considerations across the putative California, Florida, and New York subclass.

64.      In conclusion, the state-specific survey's results from both the purchase likelihood measure and the respondents' explanations are remarkably consistent: listing the challenged heart, immunity, and energy claims on the packaging of the Bayer One A Day product does *not* influence (*i.e.*, does *not* have a material or causal effect on) consumers' decisions to purchase the product.  Relatedly, respondents' explanations indicate that, not only are the challenged claims immaterial in consumers' purchasing decisions, but also a variety of other purchase motivations influence consumers, with significant heterogeneity (differences) arising between consumers.


A.2      <u>Market Research Conducted for Bayer in the Normal Course of its Business, as well as Academic Research, Demonstrate that Multiple Factors -- Unrelated to the Three Challenged Claims -- Drive Consumers' Purchases of the Disputed One A Day Products</u>

65.      Findings from marketing research conducted for Bayer in the ordinary course of its business, as well as from academic research, are consistent with the results of my surveys.  More specifically, such marketing and academic research indicates that consumers purchase the disputed Bayer One A Day products, in particular, and multivitamins, in general, for a variety of reasons that are unrelated to the advertising and packaging claims challenged in this case.  Thus, the research reviewed supports the notion that the challenged heart, immunity, and energy claims do *not* commonly drive purchase decisions.

---

[29] *See ibid*, Table 6, pp. 6 – 18.

66.     The factors driving consumers' purchases of, and choices among, multivitamins include, but are not limited to, brand equity and recognition; the recommendations of health care providers, family, and friends; a desire to maintain a healthy lifestyle; wanting to look and feel better; attempting to close nutritional gaps; form factor (*i.e.*, pills vs. gummy); price, perceived value for money, and sales promotions; packaging and quantity of pills; ingredients, minerals, and vitamins; and potential future pregnancy.



---

[30] *See* "One-A-Day Segmentation Refresh: Final Presentation, December 2011"; DEF-0010716.
[31] DEF-0010718.
[32] DEF-0010743. ████████████████████████████████████
[33] DEF-0010743. ████████████████████████████████████
[34] DEF-0010725.
[35] DEF-0010727.

Dr. Kivetz Expert Declaration            Highly Confidential            Case No. 314-cv-04601-WHO
                                              Page 29



68.     Relatedly, academic research indicates that consumers purchase multivitamins for a variety of reasons and that the challenged heart, immunity, and energy claims do *not* commonly drive consumers' purchase decisions.  One study, of Caucasian female college students, found that reasons to use multivitamins include such motivations as looking and feeling better, getting additional nutrients, and affordability.[38] The same study suggests that some women of child-bearing age may be motivated to use multivitamins to obtain sufficient levels of folic acid, a key approach to preventing birth defects.[39]

69.     Another study, of African-American female college students, found that reasons to use multivitamins included looking and feeling better, having extra energy, and encouragement from family, peers, and/or doctors.[40]  A different study, in which free multivitamin samples were given to women, found that some study participants provided such reasons for using the multivitamins as general health, potential future pregnancy, and

---

[36] DEF-0010739.

[37]

[38] Pawlak, R., Brown, D., Meyer, M. K., Connell, C., Yadrick, K., Johnson, J. T., & Blackwell, A. (2008), "Theory of Planned Behavior and Multivitamin Supplement Use in Caucasian College Females," *The Journal of Primary Prevention*, 29 (1), 57 - 71.
[39] *Ibid*; *see also* Pawlak, R., Connell, C., Brown, D., Meyer, M. K., & Yadrick, K. (2005), "Predictors of Multivitamin Supplement Use Among African-American Female Students: A Prospective Study Utilizing the Theory of Planned Behavior," *Ethnicity and Disease*, 15 (4), 540 - 547.
[40] Pawlak, R., Connell, C., Brown, D., Meyer, M. K., & Yadrick, K. (2005), "Predictors of Multivitamin Supplement Use Among African-American Female Students: A Prospective Study Utilizing the Theory of Planned Behavior," *Ethnicity and Disease*, 15 (4), 540 - 547.

not eating well.[41]  Other women in the same study indicated that forgetting, upset stomach, and bad taste were reasons for not using the multivitamins.[42]

70.     Consistent with the findings from the two surveys that I conducted in this case, and with the results of Bayer's market research, scientific consumer research suggests that an important factor motivating purchases of the disputed products are the Bayer and the One A Day brand names, brand equities, and brand familiarity.[43]  Academic research has shown that, in purchase decisions involving consumer-packaged goods, brand name is a highly important attribute and sometimes a dominant choice heuristic.  Further, research utilizing eye tracking methodologies demonstrates that consumers pay a great deal of attention to brand name information and that consumers do so under conditions of both high and low time pressure.[44]

71.     Consumers' skepticisms and reactance to advertising claims is another reason why the challenged claims do *not* commonly drive purchase decisions.  When consumers encounter, pay attention to, and process an advertising claim made on a product's package, they may accept the claim and incorporate it into their purchase decision-making, or instead, they may be skeptical of the statement.  Academic research in marketing and consumer behavior has documented that many consumers are skeptical of information that is provided to them by marketers.[45]  Relatedly, consumer behavior and decision-making research shows that consumers often react to marketing communications and promotions;[46] that is, consumers are often aware that marketers

---

[41] Morgan, L. M., Major, J. L., Meyer, R. E., & Mullenix, A. (2009), "Multivitamin Use Among Non-pregnant Females of Childbearing Age in the Western North Carolina Multivitamin Distribution Program," *North Carolina Medical Journal*, 70 (5), 386 - 390.

[42] *Ibid*.

[43] *See, e.g.*, W. Hoyer and S. Brown (1990), "Effects of Brand Awareness for a Common Repeat-Purchase Product," *Journal of Consumer Research,* 17 (September), 141 - 198.

[44] R. Pieters and L. Warlop (1999), "Visual Attention During Brand Choice: The Impact of Time Pressure and Motivation," *International Journal* of *Research in Marketing*, 16, 1 – 16.

[45] Pollay, Richard W. and Banwari Mittal (1993), "Here's the beef: Factors, determinants and segments in consumer criticism of advertising." *Journal of Marketing*, 57 (3), 99-114.

[46] *E.g.*, R. Kivetz (2005), "Promotion Reactance: The Role of Effort-Reward Congruity," *Journal of Consumer Research*, 31 (4), March, 725-736.  This article won the 2005 "Ferber Award" from the

provide information in an attempt to influence them to make a purchase, and customers regularly counteract such influence tactics.[47]

72.     Overall, Bayer's research conducted in the normal course of its business, as well as academic, scientific research, demonstrate that numerous features and motivations influence consumers' purchases and choices of multivitamin products.  These empirical research findings support the notion that the challenged heart, immunity, and energy claims are *not* common causal factors in consumers' decisions to purchase the Bayer One A Day products.

A.3     The Named Plaintiffs' Deposition Testimony Supports the Notion that Consumers Purchase Bayer One A Day Products for a Variety of Reasons

73.     The Plaintiffs' depositions are consistent with the findings from the two consumer surveys that I conducted in this case, with Bayer's market research, and with the academic research reviewed above.  More specifically, the testimony of the three named Plaintiffs supports the notion that consumers purchase and choose Bayer One A Day products for myriad reasons.  Plaintiffs testified that some of the factors that motivated their purchases of, and choices among, multivitamins include, but are not limited to, brand equity and recognition; the recommendations of health care providers; a desire to maintain general health; a desire to maintain bone, heart, eyes, skin, and/or memory health; an attempt to fill in nutritional gaps; price; individual health conditions; and various ingredients, minerals, and vitamins.

74.     For example, Plaintiff Lopez testified that, among other reasons, she decided to purchase the Bayer One A Day multivitamin due to such considerations as:

---

Association for Consumer Research, which is the largest association of consumer researchers in the world.

[47] M. Friestad and P. Wright (1994), "The Persuasion Knowledge Model: How People Cope with Persuasion Attempts," *Journal of Consumer Research*, 21, 1-31;  P. Wright (1985), "Schemer Schema: Consumers' Intuitive Theories about Marketers' Influence Tactics," *Advances in Consumer Research*, 13, UT: Association for Consumer Research, 1-3.

███████████████████████████████████

██████████████████████ (b) brand recognition ("Well, I see One A Day, of

course; they're a famous brand. I seen it on TV. So I got it.");[49] (c) general health;[50] (d)

bone, heart, eyes, skin, and memory health.[51]

75.     Plaintiff Cosgrove testified that the factors affecting her purchase decisions

and choices regarding multivitamins and the Bayer One A Day product include, but are

not limited to: (a) a desire to improve her general health;[52] (b) her doctor's

recommendation;[53] (c) price;[54] (d) brand;[55] (e) quantity of chewables or gummies;[56] and

(f) minerals and vitamins.[57]

76.     Plaintiff Farar testified that some of the reasons that influenced her

decisions to purchase vitamins and the Bayer One A Day product include: (a) brand

reputation;[58] (b) a desire to maintain her energy level;[59] (c) that she "care[s] about [her]

bones as a woman" and wanted to "[make] sure that [she has] enough calcium or enough

vitamin D, because [she doesn't] drink milk";[60] (d) that *she thinks* that vitamins are "good

for" her heart, her energy, her hair, her skin, and her nails, as well as that *she thinks*

vitamins are helpful for not getting sick.[61]

*******************

---

[48] Lopez Deposition, pp. 166 – 167.
[49] *Ibid*, p. 198.
[50] *Ibid*, p. 60.
[51] *Ibid*.
[52] *See, e.g.*, Cosgrove Deposition, pp. 309 – 301 & 324.
[53] *Ibid*, pp. 302 – 305 & 324.
[54] *Ibid*, p. 51 - 52.
[55] *Ibid*, pp. 52, 55, & 58 - 60.
[56] *Ibid*.
[57] *Ibid*.
[58] Farar Deposition, p. 69.
[59] *Ibid*, pp. 54 - 55.
[60] *Ibid*.
[61] *Ibid*, p. 55.

A.4     Some Consumers are Likely to Purchase One A Day Multivitamins to Obtain
        Insurance Value or a Perceived Nutritional Safety Net

77.     It is my understanding that Plaintiffs agree that if a consumer is deficient in
vitamins, then the Bayer One A Day product *does* provide a benefit for that individual.
Thus, in claiming that the disputed "Products are ineffective and provide no benefit…,"[62]
it appears that the Plaintiffs contend that consumers who are *not* deficient in vitamins
receive no value or benefit from the One A Day products.  Plaintiffs' argument fails to
account for the many different ways in which One A Day consumers may benefit from
the products.  In particular, one such benefit is "insurance value."  Specifically, as
explained next, academic research, Bayer's internal research, and Plaintiffs' depositions
all demonstrate that consumption of multivitamin products may serve as an insurance (or
reassurance) against an actual or perceived deficiency in daily amounts of nutrition in
consumers' diets.

78.     *First*, academic research indicates that some consumers may purchase and
use multivitamins as a form of insurance or nutritional safety net.  For example, one
study of pharmacy customers who use multivitamins identified distinct types of reasons
for using multivitamins.[63]  Some users endorsed perceived physical benefits of using
multivitamins, whereas others endorsed taking multivitamins as a form of "insurance,"
based on such benefits as peace of mind about health and feeling in control of their
health.[64]  Similarly, in another study, with child-bearing aged women, some consumers
reported using multivitamins as insurance against the possibility of missing vitamins and
minerals from food alone.[65]

---

[62] *Plaintiffs' Notice of Motion, Motion, and Memorandum of Points and Authorities in Support of Class Certification*, p. 16.
[63] Okleshen Peters, C. L., Shelton, J., & Sharma, P. (2004), "An Investigation of Factors that Influence the Consumption of Dietary Supplements," *Health Marketing Quarterly*, 21 (1-2), 113 - 135.
[64] *Ibid*.
[65] Lindsey, L. L. M., Hamner, H. C., Prue, C. E., Flores, A. L., Valencia, D., Correa-Sierra, E., & Kopfman, J. E. (2007), "Understanding Optimal Nutrition Among Women of Childbearing Age in the United States and Puerto Rico: Employing Formative Research to Lay the Foundation for National Birth

79. 

80.    It is noteworthy that, even people who -- on average -- consume sufficient amounts of nutrition may be concerned that they could become nutrition deficient over a given period and may seek to guarantee that they consistently have enough nutrients and vitamins by using multivitamins.  Relatedly, many consumers likely realize that they cannot know whether they are vitamin or nutrition deficient.  Such consumers, too, may purchase multivitamins as a form of insurance or nutritional safety net.  Considerable academic research has demonstrated that people find value in purchasing insurance to eliminate the possibility of even highly unlikely negative outcomes and losses.[68]

81.    *Third*, Plaintiffs' deposition testimony is consistent with the notion that some consumers purchase multivitamins as a sort of insurance against an actual or perceived deficiency in vitamin, nutrient, and/or mineral intake.  For example, Plaintiff Cosgrove testified as follows:[69]

> Q. … Why did you think that giving your kids a multivitamin was a good idea even before your physician recommended it?

---

Defects Prevention Campaigns," *Journal of Health Communication*, 12 (8), 733-757.
[66] DEF-0010743.

[67] DEF-0010743.

[68] D. Kahneman and A. Tversky (1979), "Prospect Theory: An Analysis of Decision Under Risk," *Econometrica*, 47 (March), 313-327; *see also* Rottenstreich, Yuval, and Ran Kivetz (2006), "On Decision Making without Likelihood Judgment," *Organizational Behavior and Human Decision Processes*, Volume 101 (1), September, 74-88.
[69] Cosgrove Deposition, p. 41.

> A. So that they could get nutrients and vitamins that they need that they are potentially not getting any of or enough of in their regular daily diet.

And:[70]

> Q. And to make it faster, I'm not going to go through all the other vitamins, but you don't know if you have the recommended intake level for any vitamin, nutrient, or mineral, correct?
> A. That's right.
> Q. And that's one of the reasons you take a multivitamin or you have taken a multivitamin in order to reach the appropriate intake levels, correct?
> A. Yes.
> Q. And that's one of the reasons your kids take a multivitamin too, right?
> A. Yes.

Similarly, Plaintiff Farar testified as follows:[71]

> Q. … When you've given your children vitamins, what was the reason you did so?
> A. Maybe because I felt like it was the right thing to do, that it's something you're supposed to do.
> Q. Why do you think it was the right thing to do?
> A. My son is a picky eater. I wanted to make sure that he was getting what he needs. But he's a much healthier eater now.
> Q. So you thought that the vitamins could fill in potential gaps in his diet?
> A. Of certain things.

82.     In summary, as the above analysis and discussion indicates, some consumers obtain insurance value from purchasing the disputed Bayer One A Day multivitamins.  Plaintiffs' claim that the disputed "Products are ineffective and provide no benefit…"[72] fails to recognize this product benefit.

### A.5   Consumers Purchase Multivitamins and Bayer One A Day Products Based on Information from a Variety of Non-Bayer Sources that are Independent of the Challenged Packaging and Advertising Claims

83.     Bayer's marketing research indicates that many consumers decide to purchase multivitamins and Bayer One A Day products based on information obtained from a variety of non-Bayer sources.  Such information sources, which are independent

---

[70] *Ibid*, p. 299.
[71] Farar Deposition, p. 54.
[72] *Plaintiffs' Notice of Motion, Motion, and Memorandum of Points and Authorities in Support of Class Certification*, p. 16.

of the challenged advertising and packaging claims, include doctors, pharmacists, personnel at vitamins stores, family and friends, and magazine and Internet articles.



[73] *See* "2011 Multivitamin Segmentation Qualitative Exploratory, May 2011"; DEF-0007140.
[74] DEF-0007142.
[75] DEF-0007143.  Alternative channel shoppers shop at organic/health food stores such as Trader Joes and Whole Foods, or at other organic/health food stores, as well as vitamin/health stores such GNC, Vitamin Shoppe, Vitamin World, or other vitamin/health stores.
[76] DEF-0007153.
[77] DEF-0007160.
[78] DEF-0007170.
[79] *See* "2014 Multivitamin Tracking Presentation, March 2015"; DEF-0011968.



---

[80] DEF-0011969.
[81] DEF-0011977.
[82] See "One-A-Day Segmentation Refresh: Final Presentation, December 2011"; DEF-0010716.
[83] DEF-0010729.
[84] DEF-0010749.
[85] DEF-0010753.
[86] DEF-0010755.
[87] DEF-0010761.



85.     Overall, Bayer's market research ████████████████████████
████████████████████████████████████████████████████████████████

████     Such information sources are likely independent from Bayer's advertising and packaging.  This is another reason why the challenged advertising and packaging claims in this case do *not* commonly influence purchase decisions among the putative class and subclasses members.

A.6     The Putative Class/Subclass Members Differ from Each Other in Terms of Their Purchase Decisions

86.     As the analysis in the prior Subsections indicates, consumers of multivitamins, in general, and One A Day, in particular, have different purchase motivations, and consumers differ in their valuation of the challenged heart, immunity, and energy claims, if they place *any* value at all on these claims.  The present Subsection reviews Bayer's market research, academic research, and other sources that demonstrate that, in this case, the putative class (and subclasses) members differ from each other in terms of their purchase motivations and decisions.

87.     As I have taught my MBA and Executive MBA students at Columbia University Business School, one of the most fundamental principles in marketing is that consumers are heterogeneous, and accordingly, that marketing managers must segment their customer base.[91]  Voluminous research demonstrates that consumers systematically

---

[88] DEF-0010727.
[89] DEF-0010728.
[90] DEF-0010739.
[91] Kotler, P. (1997), *Marketing Management: Analysis, Planning, Implementation, and Control.* Upper

differ from each other with respect to their attitudes, perceptions, preferences, behaviors, and product usage patterns.[92]  My own peer-reviewed, published research on consumers' response to promotions, rewards, products, and other marketing tactics has uncovered considerable consumer heterogeneity.  In my research, I have found that consumers systematically vary in their preferences and behaviors due to individual differences related to emotions of guilt about indulging, risk and time preferences, hedonism, social comparison tendencies, belief in the protestant work ethic, psychological reactance, and other factors.[93]  For example, consumer differ in their tendency to accelerate their efforts and purchases as they near goals, with some consumer segments exhibiting pronounced acceleration (*i.e.*, a strong "goal gradient" effect), some demonstrating weaker acceleration, and some even manifesting deceleration (reduced effort as a function of goal proximity).[94]

88.     Relatedly, academic research demonstrates that consumers differ in how they value products, and in how important various product attributes and benefits are in their purchase decisions.  Holding constant the specific perceptions, inferences, and expectations that consumers form about product attributes, an additional source of heterogeneity has been found to emerge from the unique and subjective value that each consumer may attach to advertised product attributes and benefits.  Specifically, the perceived value from a given product's attributes and benefits has been shown to vary

Saddle River, New Jersey: Prentice-Hall;  Wedel, Michel and Wagner A. Kamakura (2000). Market Segmentation: Conceptual and Methodological Foundations. Amsterdam: Kluwer.

[92] G. M. Allenby, N. Arora, and J. L. Ginter (1998), "On the Heterogeneity of Demand," *Journal of Marketing Research*, 35 (3), 384-389;  G. M. Allenby and J. L. Ginter (1995), "Using Extremes to Design Products and Segment Markets," *Journal of Marketing Research*, 32 (4), 392-403.

[93] R. Kivetz and Y. Zheng (2006), "Determinants of Justification and Self-Control," *Journal of Experimental Psychology: General*, 135 (4), 572-587;  R. Kivetz and I. Simonson (2002);  R. Kivetz and I. Simonson (2003), "The Idiosyncratic Fit Heuristic: Effort Advantage as a Determinant of Consumer Response to Loyalty Programs," *Journal of Marketing Research*, 40 (4), 454-467;  R. Schrift, O. Netzer, and R. Kivetz (2011), "Complicating Choice," *Journal of Marketing* Research, 48 (2), 308-326 (*Winner*, 2010 *Best Competitive Paper Award*, *Society of Consumer Psychology*);  J. Levav, R. Kivetz, and K. C. Cho (2010), "Motivational Compatibility and Choice Conflict," *Journal of Consumer* Research, 37 (3), 429-442;  R. Kivetz (2005), "Promotion Reactance: The Role of Effort-Reward Congruity," *Journal of Consumer Research*, 31 (4), 725-736.

[94] *See*, R. Kivetz, O. Urminsky, and Y. Zheng, (2006).

significantly across individuals.[95]  As Professor Zeithaml wrote: "What constitutes value
-- even in a single product category -- appears to be highly personal and idiosyncratic."[96]

89.    Academic research documents substantial variability in the use of, and the
reasons for purchasing, multivitamins.  For example, multivitamin use is more prevalent
among women (vs. men), older people, whites (vs. racial minorities), and people with
higher education, lower BMI, and more physical activity.[97]  In a large-scale survey[98],
reasons for taking multivitamins differed according to both gender and body weight.  In
particular, the degree to which participants agreed with reasons for using multivitamins
(including health, daily routine, not eating a balanced diet, more energy, and healthcare
provider recommendations) differed between men and women, and differed among
women of different body masses.



---

[95] *E.g.*, Zeithaml, V. A. (1988), "Consumer Perceptions of Price, Quality and Value: A Means-End Model
and Synthesis of Evidence," *Journal of Marketing*, 52 (3), p. 13.
[96] *Ibid.*
[97] Rock, C. L. (2007), "Multivitamin-multimineral Supplements: Who Uses Them?," *The American
Journal of Clinical Nutrition*, 85 (1), 277S-279S.
[98] Kimmons, J. E., Blanck, H. M., Tohill, B. C., Zhang, J., & Khan, L. K. (2006), "Multivitamin Use in
Relation to Self-reported Body Mass Index and Weight Loss Attempts," *Medscape General Medicine*,
8(3): 3.
[99] *See* "One-A-Day Segmentation Refresh: Final Presentation, December 2011"; DEF-0010716.
[100] *See, e.g.*, DEF-008794; DEF-0011664; DEF-0011830; DEF-0007568; and DEF-0009996.



[101] DEF-0010743.

████████████████████████████████████

██████████████████████████████████████

███████████████████████████████████

██████████████████████████████████████████

████████████████████████████████

93.     Relatedly, the results of the two consumer surveys that I conducted in this litigation, indicate that purchasers of the disputed Bayer One A Day products differ from one another in terms of their purchase motivations.  For example, as detailed in Subsection A.1 of this declaration, respondents' explanations indicate that, not only are the challenged claims immaterial in consumers' purchasing decisions, but also a variety of other purchase motivations influence consumers, with significant heterogeneity (differences) arising between consumers.  Overall, my surveys' findings are diametrically opposed to the notion that the challenged heart, immunity, and energy claims are material.

94.     Notably, customer heterogeneity and segmentation is directly relevant to the question of whether the putative sub/class members are similar to, or different from, one another with regards to their purchase drivers and the impact, if any, of the challenged advertising and packaging claims on purchase decisions.  The analyses and findings reported in the previous subsections demonstrate that purchasers of the disputed Bayer One A Day products differ from one another in terms of their purchase motivations, product knowledge, and product usage patterns.  More specifically, the results of my two consumer surveys; the analyses of Bayer's market research and of academic research; the disputed One A Day products, packages, and challenged claims; and the named Plaintiffs' depositions all indicate that the putative sub/class members differ in many respects, which include, but are not limited to, the following:

(a) differences between the putative sub/class members in the key factors motivating

---

[102] DEF-0010746.

purchases of the disputed Bayer One A Day products (*e.g.*, brand equity/recognition; appeal of packaging in terms of amount of pills, appearance, color, or size; specific fit for women or men; importance of different perceived benefits, such as bone, skin, and eye health benefits; wanting to look and feel better; attempting to close nutritional gaps; form factor [*i.e.*, pills vs. gummy]; price, perceived value for money, and sales promotions; and importance of folic acid in order to prevent birth defects);

(b) substantial differences in the extent to which specific vitamins, minerals, and/or ingredients matter to different sub/class members when making purchase decisions;

(c) differences in the perceived "insurance value" of multivitamin products;

(d) the extent to which purchase decisions are influenced by recommendations from doctors, pharmacists, vitamin store staff, friends and family, and magazine and Internet articles;

(e) substantial differences in the demographics (*e.g.*, age & gender) and psychographics of the consumers who purchase the disputed Bayer One A Day products;

(f) differences between the putative class members in terms of their health history, health conditions, and health consciousness, and perceived nutritional needs;

(g) individual differences in various psychological factors (*e.g.*, skepticism, psychological reactance, need-for-cognition) that affect the degree to which the putative sub/class members would be misled and influenced by the disputed Bayer One A Day packages and challenged advertising claims;

(h) differences in consumers' responsiveness to various packaging claims; and

(i) possible variations -- due to demographic, situational, and psychographic differences -- in the interpretation and perception of the challenged heart health, immunity health, and physical energy claims.

95.     In conclusion, the existence of considerable consumer heterogeneity is inconsistent with common reliance on the challenged heart, immunity, and energy claims.

My professional opinion is that the members of the putative sub/class differ from one another in multiple significant ways, including in terms of their multivitamin preferences, purchase motivations, and usage behaviors.  Such differences mean that there is meaningful and substantial variation across the putative sub/class members in terms of their purchase drivers and in terms of the effect, if any, of the challenged claims on their purchase decisions.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**B.**      **THE PUTATIVE CLASS AND SUBCLASSES MEMBERS CANNOT SELF-IDENTIFY IN A RELIABLE AND VALID MANNER**

96.      Like other consumer packaged goods (CPG) manufacturers, Bayer does *not* have individual-level sales and consumer data.  To the best of my knowledge, Bayer does *not* sell its products directly to consumers, and therefore, Bayer does not have direct customer purchase information.  Thus, to ascertain and manage the putative class and subclasses, Plaintiffs may seek to rely on consumers' ability to accurately self-identify and self-select into the putative class and subclasses.  Plaintiffs in their brief provide no explanation or evidence of how they will identify class members.  However, as detailed in this section, academic and industry research, as well as the specific products and packaging at issue in this case, all indicate that it is impossible to ascertain Plaintiffs' proposed class and subclasses in a reliable and valid manner.

97.      In order for consumers to accurately self-identify into the putative class and subclasses, consumers will have to remember: (a) whether they bought a Bayer One A Day product (*i.e.*, as opposed to some other brand of multivitamins that has similar packaging or displays packaging claims that are similar to the claims challenged in this litigation); (b) when they bought the One A Day product (*i.e.*, during the proposed Class Period or before); *and* (c) whether the packaging of the One A Day product -- which they ostensibly purchased during the proposed Class Period -- included *at least* one of the challenged claims (*i.e.*, whether the One A Day product they purchased is included in Plaintiffs' definition of the sub/class).[103]

---

[103] Note that plaintiffs defined the putative National Class as: "All persons in the United States who purchased Bayer One A Day Supplements in the United States that contained one or more Claims from October 15, 2010 until the date of certification ("Class Period")"; *Plaintiffs' Notice of Motion, Motion, and Memorandum of Points and Authorities in Support of Class Certification*, p. 7.  Relatedly, Plaintiffs defined the putative California, Florida, and New York Subclasses as: "All persons in California [Florida/New York] who purchased Bayer One A Day Supplements in California [Florida/New York] that contained one or more Claims during the Class Period"; *Ibid*, p. 8.

98.     As detailed in this subsection, consumers will *not* be able to self-identify in a valid and reliable manner into the putative class and subclasses.  Such self-identification by the putative class and subclass members will be unreliable, inaccurate, and susceptible to biases arising from: (*i*) memory limitations; and (*ii*) similarities in the branding and packaging of the disputed Bayer One A Day products (that display *at least one* challenged packaging claim) and the undisputed Bayer One A Day products (*i.e.*, that do not depict *any* challenged packaging claim); (*iii*) similarities between the disputed Bayer One A Day products and other brands of multivitamins that use similar packaging or display packaging claims like the claims challenged in this litigation.

### B.1.   <u>Memory Limitations</u>

99.     The products at issue in this case are consumer packaged goods (CPGs) that are consumable and perishable.  Consumers buying such products typically have no reason to retain the package after they use its content.  For example, Plaintiff Farar testified that her normal practice is to throw away [vitamin] boxes after she finishes using the product:[104]

> Q. So you would have likely thrown away the box sometime in late summer 2014?
> A. I really can't -- I can't say for sure.  My normal practice is not to keep boxes.  I have a household with four people.  If I kept every box, it would be -- my normal practice would be to throw the box away.
> Q. And you likely threw the bottle away in September or October of 2014, when you finished using the product?
> A. I likely threw away the bottle when I was done with it.  I don't know if it was September or October or November or December.  I don't remember.  Because I don't remember the time period that I took that one before I started the Raw One.

100.     Further, the putative sub/class members are unlikely to have proof of purchase (receipts) showing that they bought the disputed One A Day products during the

---

[104] Farar Deposition, p. 166; *see also* pp. 239 – 240.  Plaintiff Lopez also testified that she threw out multivitamin and vitamin product packages; *see, e.g.*, Lopez Deposition, pp. 221 – 222.

relevant Class Period.  Indeed, Ms. Farar testified that she did *not* retain the receipt from her purchase of a One A Day product at CVS:[105]

> Q. And in summer 2014, you went into the CVS, you bought the One A Day product; right? Did you keep the receipt for that purchase?
> A. No.

101.  Certainly, the putative sub/class members are unlikely to possess any records that would allow the court to determine whether any purchased Bayer packages displayed the challenged heart, immunity, and/or energy claims.  Importantly, as subsequently detailed in Subsection B.2 of this Declaration, there is substantial variation in the claims appearing on the disputed One A Day products.  Moreover, there are multiple One A Day branded products that do *not* depict *any* challenged claims at all, but which nevertheless appear similar in many respects to the disputed products.

102.  Considerable research on human memory, as well as the Bayer One A Day products, packages, and challenged claims at issue in this case, indicate that the putative sub/class members would *not* be able to accurately remember the required details to reliably self-identify.

103.  Research shows that human memory is both limited and diminishing with the passage of time.[106]  For example, academic research demonstrates that over half of shoppers cannot recall price and purchase-related information regarding items that they just placed in their shopping cart.[107]  This finding is inconsistent with the notion that consumers will be able to remember the necessary details in order to reliably and validly self-identify into the putative class and subclasses.

104.  Plaintiffs' deposition testimony supports the notion that the putative sub/class members will *not* be able to self-identify in a valid and reliable manner.  More specifically, the named Plaintiffs were *not* able to recall the packaging, or the challenged packaging

---

[105] Farar Deposition, pp. 99 – 100.  *See also* Lopez Deposition, p. 173.

[106] *E.g.*, J. R. Anderson (1985), *Cognitive Psychology and Its Implications*, W.H. Freeman and Company.

[107] P. R. Dickson and A. G. Sawyer (1990), "The Price Knowledge and Search of Supermarket Shoppers," *Journal of Marketing*, 54 (July), 42-53.

claims, of the disputed One A Day products they purchased.  Consider, for example, the

following testimony provided by Plaintiff Cosgrove:[108]

> Q. So, what we were talking about before we broke, Ms. Cosgrove, is that you don't have any specific recollection of any of the claims that you saw or relied upon before purchasing the product, correct?
> A. Correct.

Ms. Cosgrove was also unable to remember whether the packaging claims impacted her

decision to purchase the product:[109]

> Q. It's possible that the claims on the bottle made an impact on your purchasing decision, it's possible they did not; you don't remember either way?
> A. Correct.

In addition, Ms. Cosgrove could not recall the brands of multivitamin she bought for her kids

in late 2015 or the claims, if any, that appeared on their packaging:[110]

> Q. Do you know how many multivitamin bottles you purchased for your kids in late 2015?
> A. One or two.
> Q. And you don't recall which brand they are?
> A. No.
> Q. You don't recall which claims, if any, are on them?
> A. No

105.    Similarly, Plaintiff Farar could not recall the name of at least one of the

multivitamins she took:[111]

> Q. And you don't remember the name of the other multivitamin you took?
> A. I don't remember. I don't.
> Q. And you have no records of that multivitamin?
> A. No.
> Q. And whatever records you had of that purchase you threw away.
> A. Right.

Plaintiff Farar also appeared to be unable to remember which packaging claims appeared

on the product packaging.[112]

---

[108] Cosgrove Deposition, p. 324.
[109] *Ibid*, p. 325.
[110] *Ibid*, p. 61.
[111] Farar Deposition, p. 165.
[112] *Ibid*, pp. 276 – 278.

B.2.    Similarities in the Branding and Packaging of the Disputed Products and Multiple
        Other (Undisputed) Products, including (Undisputed) Bayer One A Day Products

106.    To further assess consumers' ability to self-identify and to evaluate the
putative class' and subclasses' ascertainability and manageability, it is helpful to consider
the variations in the Bayer One A Day products' packaging, as well as the similarities
with other multivitamin product packages.  The challenged claims varied across different
disputed Bayer One A Day products' packages.  A review of the One A Day products'
packaging labels shows that many of the challenged claims varied across different
packages, with multiple challenged claims *not* appearing during the proposed Class
Period on many of the One A Day packages at issue.

107.    Critically, during the proposed Class Period, there were some Bayer
One A Day multivitamin products that were sold without *any* challenged claims on their
consumer-facing packaging (*i.e.*, the packages consumers encountered on store shelves).
Examples of some of these One A Day multivitamin products are shown in Figure 1:[113]

******************

---

[113] For additional examples of Bayer One A Day multivitamin products that do not display *any* challenged
claims on their labels, *see* DEF-0004007;  One A Day Women's VitaCraves Gummies - DEF-0004284;
One A Day-womens-prenatal-vitamin-with-dha-295-a.jpg;  Women's One A Day Active Mind and Body
DEF-0004041;  Women's One –A Aay Active Metabolism DEF-0004213;  Women's One A Day
Vitacraves gummies DEF-0004265;  Women's One A Day Vitacraves multi gummies DEF-0004284.
Other Bayer One A Day multivitamin products did not display *any* challenged claims on the front of the
package, but did display one or more challenged claims on a side panel; *see, e.g.*, Womens One A Day
Menopause Formula DEF-0004103, which displays the challenged heart health and physical energy
claims only on a side panel.

**Figure 1: Images of Bayer One A Day Multivitamin Products Without *Any* Challenged Packaging Claims as Encountered by Consumers in Stores During the Class Period**

 

******************

**Figure 1 (cont.): Images of Bayer One A Day Multivitamin Products Without *Any*
Challenged Packaging Claims as Encountered by Consumers in Stores During the Class
Period**

 

108.    The fact that during the Class Period multiple Bayer One A Day multivitamin products were sold without *any* challenged claims on their packaging makes it very difficult, if not impossible, for consumers to remember whether they bought a *disputed* (as opposed to an undisputed) One A Day product and to reliably self-identify into the putative class and subclasses.  Moreover, the existence of multiple One A Day multivitamin products that do *not* bear the challenged claims means that there is *no* common (or uniform) exposure to the challenged claims among the putative sub/class members.  This is another reason why the challenged claims are *not* material factors in influencing purchase decisions *commonly* across the putative class or subclass members.

109.    Consistent with academic research on memory limitations, as well with the

named Plaintiffs' deposition testimonies, it is extremely unlikely that consumers would be able to discern and accurately recall whether the specific package/s they bought displayed particular challenged claims.

110.    Moreover, some store brands that compete with Bayer sell multivitamin products with packaging that is similar to the disputed One A Day packages.  For example, Walgreens sells Walgreens One Daily Multivitamins for Women and Men. Examples of the Walgreens products next to Bayer's products are shown below in Figure 2a.  The women's package label for both products is orange, while the men's package label for both products is blue.

**Figure 2a: Images of Walgreens Multivitamin Products Sold During the Class Period with Packaging that is Similar to that of the Disputed Bayer One A Day Products**



111.    Additionally, the Walgreens store brand includes the packaging statement "One Daily," which resembles Bayer's "One A Day" brand name.  Further, the messaging on the Walgreens product packaging specifically asks consumers to compare it to Bayer's One A Day multivitamin products.  These Walgreens One Daily Multivitamin packages also depict such claims as "support[] energy metabolism" and "for heart health and immunity."  Thus, the Walgreens One Daily Multivitamin packages display some of the same challenged claims as the disputed Bayer's One A Day packages.

112.    CVS Health One Daily Men's and Women's multivitamin products provide additional examples of a store brand that competes with Bayer and sells multivitamin products with packaging that is similar to the disputed One A Day packages.  Examples of the CVS Health One Daily products next to Bayer's products are shown below in Figure 2b.

**Figure 2b: Images of CVS Health Multivitamin Products Sold During the Class Period With Packaging that is Similar to that of the Disputed Bayer One A Day Products**



113.    Additional examples of competitor store brand packages (and claims) that are similar to the challenged Bayer One A Day packaging and claims are shown below in Figure 2c:

******************

**Figure 2c: Images of Additional Competitor Multivitamin Products Sold During the Class Period with Packaging and Claims Similar to the Challenged Bayer One A Day Products and Claims**



\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**Figure 2c (continued): Images of Additional Competitor Multivitamin Products Sold During the Class Period with Packaging and Claims Similar to the Challenged Bayer One A Day Products and Claims**



114.    In addition to store brand competitors, some of Bayer's branded competitors sell multivitamin products in packaging that displays similar claims to the claims challenged in this litigation.  Examples of some of these competitor products with packaging claims that are similar to the claims being challenged by the Plaintiffs are shown below in Figure 3.  Such similarity in packaging claims further makes it difficult for the putative sub/class members to remember whether they purchased a disputed Bayer

One A Day product (with a challenged claim) or rather another (undisputed) competitor multivitamin that makes similar packaging claims.

**Figure 3: Images of Competitor Multivitamin Products Sold During the Class Period With Packaging Claims Similar to the Challenged Claims**



\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**Figure 3 (continued): Images of Competitor Multivitamin Products Sold During the Class Period With Packaging Claims Similar to the Challenged Claims**







115.    As discussed earlier, to reliably self-identify, the putative sub/class members have to accurately remember whether and when they bought Bayer One A Day products and -- if they do recall buying the One A Day products during the relevant Class Period (*i.e.*, 2010 to the present) -- whether the packages included specific challenged claims. Considering the variations in packaging before and during the Class Period, together with the limitations of human memory, my professional opinion is that the putative sub/class members would *not* be able to self-identify in a reliable and valid manner.

116.    It is noteworthy that research on human memory suggests that, in the present case, consumers are likely to erroneously self-identify themselves as sub/class members.  Specifically, research shows that memory errors ("false positives" or "false hits") occur when people are asked whether they recall seeing a *novel* stimulus that is associated with a different stimulus that they had previously encountered.[114]  Thus, consumers who had bought (*i*) a One A Day product that did *not* display any of the three challenged claims, (*ii*) a competitor product with highly similar packaging, and/or (*iii*) a competitor product that makes claims similar to the challenged claims are likely to mistakenly self-identify themselves as sub/class members.  Given the similarity between the multivitamin product they actually purchased and a One A Day product whose package is included under the sub/class definition (but which they did not purchase), such a memory error (or false hit) is highly likely.

117.    I reserve the right to supplement and/or revise my opinion and this declaration in response to any further information provided by the parties and/or in light of additional documents or testimony, which may be brought to my attention after the date of my signature below.

---

[114] G. Mazzoni and A. Scoboria (2008), "False Memories," *Handbook of Applied Cognition*, Second Edition (eds F. T. Durso, R. S. Nickerson, S. T. Dumais, S. Lewandowsky and T. J. Perfect), John Wiley & Sons Ltd, Chichester, UK.

I declare under penalty of perjury under the laws of the United Stated of America that the forgoing is true and correct.  Executed this 24th day of March 2017 in New York, NY.

_____

Dr. Ran Kivetz, Ph.D.