Pages 1 - 45

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE WILLIAM H. ORRICK

ILANA FARAR, ANDREA LOPEZ, and      )
ROSANNE COSGROVE, on behalf of      )
themselves and all others similarly )
situated,                           )
                                    )
                                    )
             Plaintiffs,            )
                                    )
   vs.                              ) No. C 14-4601 WHO
                                    )
BAYER AG, BAYER CORPORATION, and    )
BAYER HEALTHCARE LLC                )
                                    )
                                    ) San Francisco, California
             Defendants.            ) Tuesday
                                    ) January 23, 2019
_____) 9:00 a.m.

                    __TRANSCRIPT OF PROCEEDINGS__

**APPEARANCES**:

**For Plaintiffs:**        TILLOTSON LAW
                           1807 Ross Avenue
                           Suite 325
                           Dallas, Texas 75201
                   BY:  **JEFFREY MARK TILLOTSON, ESQ.**
                        **JONATHAN ROBERT PATTON, ESQ.**
                        **JAMES MEADOWS GOFF, ESQ.**




                           STANLEY LAW GROUP
                           10021 Willow Creek Road
                           Suite 200
                           San Diego, California 92131
                   BY:  **MATTHEW J. ZEVIN, ESQ.**

           **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**


*Reported By:*   **Debra L. Pas, CSR 11916, CRR, RMR, RPR**
                 *Official Reporter - US District Court*
                 *Computerized Transcription By Eclipse*

1    **APPEARANCES:   (CONTINUED)**

2

3    **For Defendants:**            WILKINSON WALSH + ESKOVITZ LLP
                                    11601 Wilshire Boulevard
                                    Suite 600
4                                   Los Angeles, California 90049
                             BY:   **SEAN ESKOVITZ, ESQ.**
5

6                                   WILKINSON WALSH + ESKOVITZ LLP
                                    2001 M Street, NW
7                                   10th Floor
                                    Washington, DC 20036
8                            BY:   **ALEXANDRA M. WALSH, ESQ.**
                                   **JAMES M. ROSENTHAL, ESQ.**
9                                   **KIERAN G. GOSTIN, ESQ.**

10                                        -   -   -

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

<u>**TUESDAY - JANUARY 22, 2019**</u>                              <u>**9:06 A.M.**</u>

<u>**P R O C E E D I N G S**</u>

**---000---**

THE CLERK:  We are here in Case No. 14-4610, Farar, et al versus Bayer.

Counsel, if you would, please come forward and state your appearance for the record.

MR. TILLOTSON:  Good morning, your Honor.  Jeff Tillotson.  I will be speaking on behalf of the plaintiffs.

MR. ESKOVITZ:  Good morning, Your Honor.  Sean Eskovitz on behalf of Bayer.

And with me, my partner Alex Walsh.

MS. WALSH:  Good morning, Your Honor.

MR. ESKOVITZ:  James Rosenthal and Kieran Gostin from my firm as well.

THE COURT:  Great.  Good morning, everybody.

Before I get going, does anybody have a notion as to what your materiality stipulation does to any of the motions that I'm about to give the tentative on?

MR. TILLOTSON:  We do.

THE COURT:  Well, come tell me, Mr. Tillotson.

MR. TILLOTSON:  Oh, thank you, Your Honor.

Well, first, we think it disposes of the motion to decertify, which is primarily an effort to attack materiality and/or reliance.

```
 1        Our view is once they stipulated to materiality, the
 2   presumption of reliance is now complete.  And of our claims,
 3   the way I've looked at it, four of them do not require
 4   reliance, but require proof of a reasonable consumer standard,
 5   which is proven by showing the representation as material,
 6   which we now have stipulated.  So we've established it for
 7   those four.
 8        The other three require proof of individual reliance,
 9   which we will put on at trial.  But for class-wide, all those
10   statutes in the case law allows presumption of reliance if you
11   can show the representation is material, which we have now
12   stipulated.  So it is established.
13        So we think it pretty much moots that issue.  It moots
14   some of the experts, in our mind.
15        And the real fight I think we have is they seem to think
16   despite that stipulation they can still contest reliance.  We
17   dispute that.  We also dispute how they can contest it.  They
18   seem to think they can do it in phase two by dressing it up as
19   a damages kind of analysis.  We think that is just attacking
20   the stipulation in another form, and we were -- as the Court
21   knows, when you make a stipulation, that fact is deemed
22   admitted.  You cannot really try to chip around at the edges of
23   that.
24        So anything that would tend to undercut the notion of
25   materiality we say is not permissible and not allowed.  So we
```

think it moots that and it moots that element for those claims.

           **THE COURT:**  Okay.

           **MR. TILLOTSON:**  Thank you, Your Honor.

           **MR. ROSENTHAL:**  James Rosenthal on behalf of Bayer.

    We obviously don't think it affects the decertification motion at all.  We think materiality and reliance are totally separate elements.

    We recognize that under California law, at least, materiality can create a presumption of reliance, but we cite cases where the presumption was then taken away not because the representation wasn't material, but because there was avenues that people didn't rely.  One looks at a hypothetical reasonable consumer, the other looks at an actual person and why they purchased.

    To us, the bigger impact on materiality is actually on the Motions in Limine where, if you read some of the avenues we're trying to exclude, plaintiffs' principal reason for trying to get the evidence in is that it goes to materiality.  And if materiality is stipulated to, then we think that they evidence shouldn't come in.  And that's obviously something we can discuss after the tentative.

    But we absolutely disagree that the decertification motion hinges on materiality.  We're not challenging materiality and decert.  We're focusing on reliance.

           **THE COURT:**  Okay.  All right.  That was really not

1    helpful then.

2        So now I'll just run through my tentative on the Motions

3    to Strike, Motion to Decertify and the Motions in Limine,

4    because they all relate fairly heavily it seems to me.

5        And one thing just at the outset so that I don't forget

6    it, there is an administrative motion to seal at docket 249.

7    Bayer hasn't provided a declaration with respect to that.

8    Maybe that's because there is no reason to seal it, but if

9    there is some reason to seal anything, file something within

10   two days.

11       All right.  For the Motions to Strike, I would grant in

12   part.  Both Martin and -- what's the correct pronunciation?

13           **MR. ROSENTHAL:**  Mathiowetz.

14           **THE COURT:**  Mathiowetz?

15           **MR. ROSENTHAL:**  Yes.

16           **THE COURT:**  Okay.  Martin and Mathiowetz were

17   disclosed on October 2nd as damages experts.  They can't

18   testify in phase one.

19       And then the next task I was trying to do was to separate

20   out materiality from damages opinions.  Mathiowetz has two

21   opinions from the consumer survey.

22       First, that a majority of people would purchase the

23   product after knowing that there is no heart health benefits

24   for a person who eats a balanced diet.  That question didn't

25   establish whether consumers realized they would get no benefit

1  whatsoever unless they had a diagnosed nutrient deficit, which

2  is plaintiffs' theory.  I'd strike that opinion.

3      The second opinion was 31.7 percent of people took

4  multivitamins at the recommendation of a doctor, nurse or

5  health professional, and I would allow that.

6      With respect to Martin, she may rebut plaintiffs' damages

7  calculations, but she can't testify about an insurance benefit

8  because she's not a health professional.  There is no

9  information on who would get an insurance benefit because they

10  are on the borderline for a nutrient deficiency, which I think

11  is the -- would be the purpose of having an insurance benefit.

12      The sales data analysis would go to materiality and not

13  damages.  And the statistical analysis is just simplistic and

14  it goes to materiality, not damages.

15      On the Motion to Decertify, I would deny it.  Given my

16  tentative on the Motions to Strike, the opinions on damages

17  don't impact my prior order.  It's too late for Bayer to rely

18  on the opinions as they go to materiality.  But if I did

19  consider the opinions, I wouldn't decertify.

20      If the named plaintiffs prove that the statements were

21  material to their purchase and for some laws that they relied

22  on the statements in phase one, then materiality will allow for

23  a presumption of reliance, I think, for the class.  In a no

24  value case the plaintiffs can prove materiality of

25  misrepresentations and no general use to the product.

1    The presumption of reliance is not rebutted by the

2    opinions which I've struck.   The securities cases under

3    10(b)(5) don't apply, and the consumer cases cited by Bayer are

4    factually inapposite.

5         Here the labels uniformly contained at least one of the

6    alleged misrepresentations, and the theory is that there is no

7    evidence that the statements are not false or that the truth

8    was, in fact, disclosed.

9         So on to the Motions in Limine.   Essentially I'm going to

10   be denying all of them and I'm going to give you some

11   explanation on both sides.

12        One and nine I would deny.   The examination will be

13   admissible as to bias, but for no other purpose.   Bayer may not

14   suggest any profit or monetary motive with respect to the named

15   plaintiffs, and I will provide a limiting instruction.

16        The second one I will deny -- I would deny.   Facts

17   regarding the purchases and use of One A Day after suit is okay

18   with respect to the named plaintiffs.

19        Number three, absent class members damages is a phase two

20   issue.

21        Four, parties agree on the distinction between phase one

22   and two.   Plaintiffs must show in phase two that products

23   provide no benefit or no nutritional benefit to a vast majority

24   of consumers.

25        Five, in phase two absent class members are entitled to a

1    presumption of reliance and Bayer can bring forward evidence of

2    value and advice of health professionals.

3          Six, I've already discussed the insurance benefit.  It

4    would need a health expert to speak to the issue.

5          Seven, Mathiowetz and Martin are phase two.

6          Experts, eight.  Bayer is -- denied.  Bayer is entitled to

7    cross on the named plaintiffs' use of other multivitamins.

8          Ten, with respect to the product benefits, it's okay to

9    show reliance if there is competent evidence.

10         Eleven, again, there needs a scientific basis for this.

11         And twelve, defendants may cross Blonz on his use of

12   multivitamins.

13         With respect to the defendants' Motions in Limine, again,

14   I would basically deny all of them, although I -- I will be

15   interested in arguments with respect to the materiality

16   stipulation with the first three Motions in Limine.

17         The 90 percent statement in number one, advertising, and

18   number two, and the marketing to different groups, as I

19   understood those, the plaintiffs' arguments, they were

20   primarily related to materiality.  There may be other reasons

21   that they would come in.  If they do come in, I would have a

22   limiting instruction, but I would like to hear the argument

23   there.  Of course, I would like to hear the argument on any

24   issue that you all want to make.

25         Number four, it's -- number four was just unclear to me

what the defendants wanted me to preclude, and I'll just

consider objections as they come up at trial.  I didn't see the

strength of that motion.

Number five, the plaintiffs are entitled to show the

purported harm of One A Days.

Number six, the plaintiffs can argue about lack of

substantiation.

Number seven, news articles are hearsay, but if they are

offered to show why Bayer publicized the challenged claims,

that would seem to be a non-hearsay use and it might be

admissible.

So that's the -- that's my summary of all of the motions

in front of me.  I think I will let the defendants argue first

on -- and deal with the Motions to Strike and Motion to

Decertify at one time.

And don't feel like you have to argue any of these things,

but...

**MR. ROSENTHAL:**  Good morning again, Your Honor.

James Rosenthal on behalf of Bayer.  And I understand I have an

uphill battle here and I will try to make this quick.

I want to raise two issues.  The first is when talking

about Dr. Mathiowetz and the survey question that she did on

reliance and whether people would have continued to purchase,

Your Honor said in the tentative that the problem was that it

did not test whether people got no benefit at all.  And I think

1    that's the wrong inquiry.

2        For any damages model and what she -- I mean, the damages

3    model here assumes universal reliance.  It is embedded in Mr.

4    Bergmark's report.  The reason why he thinks everybody gets a

5    full refund is he assumes in a but-for world, not in the

6    challenged claims, nobody would have purchased.  And the key to

7    that is in the but-for world -- is what is the but-for world.

8    In the but-for world is a world without the challenged claims

9    and that is it.

10       So the question is not did you get no benefit at all.  The

11   question is:  In a but-for world where Bayer had not said the

12   three things, heart health, energy and immunity, would the

13   person have continued to purchase.

14       Your Honor, in fact, at Page 18 of your class cert

15   opinion, and I know we quote to this so many times that

16   everyone in this room --

17           THE COURT:  When people do this to me, it always

18   makes me think, "I should have never said something like that."

19           MR. ROSENTHAL:  Your Honor was absolutely correct.

20   If you go back to *Comcast*, *Comcast* addresses the viability of a

21   damages model in a class action, which is what we have here.

22   And *Comcast* is crystal clear that the damages model has to link

23   to the theory of wrongful conduct and not anything else.

24       There are only three allegations of wrongful conduct in

25   this case as narrowly defined:  Heart health, energy and

```
 1   immunity.  So the question is not whether you got no benefit at
 2   all.  The question is whether those three statements impacted
 3   purchasing decisions.
 4        If you take -- take a hypothetical Joe Smith.  And Joe
 5   Smith in a but-for world would still have purchased the product
 6   because Joe Smith was concerned about, let's say, bone health.
 7   And it turns out after the fact you test Joe Smith's blood, Joe
 8   Smith did not get bone health benefit either.  That does not
 9   matter because bone health is not a challenged claim.
10        The test is had Bayer not had -- had Bayer not done the
11   things alleged to be deceptive would the person have continued
12   to purchase.  Which is precisely why Dr. Mathiowetz's survey is
13   written the way it is, because she is testing the underlying
14   assumption in Mr. Bergmark's report, which is the challenged
15   claims.
16            THE COURT:  But if you're over the hump on
17   reliance -- if the individual plaintiffs show that they are --
18   that there is reliance, then why -- if, in fact -- and I'm sure
19   Bayer wouldn't be arguing that its product is worthless, but if
20   the plaintiffs were able to show that, having gotten over that
21   materiality hump, there is just no benefit for having a
22   One A Day, why wouldn't the damages model work?
23            MR. ROSENTHAL:  That's not their claim though.  They
24   could have brought a claim which says these products have no
25   benefit at all, that everything Bayer said was fraudulent.  And
```

```
 1   they only alleged three fraudulent acts and they have to be
 2   confined to those three alleged fraudulent acts.  You cannot --
 3   I mean, the theory they were certified on was those three.
 4   They had actually other alleged misconduct that Your Honor
 5   threw out at class cert, and we'll hear about that later on the
 6   Motion in Limine.
 7        But the whole point of Comcast -- if you read Comcast, it
 8   says over and over and over again the theory of liability has
 9   to be expressly linked to the damages model and no more.  And
10   so to the extent you're bringing in other allegations that are
11   not the theory of liability, that model would fail under
12   Comcast.  For the model to work under Comcast, it has to be
13   specifically linked to those three challenged statements.
14            THE COURT:  Okay.  I understand your arguments.
15            MR. ROSENTHAL:  The one other thing I would say very
16   quickly and then I will sit down is I think materiality and
17   reliance is distinct.  There is a relationship that is -- I
18   mean, they both deal with why people purchase in general.  And
19   under California -- and I would disagree that this is the law
20   in New York or Florida, there is no question that under
21   California materiality blows up the presumption of reliance.  I
22   mean, if you think of the presumption as a balloon, materiality
23   is the air that gives you the balloon and while the balloon is
24   intact, plaintiffs are fine.  They don't need to do anything
25   else to prove reliance.
```

 1          But we do cite case after case where the defendant came

 2     with evidence that, in fact, some people didn't rely.  And if

 3     you look at those cases, in many instances it is clear that the

 4     representations were material.

 5          *Tucker*, to me, is a very good example.  In *Tucker* the

 6     allegation was that the cell phone company had made

 7     misrepresentations about the number of minutes that you were

 8     going to get, and as a result, consumers thought they were

 9     getting more cell phone minutes than they actually did.  The

10     Court never says that isn't material.  That clearly is

11     material.  I mean, any -- that's important information you're

12     going to want to know, how many cell phone minutes am I going

13     to get.

14          Nevertheless, the Court did not apply the presumption

15     because the evidence showed that some people were aware of how

16     the cell phone minutes were actually calculated and bought it

17     anyway.  And that goes not to materiality, but on the back end

18     that you could not presume that everyone relied, which is the

19     basis for our motion, which, obviously, Your Honor understands.

20     And we have a lot to do today.  I will gladly sit down now.

21          **THE COURT:**  Mr. Tillotson.

22          **MR. TILLOTSON:**  Briefly, Your Honor.

23          At a very superficial level I think the two issues are

24     phase one is about why people bought, which is reliance.  The

25     language he used is "impacting your decision."  And phase two

1    is about what benefit did you get from that purchase.

2        And they are attempting to have experts that essentially

3    mirror what their first expert did that the Court rejected in

4    phase two and dress it up as either causation or the purchase

5    decision.

6        But it's pretty clear if we put on evidence, as the Court

7    says, that the vast majority of class members got no benefit,

8    what we're really supporting is the restitution damages model.

9    The theory of liability is already established.  The jury has,

10    in effect, bought that.

11        The one thing I would ask the Court just in looking at is

12    the opinion regarding 31 percent -- 31.7 percent of consumers

13    took vitamins based upon a recommendation from a doctor.  We

14    don't see that as proof of a benefit.  We see that as proof of

15    why; that that's a reliance related issue.  You didn't buy it

16    because of the challenged claims.  You bought it because a

17    doctor told you to buy it.

18        And they don't offer in the expert report any opinion

19    testimony that that in itself is a value to a consumer.  Buying

20    a product your doctor tells you, even if the product is

21    worthless, gives you some value.  And, therefore, I would ask

22    the Court, as it looks at it, to at least reconsider that

23    issue.

24        It's very close to what the Court had talked about in the

25    damages phase, the offset notion, but the -- if our theory is

1   correct, which is you don't get any value from their product

2   unless you have a nutritional deficiency, the true offset

3   evidence is people who are buying it for that nutritional

4   deficiency, not people who are buying it because their doctor

5   told them, but getting no benefit otherwise.  So I would ask

6   the Court to at least look at in it that context.

7           **THE COURT:**  Yeah, but aren't you able to either

8   through cross examination of that witness or through your own

9   evidence present your own view on the materiality of the

10  31.7 percent?

11          **MR. TILLOTSON:**  Well, I feel that we will then be

12  tracing in phase two into the product buying decision, as

13  opposed to the benefit decision and confuse the jury.  What

14  their real goal is to figure out did people buy it because of

15  the challenged claims, which we've already decided in phase

16  one.

17          So if we're really -- I think so that the jury is not

18  confused when we talk about offsets, it's clear what we mean

19  and offsets means a recognized benefit from it.

20          Now, if the expert had said, look, people feel better and

21  there is a benefit to people from just doing what their doctor

22  says, even if the product itself is a placebo, for example,

23  then, you know, if they wanted to get that evidence in, I mean,

24  I don't know -- I think it would fit within the court.  But

25  this is just simply why people bought it.

1    This should have come in in phase one to rebut the notion

2    of reliance or materiality; that a big chunk of people are

3    buying it not because they are reading the label, but because

4    their doctor is telling them go get a multivitamin.  And so I

5    don't think it is true phase two evidence.

6        I'm always reminded on appeal whenever a Court of Appeals

7    justice says, "But I'm sure you had a great cross examination

8    of that expert."  So I think it's dangerous to let it in

9    because I think it could mislead the jury as to what we're

10   trying to do with respect to the offsets.

11       The only reason why I harp on it, as the Court may recall,

12   within the last hearing I have been very specific what's

13   permissible in phase two so we know, so we can be ready.  And

14   it's always been these recognized offsets of a benefit, not why

15   you bought it for.

16       So I would just ask the Court to reconsider in light of

17   that argument.

18            **THE COURT:**  Okay.

19            **MR. TILLOTSON:**  Thank you, Your Honor.

20            **THE COURT:**  Does anyone want to say anything about

21   the 31.7?  Mr. Rosenthal?

22            **MR. ESKOVITZ:**  We followed exactly what Your Honor

23   said in the trial plan, which is that if somebody is taking

24   multivitamins on behalf of a health professional's

25   recommendation, that's an indication they are getting a

```
 1   benefit.
 2       I mean, this is -- the key is the fact that you're being
 3   told to take a multivitamin by a health professional means you
 4   are getting a benefit.  So it relates directly to the offset
 5   and that's why we have it.
 6       I mean, if he has questions with the wording, he's
 7   obviously happy to -- we're happy to have him cross Dr.
 8   Mathiowetz about it, but it goes to the precise issue of
 9   whether you're getting a benefit.
10           THE COURT:  All right.  So let's go to the Motions in
11   Limine.  We'll start with the plaintiffs' motions.
12           MR. TILLOTSON:  Yes, Your Honor.
13       I don't think I have anything to add, Your Honor, from the
14   Court's rulings except one thing.  I want to make it clear, the
15   Motion in Limine about randomly asking people if they take a
16   One A Day or a multivitamin was designed to prevent anecdotal
17   evidence from coming in about people using it.
18       And so, yes, there is testimony about our expert using it
19   and, yes, he has a reason or explanation, but it was really
20   designed to avoid letting people judge this case based upon
21   their personal experience with vitamins and each witness
22   offering it.
23       I joked to opposing counsel in asking this one, I could
24   take a multivitamin every day of trial and report how I'm
25   feeling, if I've got more energy, you know, if my heart seems a
```

little better, and that would not be competent evidence of
anything, either benefit or no benefit.

So it was really designed to avoid gamesmanship of getting
in that particular part.  I would ask the Court to reconsider
that particular portion because if you're going to allow it,
then I just want to ask the Court, I can ask any witness if
they take a multivitamin, including Bayer people as well.

THE COURT:  I'm not sure you want to do that,
Mr. Tillotson.

MR. TILLOTSON:  I have my suspicions that I may be
safe in some of them.

I just want to make sure that that particular aspect,
anecdotal usage of vitamins, is free rein.  It's not just this
one guy that we're going to ask.

So I would ask the Court to either keep it all out,
otherwise it will all come in depending upon what we think or
what we know.

THE COURT:  It seems to me to be sort of an
interesting piece, certainly, for the named plaintiffs.  And
when you have an expert testifying, I think it's okay for the
defendants to take a shot at that.

MR. TILLOTSON:  I would liken it to an expert who
might testify that a Lexus LS230 was defectively designed in
connection with a particular crash.  And you ask him, does he
drive a Lexis.  And he says yes.  And you say, well, ah-hah,

 1  you must not believe your particular opinions in this case.

 2      I mean, that anecdotal evidence of usage is not really

 3  true impeachment evidence because there is a whole explanation

 4  or issue or it's not causally connected to his opinions.

 5      So I guess, really, all I'm asking for is I want to make

 6  sure I don't get in trouble and that we're not being viewed as

 7  playing games or being tricky if we take the same tactic.

 8          **THE COURT:**  I wouldn't accuse you of that.

 9          **MR. TILLOTSON:**  Thank you, Your Honor.

10      I don't really have any push-back on those.  We'll deal

11  with them as they come up, at least on ours.

12          **THE COURT:**  All right.  So how about -- is there

13  anything I said about the plaintiffs' motions that the

14  defendants wants to discuss?

15          **MR. ESKOVITZ:**  No, Your Honor.

16          **THE COURT:**  So let's go to the defendants' motions.

17          **MR. GOSTIN:**  Kieran Gostin for the defense.

18      Your Honor, I just want to make a couple points about

19  materiality, particularly with respect to our first Motion in

20  Limine, the 90 percent claim, because I do think that

21  plaintiffs' primary argument was that that evidence goes to

22  materiality, which has now been stipulated to.  And I don't see

23  any reason that evidence should come in for that reason.

24      I also want to just sort of emphasize something that we

25  did not emphasize as much, I think, in our brief as we should

```
1    have.  It's not just that the 90 percent claim was dismissed.
2    I think it's the reason that it was dismissed that is so
3    important.
4         Your Honor dismissed the 90 percent claim because it was
5    not made until January 2015 after all the class reps had
6    purchased.  Also, because it's 2015, these classes go back to
7    2010 and 2011.  So it's not just an issue of, you know, we
8    don't know which class members might have seen the 90 percent
9    claim.  We know definitively anybody who was making a purchase
10   before then would not have seen the 90 percent claim, which
11   really diminishes any potential relevance it could have.
12        Moreover, when the 90 percent claim was made, it was never
13   put on the box.  The 90 percent claim was only ever in print
14   advertising and in TV ads.  So there is really no way to know,
15   even after 2015, what percentage of people might have known.
16        So plaintiffs really want to focus on this 90 percent
17   claim, but, one, I think it could be very confusing for the
18   jury because they are supposed to be focusing on heart health
19   benefit, immunity and energy, and the 90 percent claim is a
20   totally separate claim.
21        It's also the case that just many, many people who made
22   purchases within this class could never have seen it.
23             THE COURT:  Okay.  Let's do this.  Let's take this on
24   in -- the first three in materiality, is what I'm interested
25   in.
```

1          **MR. ESKOVITZ:**  If I could just brief address the

2    second and the third, Your Honor, because Mr. Gostin spoke to

3    the first.

4          **THE COURT:**  Yes.

5          **MR. ESKOVITZ:**  The arguments are similar as the

6    Court, I think, alluded to.

7          With respect to the advertisements, the Court certified

8    the classes based on plaintiffs' claims with respect to those

9    three claims which were all on the package.  There is no

10   evidence that any kind of advertisements were seen by the

11   entire class, much less even the class representatives.  For

12   example, Ms. Cosgrove testified that she did not recall ever

13   seeing any of the advertisements.  There is no specificity as

14   to what any of the other class reps may have seen.

15         So I think plaintiffs' argument on the advertisements was

16   that it goes to materiality and that issue is now off the

17   table.  So without universal exposure, it really doesn't

18   have -- and certification on the basis of those advertisements,

19   it doesn't have any role in the trial from our perspective.

20         And similarly with respect to the evidence and targeting

21   of particular populations, just to be clear, we're not saying

22   that, you know, the jury can't hear that there are various

23   kinds of products for various subgroups of the consumer

24   population, like, men over 50 or, you know, women and different

25   products like that.  The plaintiffs, the named plaintiffs in

1    this class -- in these three classes all purchased the women's

2    product.   The Court certified again the claims based on those

3    three claims on all of the products.

4         So we don't think there is any legitimate basis on

5    which -- for plaintiffs to claim that the targeting is somehow

6    improper or that that's a claim that should be in the case.

7    And, again, if the argument is materiality, that's now off the

8    table.

9              THE COURT:  Okay.

10        Mr. Tillotson.

11             MR. TILLOTSON:  Yes, Your Honor.

12        First, for each of the three materiality or proof of

13   materiality was a component, but it's not the only component.

14        For the 90 percent, the defendants have not stated they

15   are not going to try and get into evidence that many Americans

16   don't get their RDA minimum.   In fact, they say in response to

17   our Motions in Limine that that's some of the evidence they are

18   going to get into.   We have objected to that.   We find it

19   curious that they want to put that in, but they don't want to

20   put the 90 percent in.

21        Here is the relevance of the 90 percent apart from

22   materiality and we tried to link this, but there was news,

23   advertisements that vitamins were worthless.   Internally Bayer

24   saw this as a threat to the brand.   They came up with a

25   90 percent.   They later had scientific push-back from it; that

1    they couldn't get the scientific approval and instead they

2    focused on the challenged claims.

3        The challenged claims were then focus group tested against

4    specific targeted people.  For example, they found men really

5    responded to the support's energy.  They found women responded

6    to the immune as well.

7        So one theory or theme we're going to push with the jury

8    is that Bayer didn't pick these challenged claims because they

9    were true.  They picked them because they sold vitamins and

10   they knew it.  And that's where the 90 percent comes in.

11       To the extent that they claim that somehow there is

12   justification or benefit because lots of people don't get RDA,

13   we intend on impeaching the witnesses that their claim that

14   they made about this was not true and they couldn't

15   substantiate really how many or what percentage of people, in

16   fact, were vitamin deficient and whether or not the vitamins

17   would help them given whatever levels of deficiency they were.

18   That's how we link the 90 percent and the targeted populations.

19           **THE COURT:**  Well, I just heard that the 90 percent

20   wasn't published until 2015.

21           **MR. TILLOTSON:**  But the focus group testing for that

22   and the targeted group goes back before that.  So we're not

23   going to claim that one of the plaintiffs saw the 90 percent

24   and, therefore, relied on it or was impacted, but we're going

25   to use it to show that Bayer specifically knew and targeted and

1  used the challenged claims to sell vitamins and not because of

2  the truth of the particular claims that they had.

3      And specifically when they claim that one thing they are

4  doing is that most Americans don't get their RDA, we want to be

5  able to impeach their witnesses that, in fact, internally they

6  had push-back on those particular types of claims.  So this

7  goes to show that.

8      So that's how the two claims relate.  We're not going to

9  assert that it is a reliance issue.  It's going to be linked to

10  Bayer and Bayer's conduct and what we have to prove with

11  respect to falsity.

12      With respect to the ads seen uniformly by the class, my

13  understanding that their argument regarding that was if I

14  couldn't show a named plaintiff saw an ad, I couldn't have it

15  as part of my case.  And I don't think that's a correct

16  statement of the law.  So long as I can show an ad is

17  substantially similar to what my plaintiffs saw, it could be

18  part of that.

19      Since we have a presumption of reliance, I'm not sure it

20  really matters to show that there was wide ads disseminated to

21  a wide group of people, but at the end of the day I don't want

22  them claiming somehow we didn't show a -- that class members

23  were impacted or affected by the challenged claims because we

24  didn't put on ads -- evidence of the TV ads or magazine ads

25  that other people besides our clients could have seen.  So, so

```
 1   long as the stipulation for materiality takes care of that
 2   issue, then I don't see us putting on TV ads or the like
 3   because I don't think we need them.
 4            THE COURT:  All right.  Well, you might want to add a
 5   sentence to your stipulation, if the defendants want to do
 6   that, and that would solve that problem.
 7            MR. TILLOTSON:  Thank you, Your Honor.
 8            THE COURT:  Anything else with the defendants'
 9   motions?
10            MR. GOSTIN:  Could I just say a couple more things
11   about the 90 percent evidence?
12            THE COURT:  Sure.
13            MR. GOSTIN:  I think two points, and I'll just make
14   them quickly because I don't want to waste too much of your
15   time.
16       Number one, as you mentioned, the 90 percent claims didn't
17   come out until 2015.  The heart health, immunity and energy
18   claims were made well before that.  So any idea it goes to why
19   those claims were made I think is not a very good link.
20       Number two, they still haven't pointed to any element of
21   their claim that they are trying to say that it goes to.  What
22   they are saying it goes to the reason that Bayer put the
23   statements out there, but that's materiality.  That's the
24   standard for materiality.  Did Bayer have a reason to think
25   people would care?  So without materiality, I still don't
```

1   think they have named an element of their claim that they are

2   really showing the 90 percent stuff goes to.

3            THE COURT:  Well, can you walk me through the

4   chronology?  Because I'm confused.

5        And, Mr. Tillotson, you may one to come up here, too, so

6   you can ping pong back and forth.

7        But the -- I understood Mr. Tillotson to say that even

8   though the claim wasn't -- the 90 percent claim wasn't made

9   until 2015, it was somehow earlier responsible for the

10  development of the three challenged claims.  Is there evidence

11  to that or have I just misunderstood what the facts are?

12           MR. GOSTIN:  Your Honor, so the 90 percent claim did

13  start getting focus -- focus group before it came out in 2015.

14  I think it was late 2013 or 2014 they started focus grouping

15  it.  But even before then -- I mean, this class goes back to

16  2010, 2011, before that focus group.  The heart health,

17  immunity and energy claims were still being made then and

18  before that.

19           THE COURT:  Mr. Tillotson.

20           MR. TILLOTSON:  I don't disagree in general with that

21  being the chronology.  The challenged claims have been around

22  for awhile.  The exact date when they came into the iteration

23  that we're suing on is unclear from the witnesses' testimony.

24       But the -- there is a substantial amount of documentation

25  starting back as early as late 2011 or 2012 regarding this

issue about the public seems to be thinking vitamins are
worthless.  What do we do about this?  And that's where you
start to see the focus group testing.  How do we convince
people you need vitamins?  How do we sell them?

     And so our point is that evidence is materially relevant
to the issue of why they did this, which doesn't go to
materiality.  It's going to go to the element of falsity and
whether or not they are trying to mislead people in how they
did this.  But that's our relevance to it.

          THE COURT:  Okay.  I think I've got this issue.
Thank you.

          MR. GOSTIN:  Thank you.

          THE COURT:  Is there any other issue on the
defendants' Motions in Limine that anybody wanted to raise?

          MS. WALSH:  No thank you, Your Honor.

          THE COURT:  All right.  Anything else from the
plaintiffs with respect to those Motions in Limine?

          MR. TILLOTSON:  No, Your Honor.

          THE COURT:  Great.  Okay.  So let's go to the trial
schedule.

     I will get an order out relatively quickly.  Probably on
the Motions in Limine, I'll do it in either the minute order or
shortly thereafter from here, and I'll think about the
arguments that were made, and the other motions soon enough.

     Okay.  So, trial schedule.  The -- I am firmly of the

1  belief that this case is going -- that we're not going to be

2  derailed by the shutdown and that this case is going to go to

3  trial.  And it's been waiting long enough and it is time.

4      So we are going to pick -- I want to pick the jury on

5  February 15th and commence the trial on the 19th.  So unless

6  somebody screams, and I didn't hear any screams, we're going to

7  do that on the 15th.  I've got another trial that is starting

8  on February 4th that will be running up until about the 15th

9  and I've got two more that are set on March 4th.  So I'm going

10  to be picking a jury on March 4th in those cases, which may or

11  may not impact this case, but we'll talk about that in just a

12  second.  So anyway, I want to get a jump on the schedule.

13      I don't know what the materiality stipulation ultimately

14  will -- how that will affect the amount of time that the

15  parties need, but I am strongly inclined -- unless I get severe

16  push-back, and I'd have to really see it -- to limit phase one

17  to 12 hours per side, which would put us with a likely argument

18  on phase one on February 26th.  We'll have a Jury Instruction

19  conference for phase one on February 22nd after the trial day

20  is over.

21      My inclination is to have Blumberg and Blonz give their

22  full testimony in phase one.

23      Phase two, I would limit to five hours.  In each of these

24  opening and closing is included.  No more than 30 minutes to

25  open and no more than an hour to close for each phase.

 1        So that's my -- that's how I'm seeing the timing of the

 2    trial.

 3        Mr. Tillotson, do you have any comments with respect to

 4    that?

 5            **MR. TILLOTSON:**  No, Your Honor.  I think 12 hours

 6    will work for us, the way I see our case given the stipulation.

 7    And five hours is certainly sufficient for phase two.

 8            **THE COURT:**  Okay.

 9            **MS. WALSH:**  Your Honor, the same is true for us.

10        May I ask one quick clarifying question?  Which is the 12

11    hours per side, how exactly is that calculated?

12            **THE COURT:**  Carefully and to the minute.

13            **MS. WALSH:**  Yes, I'm sure.

14            **THE COURT:**  It's one of my favorite things to do in

15    trials.  So it's whenever the -- whenever you've got control of

16    the podium, the time is assessed against you.  So while you're

17    cross examining, the time is assessed against you.

18            **MS. WALSH:**  Understood.

19            **THE COURT:**  I hate sidebars, but I usually allow --

20    although I discourage them, when somebody says, "I need a

21    sidebar," I usually trust them, but then I'm also very happy to

22    assess time against the losing side on the sidebars.

23            **MS. WALSH:**  Understood.  Okay.

24            **THE COURT:**  That's how it works.

25            **MS. WALSH:**  The one other thing I would say is we

 1  heard your guidance about timing for closing, which I think

 2  should be fine.  If for any reason the parties agree that it

 3  might be helpful to the jury to have a little bit longer, could

 4  we revisit that with you?

 5          **THE COURT:**  Yeah.  Any time that the lawyers agree

 6  that something that we've set out could be improved, I am very

 7  happy to listen to it.

 8          **MS. WALSH:**  Okay.  Thank you.

 9          **THE COURT:**  As long as it stays within the time

10  parameters.

11          **MS. WALSH:**  Short closing is always better, in my

12  view anyway.

13      And the one final question, which Mr. Tillotson and I have

14  talked about a little bit, is jury selection and if we can get

15  any guidance from Your Honor about how you like to run that.

16          **THE COURT:**  Yes.  So we'll have about 32 members of

17  the panel.  They will come in and there will be a row of seats

18  in front of the jury box.  So there will be 21 people there,

19  and the rest will be on the bench.  They will come in in --

20  mixed.  So that you need to focus on jurors number one through

21  nine, is what I'm thinking that we'll start with.  Have nine

22  jurors.

23      We'll have at least three peremptories, obviously.  And if

24  there are -- if we don't have too many people that need to be

25  excused for cause and hardship, I'll give you each an extra

 1   peremptory.

 2        I will have them introduce themselves and I'll conduct the

 3   voir dire.  The questions that the parties have posed generally

 4   are ones that I will be asking and I'll file the ground for

 5   you.  I'll give each of you about 15 minutes to follow up on

 6   anything that needs to be followed up.  And just to save this

 7   question, which I had in a pretrial conference yesterday for

 8   the case -- or Friday for the case that's going on the 4th,

 9   it's not 15 minutes per juror.

10        (Laughter.)

11             THE COURT:  So that will happen.

12             MS. WALSH:  Okay.

13             THE COURT:  And then after that's over, we'll meet

14   and discuss cause and hardship.  I'll let people go.  I won't

15   refill the box so that you'll know who people are.  They will

16   just stay in their assigned seats.  And then we'll -- you'll

17   pass a paper back and forth to do the peremptories.

18             MS. WALSH:  Okay.

19             MR. TILLOTSON:  I'm sorry.  So for cause should be

20   brought up at the end of the proceeding, not -- so if someone

21   says something that is obviously for cause, we don't approach

22   you then and there at sidebar.  We wait.

23             THE COURT:  Exactly.  Right.  I make people sit

24   through -- it's sort of embarrassing to have individuals

25   excused and -- unless it's somebody who is just -- I have had a

couple of occasions where somebody is just sort of wiging out

being in the room and I will let them go.  But otherwise they

stay.

        **MS. WALSH:**  Okay.

        **THE COURT:**  Okay?

        **MS. WALSH:**  Thank you, Your Honor.

        **MR. TILLOTSON:**  The 12 hours includes whatever time

for opening and closing?

        **THE COURT:**  Yes, but not voir dire.

        **MR. TILLOTSON:**  Thank you, Your Honor.

        **THE COURT:**  Let's see.  Okay.  So on to the Jury

Instructions.  I'm going to give you the preliminaries, and I

haven't gone to the substantive phase one ones yet.

    So generally I follow the Ninth Circuit model instructions

whenever possible.  So with your number 1, the one thing that I

will add is the term "implicit biases" towards the end.

    I think you've probably seen, in addition to the regular

introduction to being a juror video, we now have a video on

implicit bias that everybody will see before they come down.

And you can see a copy of that, I think it's on our website.

    We'll move your number 2 to the end of the preliminary

instructions.

    I don't intend to give 3, 11 or 16.

    Your number 6, I would go with the similarly situated

language in the class action.

1      I would use plaintiffs' 10 and revise 15.  Let me get to

2  it...

3      (Brief pause.)

4          **THE COURT:**  With 15 I would say:

5          "There will be two phases to this trial.  The

6      first phase considers whether defendants are liable

7      for plaintiffs' claims and the second phase concerns

8      damages."  And leave it at that.

9      And then I'll use the Ninth Circuit model instruction

10  instead of 18.

11     Does anybody have any concerns about that?

12         **MR. TILLOTSON:**  Plaintiff does not Your Honor.

13         **THE COURT:**  All right.

14         **MS. WALSH:**  That's fine, Your Honor.

15         **THE COURT:**  Okay.  Moving on.  I have a few

16  peculiarities which I want to make sure you are aware of.

17     First, I don't want any lawyer to get closer to the jurors

18  than the edge of the table there when you're conducting

19  examination or making arguments.  I want you to give the --

20  give the jury some space.

21     And don't yell at them either.  Some people don't know how

22  to try cases and they yell at the jury and it makes them

23  uncomfortable.

24     And I do like -- I like people to be generally tethered to

25  the podium, which -- as long as you're within an arm's length,

 1    that's okay.  But I prefer that.

 2        I don't like speaking objections.  Sometimes I need

 3    further information, and I'll ask for it when I do, but

 4    otherwise just make the objection and I'll rule.

 5        I've told you what I think will sidebars.

 6        We need, I think, unless I missed it, which I could have,

 7    a verdict form for phase one.  Do we have something?

 8            MS. WALSH:  We have submitted one, Your Honor.

 9            THE COURT:  Okay.  I just missed it when I was going

10    through things.

11            MS. WALSH:  Exhibits 6 and 7.

12            THE COURT:  Did you have -- were you disagreeing on

13    them?

14            MS. WALSH:  Yes.

15            MR. TILLOTSON:  Yes, Your Honor.  Although, if I may,

16    obviously this was done before the parties reached their

17    stipulation on materiality.  So the instructions and the

18    verdict form don't take that into account at all.

19            MS. WALSH:  Your Honor --

20            THE COURT:  I apologize for not looking at it.  So

21    tell me -- so, I was just distracted, Mr. Tillotson.  Would you

22    say what you just said again?

23            MR. TILLOTSON:  I'm sorry, Your Honor.  The Jury

24    Instructions and the verdict form were done before we had a

25    stipulation on materiality.  So there is a lot of verbiage in

```
 1   ours, and some in theirs, about that particular aspect or issue

 2   in the instructions that presumably will come out on it.

 3   So there -- and we did not submit because we didn't reach a

 4   stipulation or didn't have it until last night effectively.

 5   There was no time.

 6              THE COURT:  Okay.

 7              MR. TILLOTSON:  We checked all that.  So I want to

 8   alert the Court.  You will see stuff in there that is overdone,

 9   but it was before all this.

10              THE COURT:  Okay.  So may I suggest that you get back

11   to it and maybe a week before trial resubmit instructions that

12   you think --

13              MS. WALSH:  Your Honor, Mr. Tillotson and I have been

14   talking a lot over the last couple days to try to get closer

15   to -- we may not reach 100 percent agreement, but to try to

16   come closer to agreement and, you know, submit something that

17   should work for both sides.

18              THE COURT:  Okay.  Great.

19              MR. TILLOTSON:  Yes, Your Honor.

20              THE COURT:  I assume, however, even though you seem

21   to be working well on all of these procedural issues, that

22   there is no point in getting you back in front of someone to

23   try to resolve the case?

24              MS. WALSH:  That's right, Your Honor.

25              MR. TILLOTSON:  I've given them my cell phone number.
```

```
 1   It remains completely silent.  But whatever we can try, we'll

 2   try.  Nothing today.

 3            THE COURT:  I'm fairly confident that I'm going to

 4   see you here on the 15th and we'll have this trial, which I

 5   think is going to be really interesting.

 6        What other things should we talk about?

 7            MS. WALSH:  Your Honor --

 8            THE COURT:  Come on up.

 9            MS. WALSH:  Sorry.

10        So last night we submitted one additional proposed Jury

11   Instruction.

12            THE COURT:  I saw that.

13            MS. WALSH:  And that Jury Instruction was prompted by

14   the Ninth Circuit's recent decision in, I believe it's

15   Dachauer.  Dachauer?

16            THE COURT:  Right, right.

17            MS. WALSH:  Which, as set forth in our papers, we

18   think articulates in a very helpful way how and based on what

19   proof a plaintiff may challenge a structure function claim

20   under state law and how a plaintiff must prove falsity in order

21   to avoid the return of a verdict that is preempted by federal

22   law.  And so the verdict -- the instruction that we have

23   submitted -- I'm happy to hand up a copy --

24            THE COURT:  I looked at it this morning.

25            MS. WALSH:  Okay.  That is -- that was the impetus.
```

```
 1  The Ninth Circuit's decision, we have been studying it closely
 2  and we feel at a minimum it would require this instruction and
 3  we are, you know, considering continuing to look at it.
 4            THE COURT:  Okay.
 5            MS. WALSH:  I wanted to let you know that.
 6            THE COURT:  Okay.
 7       Mr. Tillotson?  I saw that -- there is a lengthy response.
 8  I saw that -- the case when it came out.  I haven't studied it
 9  to the degree that I'm sure everybody else has, but I will.
10            MR. TILLOTSON:  Yes, Your Honor.
11            THE COURT:  You know, while you're here, is there any
12  substantive instruction that you disagree on that you really
13  need to have an answer to before the case gets going?
14            MS. WALSH:  I would think this one that we've just
15  submitted.
16            MR. TILLOTSON:  If the jury is going to be instructed
17  that to determine falsity all they need to figure out is
18  whether or not vitamins have any effect on a body function,
19  that would be material because that's not a theory we're
20  proceeding under nor do we think that's the law.  But that
21  would be material.
22       The rest of it, our primary disagreement is not really on
23  the law.  It's the format by which we would tell the jury.
24  They want the jury to go through the key elements and say "yes"
25  or "nay" and then see what happens.  We think the jury needs to
```

 1  focus on the claims.  Even though we admit there is some

 2  overlap in the claims, there are some variances that we think

 3  matter.

 4      So that's an approach part, not necessarily a substantive

 5  law part.

 6          THE COURT:  Okay.  So you're really talking about the

 7  instruction that you just submitted you would like to get an

 8  answer on, if you could.

 9          MS. WALSH:  Yes, yes.

10      And I think, as Mr. Tillotson says, the overall approach

11  to the instructions and what we've attempted to do is to

12  propose instructions on the elements that apply across the

13  claims.  And in some cases there are -- you know, some of the

14  claims, you know, have an element.  One has an element that the

15  other doesn't have.

16      To the extent that they overlap, we have proposed

17  instructions that we believe give the jury the proper law, say,

18  for falsity under each of the relevant statutes.  And rather

19  than confront the jury with statute after statute after statute

20  to, you know, help streamline the instructions that they are

21  given and avoid confusion.

22      But I assume that will -- obviously, it will be up to Your

23  Honor whatever works best.

24          THE COURT:  I did see that when I breezed through the

25  instructions, but that really does seem to be -- go to the form

```
 1   more than the substantive of the --
 2            MS. WALSH:  I think that's right, Your Honor.
 3            MR. TILLOTSON:  The plaintiffs with the three classes
 4   are just concerned that one class doesn't take on proof of an
 5   element that's not required under their particular state law
 6   claim.  So that's where it came.
 7       But we don't disagree on what those elements are.  We just
 8   disagree on what's the best way to tell the jury.
 9            THE COURT:  All right.  So besides all of that, is
10   there anything else that we ought to talk about while we're
11   here?
12       (Brief pause.)
13            MS. WALSH:  I'm being told the answer is no.  I just
14   wanted to make sure.
15            MR. TILLOTSON:  Okay.  So we've worked out some other
16   issues that we have an agreement on, so we don't need to raise
17   them with the Court.
18            THE COURT:  All right.  So on the 15th of February at
19   8:30 come on back and the jury will be gathering then.  We can
20   take up any issues that we need to take up prior to trial at
21   that point.  If you need something between now and then,
22   contact Ms. Davis, but I will be in trial, so...
23            MR. TILLOTSON:  I just thought of one.
24            MS. WALSH:  I just thought of one, too.  Might be the
25   same one.
```

1          MR. TILLOTSON:  We asserted for one of the state law

2    claims -- and Florida allows us to seek punitive damages -- it

3    was pled for not.  It was pled for in the wrong claim within

4    the Florida claims, but part of the relief.  And they have

5    objected to us.

6         And I think we probably need to know that because it may

7    impact voir dire and impact Jury Instruction.  Even though it's

8    a damages issue, we would want to at least be able to address

9    it or consider addressing it up front.

10         And if the Court decides, no, you're not -- you didn't

11    plead it properly, you didn't raise it.  I understand it was

12    not part of the overall certification process and the trial

13    plan, but it is in there and we were reluctant to give it up

14    without at least raising it with the Court on behalf of the

15    class.

16         So that would be, I think, something we would need to

17    know.

18          THE COURT:  Okay.  Is that something that is -- I

19    remember seeing something about this, but has it been briefed?

20          MR. TILLOTSON:  Other than --

21          THE COURT:  Just mentioned in the pretrial --

22          MR. TILLOTSON:  Just mentioned in the pretrial order

23    is all it was.

24          MR. ROSENTHAL:  What I will say about that, the

25    procedural whether plaintiffs have raised it or not has been

 1   briefed.  Our position is that they haven't pursued punitive

 2   damages in this case until the submission of the pretrial

 3   statement and we think at this point punitive damages is gone.

 4       The separate question of whether they can get punitive

 5   damages in a class action with this, because they never raised

 6   it in the class cert or the trial, that has not been briefed at

 7   all.

 8            THE COURT:  And what's the answer to that question?

 9   No.

10            MR. ROSENTHAL:  I mean, honestly, Courts are all over

11   the place on that.  There are some Courts that say punitive

12   damages cannot be litigated in a class action at all.  There

13   are some that say entitlement can, amount can't.  It depends

14   sometimes on the circumstances of the case.

15       My point -- and it's also a fundamental question of

16   whether the conduct at issue here, which is -- I mean, if you

17   accept what they are saying, we sold people a $10 product that

18   they didn't need.  I mean, that's their theory, whether that

19   could even give rise to punitive damages in the first place.

20       And our more foundational point is we're a month from

21   trial.  If they had wanted to pursue punitive damages, there

22   was a number of times in which they had an obligation to come

23   forward and say, "We want to pursue punitive damages."  We

24   would have had an opportunity to brief all this and it's just

25   simply too late.

1          THE COURT:  Okay.

2          MR. TILLOTSON:  Well, it is not the flag at the front

3    of our army charging.

4          THE COURT:  I'm hearing that in your voice.

5          MR. TILLOTSON:  Right.  But it is -- I think the

6    Florida class is entitled to it if we put on that evidence and

7    the jury thinks that it is something to award.

8          There is at least one competing group of cases that say

9    since you can't go around punishing a defendant for the same

10   conduct from a bunch of people, if you have the whole group of

11   people there, it's at least sensible which way to do it.

12         So whether or not on a class basis it can be done and what

13   the instruction you would give the jury is an issue we can

14   confront.

15         The first issue is they have this procedural argument,

16   well, you never really raised it.  You never told us.  You

17   didn't put it in the class certification motion.  And I want to

18   be up front, I agree.  That was not part of it.

19         I don't really know how to litigate punitive damages

20   except to say we think we're entitled to them.  And here we

21   are.  And so we put it in as part of the relief we're seeking.

22         THE COURT:  So was this basically a forgotten issue?

23   And the -- that you're now -- as you're coming close to trial,

24   you think, oh, my goodness, here it is.

25         MR. TILLOTSON:  Well, you know, when a plaintiff

1    finds punitive damages in their desk drawer, they pull it out.

2            **THE COURT:** Right.  That's what I'm asking.

3            **MR. TILLOTSON:** I think in all fairness to the

4    parties, I don't think it was a major issue in terms of, like,

5    driving the certification; that you should deny certification

6    because they are seeking punitive damages.  And it didn't

7    appear to be contemplated by either party in the trial plan.

8    Because I think they were focused on how to bifurcate and the

9    nuances are what the Court required.

10        So I don't think they just didn't -- you know, people --

11   plaintiffs just didn't care.  It just didn't really fit with

12   any components the Court was having the parties consider.

13        But it is pled for.  And if we put on evidence of that

14   conduct, which I think would come in the phase two, the jury

15   would be entitled, if we met the standard under Florida law, to

16   determine whether or not to assess it on behalf of the class.

17   And the Court could instruct that it is punitive damages for

18   that member of the class for that conduct.  And then how you

19   distribute that, if the jury awarded it, would come in

20   phase three for that particular class.

21        So I don't want to minimize it.  It's important.  And I

22   don't want to give up the right of that subclass without at

23   least a fight.  And I think it's a little -- it's a little

24   strenuous to say we didn't really litigate this because I don't

25   know how you litigate punitive damages to prove to them we

1  really want it, except to say we're pleading for it and we

2  either have the evidence or don't at the time of trial on it.

3  So that helps explain kind of our background.

4     **THE COURT:**  All right.  So I'll look at that.

5     **MR. TILLOTSON:**  Thank you, Your Honor.

6     **THE COURT:**  And let you know about that.

7     **MR. TILLOTSON:**  Thank you.

8     **MR. ROSENTHAL:**  Thank you.

9     **MR. ESKOVITZ:**  There is one more thing I just wanted

10  to put on the Court's radar.  It's not ripe for a resolution

11  yet.

12    But we were served at the end of last week with a -- what

13  purports to be a trial subpoena.  It looks more like a 30(b)6

14  notice for a corporate representative on various topics.  We

15  told plaintiffs' counsel we intend to move to quash the

16  subpoena.

17    So I just wanted to put that on the Court's radar.  We

18  think the subpoena is improper for a variety of reasons.

19     **THE COURT:**  Okay.  Well, sooner is better than later.

20     **MR. ESKOVITZ:**  Understood.

21     **THE COURT:**  All right.  Well, thank you all.  I think

22  we're pretty well on the road.  I'll look forward to seeing you

23  on the 15th.

24    (Proceedings adjourned.)

25

## CERTIFICATE OF OFFICIAL REPORTER

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

_____

Debra L. Pas, CSR 11916, CRR, RMR, RPR

Wednesday, January 23, 2019